# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

(1)    GORDON ERNST,
(2)    DONNA HEINEL,
(6)    MIKAELA SANFORD,
(9)    NIKI WILLIAMS,
(10)  WILLIAM FERGUSON,
(11)  JORGE SALCEDO, and
(12)  JOVAN VAVIC,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Criminal No. 19-10081-IT

Violations:

<u>Count 1</u>: Racketeering Conspiracy
(18 U.S.C. § 1962(d))

<u>Count 2</u>: Conspiracy to Commit
Mail and Wire Fraud and Honest
Services Mail and Wire Fraud
(18 U.S.C. § 1349)

<u>Counts 3-5</u>: Conspiracy to Commit Federal
Programs Bribery
(18 U.S.C. § 371)

<u>Count 6</u>: Federal Programs Bribery
(18 U.S.C. § 666(a)(1)(B))

<u>Counts 7-18</u>: Wire Fraud and Honest Services
Wire Fraud; Aiding and Abetting
(18 U.S.C. §§ 1343, 1346 and 2)

<u>Counts 19-21</u>: Mail Fraud and Honest Services
Mail Fraud; Aiding and Abetting
(18 U.S.C. §§ 1341, 1346 and 2)

<u>Count 22</u>: Money Laundering; Aiding and
Abetting
(18 U.S.C. §§ 1957 and 2)

<u>Forfeiture Allegations</u>:
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. §
2461)

<u>Racketeering Forfeiture Allegations</u>:
(18 U.S.C. § 1963)

<u>Money Laundering Forfeiture Allegation</u>:
(18 U.S.C. § 982(a)(1))

## SUPERSEDING INDICTMENT

At all times relevant to this Superseding Indictment:

### General Allegations

1.     Defendant GORDON ERNST ("ERNST") was a resident of Chevy Chase, Maryland and Falmouth, Massachusetts.   Until January 2018, ERNST was employed as the head coach of men's and women's tennis at Georgetown University ("Georgetown").   In that capacity, ERNST owed a duty of honest and faithful services to Georgetown.

2.     Defendant DONNA HEINEL ("HEINEL") was a resident of Long Beach, California. HEINEL was employed as the senior associate athletic director at the University of Southern California ("USC").   In that capacity, HEINEL owed a duty of honest and faithful services to USC.

3.     Defendant MIKAELA SANFORD ("SANFORD") was a resident of Sacramento, California.   SANFORD was employed in various capacities for the Edge College & Career Network, LLC and the Key Worldwide Foundation, in Newport Beach, California.

4.     Defendant NIKI WILLIAMS ("WILLIAMS") was a resident of Houston, Texas. WILLIAMS was employed as an assistant teacher at a public high school in Houston. WILLIAMS also served as a compensated standardized test administrator for the College Board and ACT, Inc. ("ACT").   In those capacities, WILLIAMS owed a duty of honest and faithful services to the College Board and ACT, respectively.

5.     Defendant WILLIAM FERGUSON ("FERGUSON") was a resident of Winston-Salem, North Carolina.   FERGUSON was employed as the women's volleyball coach at Wake Forest University ("Wake Forest").   In that capacity, FERGUSON owed a duty of honest and faithful services to Wake Forest.

2

6. Defendant JORGE SALCEDO ("SALCEDO") was a resident of Los Angeles, California. SALCEDO was employed as the head coach of men's soccer at the University of California at Los Angeles ("UCLA"). In that capacity, SALCEDO owed a duty of honest and faithful services to UCLA.

7. Defendant JOVAN VAVIC ("VAVIC") was a resident of Rancho Palos Verdes, California. VAVIC was employed as the water polo coach at USC. In that capacity, VAVIC owed a duty of honest and faithful services to USC.

8. Martin Fox ("Fox") was a resident of Houston, Texas. Fox was employed as the president of a private tennis academy and camp in Houston.

9. Ali Khosroshahin ("Khosroshahin") was a resident of Fountain Valley, California. Until November 8, 2013, Khosroshahin was employed as the head coach of women's soccer at USC. In that capacity, Khosroshahin owed a duty of honest and faithful services to USC.

10. Laura Janke ("Janke") was a resident of North Hollywood, California. Until January 10, 2014, Janke was employed as an assistant coach of women's soccer at USC. In that capacity, Janke owed a duty of honest and faithful services to USC. Janke reported to Khosroshahin until his departure from USC.

11. Igor Dvorskiy ("Dvorskiy") was a resident of Sherman Oaks, California. Dvorskiy was employed as the director of a private elementary and high school located in Los Angeles, California. Dvorskiy also served as a compensated standardized test administrator for the College Board and ACT. In those capacities, Dvorskiy owed a duty of honest and faithful services to the College Board and ACT, respectively.

3

12.     Steven Masera ("Masera") was a resident of Folsom, California. Until December 2017, Masera was employed as an accountant and financial officer for the Edge College & Career Network, LLC and the Key Worldwide Foundation, in Newport Beach, California.

13.     Mark Riddell ("Riddell") was a resident of Palmetto, Florida. Riddell was employed at relevant times as the director of college entrance exam preparation at a private college preparatory school and sports academy in Bradenton, Florida.

14.     William "Rick" Singer ("Singer") was a resident, variously, of Sacramento and Newport Beach, California. Singer founded and, together with others, operated the Edge College & Career Network, LLC and the Key Worldwide Foundation.

### The Enterprise

15.     The Edge College & Career Network, LLC, also known as "The Key," was a for-profit college counseling and preparation business in Newport Beach, California, founded by Singer in or about 2007 and incorporated in the State of California in or about 2012.

16.     The Key Worldwide Foundation ("KWF") was a non-profit corporation in Newport Beach, California that Singer established as a purported charity in or about 2012. In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal Revenue Code, meaning that KWF was exempt from paying federal income tax. KWF maintained several bank accounts (collectively, the "KWF charitable accounts").

17.     Together, The Key and KWF constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4) (the "Key Enterprise"), that is, an association in fact of entities engaged in, and the activities of which affected, interstate and foreign commerce. The

4

Key Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

Other Relevant Entities

18.     ACT is a non-profit organization headquartered in Iowa City, Iowa that administers the ACT exam, a standardized test that is widely used as part of the college admissions process in the United States.

19.     The College Board is a non-profit organization headquartered in New York, New York. Together with Educational Testing Service ("ETS"), a non-profit organization headquartered in Lawrence Township, New Jersey, the College Board develops and administers the SAT, a standardized test that, like the ACT exam, is widely used as part of the college admissions process in the United States.   The College Board and ETS (together, "College Board") also develop and administer SAT subject tests, which are also used as part of the college admissions process.

20.     Georgetown is a highly selective private university located in Washington, D.C. Georgetown annually receives federal benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

21.     UCLA is a highly selective public university located in Los Angeles, California. UCLA annually receives federal benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

22.     USC is a highly selective private university located in Los Angeles, California. USC annually receives federal benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

23.     Wake Forest is a highly selective private university located in Winston-Salem, North Carolina. Wake Forest annually receives federal benefits in excess of $10,000 under Federal programs involving grants, contracts, subsidies and other forms of Federal assistance.

24.     The athletic teams of Georgetown, UCLA, USC, and Wake Forest (collectively, "the Universities") compete in most sports at the Division I level, the highest level of intercollegiate athletics sanctioned by the National Collegiate Athletic Association ("NCAA").

25.     The Universities are commercial enterprises that, among other things, charge tuition for their services.

### Background on Standardized Testing and the College Admissions Process

26.     Most selective colleges in the United States require students to take a standardized test, such as the ACT or the SAT, as part of the admissions process.

27.     The ACT includes sections on English, mathematics, reading and science.

28.     The SAT includes sections on writing, critical reading and mathematics.

29.     The ACT and the SAT are typically administered to large groups of students on specified dates and under strict time limits. In some instances, however, students with certain learning or other disabilities may qualify for extended time and, in such circumstances, may take the test alone, under the supervision of a test administrator retained by ACT or the College Board.

30.     Prior to administering the ACT, test administrators must typically certify that they will administer the test in accordance with the ACT Administration Manual, and will ensure that the "test materials are kept secure and confidential, used for this examinee only, and returned to ACT immediately after testing."

31.     Similarly, prior to administering the SAT, test administrators must typically certify that they will administer the test in accordance with the SAT coordinator's manual, that the SAT

6

is the property of the College Board, and that no one other than the student can "open a test book and see the test content."

32.     The ACT tests are sent to and from the testing sites via Federal Express, a private, interstate commercial carrier.

33.     The SAT tests are sent to and from the testing sites via United Parcel Service ("UPS"), a private, interstate commercial carrier.

34.     Most of the Universities require prospective students to submit standardized test scores as part of their application packages.  When submitted, standardized test scores are a material part of the admissions process at each of the Universities.

35.     All of the Universities recruit student athletes, and typically apply different criteria when evaluating applications from students with demonstrated athletic abilities.  Recruited student athletes at USC, for example, are typically considered by a designated admissions sub-committee, which gives significant consideration to their athletic abilities and which frequently admits applicants whose grades and standardized test scores are below those of other USC students, including non-recruited athletes.  The admissions offices at the Universities typically allot a set number of slots to each varsity head coach for that coach's recruited athletes.  At each of the Universities, the admissions prospects of recruited athletes are higher—and in some cases significantly higher—than those of non-recruited athletes with similar grades and standardized test scores.

## Purposes of the Racketeering Conspiracy

36.    The principal purposes of the racketeering conspiracy included the following:

a.    to facilitate cheating on college entrance exams;

b.    to facilitate the admission of students to elite universities as recruited athletes, with little or no regard for their athletic abilities;

c.    to enrich the defendants and Singer personally; and

d.    to provide additional funds for designated accounts associated with university athletic programs controlled by the defendants.

## Manner and Means of the Racketeering Conspiracy

37.    Among the manner and means by which the defendants, Singer, and coconspirators known and unknown to the Grand Jury carried out the racketeering conspiracy were the following:

a.    facilitating cheating on the ACT and SAT exams in exchange for bribes by arranging for or allowing a third party—generally Riddell—to secretly take the exams in place of the actual students, or to replace the students' exam responses with his own;

b.    taking high school and college classes on behalf of students, and then submitting that coursework to the Universities and other colleges as if the student had taken the classes themselves;

c.    designating applicants as purported recruits for competitive college athletic teams, with little or no regard for the applicants' athletic abilities, in exchange for bribes;

d.    recruiting additional college and university athletic coaches and administrators to participate in the conspiracy by designating applicants as purported recruits for competitive college athletic teams in exchange for bribes; and,

8

e. concealing the nature and source of the bribe payments by funneling payments through the KWF charitable accounts.

<u>Acts in Furtherance of the Racketeering Conspiracy</u>

38. On various dates between 2007 and February 2019, the defendants, Singer, and coconspirators known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the racketeering conspiracy:

A. <u>Cheating on Standardized Tests</u>

39. Singer agreed with clients whose children were scheduled to take the SAT or ACT exams as part of the college admissions process to have Riddell either take the tests in their children's place or correct the children's answers after they had completed the tests.

40. Parents generally paid Singer between $15,000 and $75,000 per test, typically structuring the payments as purported donations to KWF that they wired or deposited into one of the KWF charitable accounts.

41. To facilitate the cheating, Singer counseled parents to seek extended time on the exams, including by having their children purport to have learning disabilities in order to obtain medical documentation that ACT and the College Board typically required before granting students extended time.

42. Singer used the purported charitable donations from parents, at least in part, to bribe Dvorskiy, who administered the SAT and ACT exams at the private school in Los Angeles, California where he worked, and WILLIAMS, who administered the exams at the public high school in Houston, Texas where she worked.

43. At Singer's direction, Masera sent the bribe payments to Dvorskiy—typically $10,000 per student—from one of the KWF charitable accounts.

44.     Singer initially funneled the bribe payments to WILLIAMS through Fox, who paid WILLIAMS in cash, but in July 2018, Singer sent WILLIAMS a $5,000 check directly.

45.     In exchange for the bribe payments, Dvorskiy and WILLIAMS allowed Riddell to secretly take the ACT and SAT tests in place of the children of Singer's clients, or to replace the children's exam responses with his own, in violation of the duty of honest services they owed to ACT and the College Board.

46.     At Singer's direction, Masera sent Riddell payments of approximately $10,000 per test, usually from one of the KWF charitable accounts.

47.     Dvorskiy and WILLIAMS caused the falsified exams to be returned to ACT and the College Board via Federal Express and UPS, respectively, so that they could be scored.

48.     Singer's clients and/or their children then submitted these fraudulently obtained SAT and ACT scores to colleges and universities nationwide. As an example, on or about November 21, 2016, an applicant to Boston College, in the District of Massachusetts, caused her fraudulent ACT score—obtained after WILLIAMS accepted a bribe to permit Riddell to correct the student's answers—to be submitted to the college via wire communication in interstate commerce.

B.      The Student-Athlete Recruitment Scam

49.     Parents paid Singer approximately $25 million over the period 2011 through February 2019 to bribe coaches and university administrators to designate their children as recruited athletes, and as part of other favored admissions categories, in violation of the duty of honest services the coaches and administrators owed to their employers, thereby facilitating the children's admission to the Universities.

50.     In some instances, SANFORD and Janke helped fabricate athletic "profiles" and other documents to bolster the students' college applications by making them appear to be highly successful high school athletes when in fact they were not.

51.     SANFORD also took online classes in place of certain students so that the students could submit the grades SANFORD earned in their names as part of their application packages. As one example, in or about the summer of 2017, SANFORD completed online classes for the daughter of one of Singer's clients. On or about August 23, 2017, SANFORD requested that the student's high school send her transcript—which reflected courses actually completed by SANFORD—to Boston University, in the District of Massachusetts.

    i. <u>USC</u>

52.     Singer similarly bribed VAVIC, Janke, Khosroshahin, HEINEL and others at USC to designate students as recruited athletes. VAVIC, Janke, Khosroshahin, HEINEL and others at USC accepted these bribes in violation of the duty of honest services they owed to USC.

53.     For example, Singer directed payments totaling approximately $350,000 to a private soccer club controlled by Janke and Khosroshahin.

54.     In exchange for these payments, Janke and Khosroshahin designated four children of Singer's clients as recruits for the USC women's soccer team, despite the fact that none of those children played competitive soccer.

55.     Likewise, Singer and co-conspirators made payments totaling $250,000 to a bank account at USC that funded VAVIC's water polo team.

56.     In exchange for these payments, VAVIC designated two students as recruits for the water polo team, thereby facilitating the students' admission to USC.

57.     Singer also made private school tuition payments for VAVIC's children—under the guise of a fabricated scholarship—via checks drawn on one of the KWF charitable accounts and sent to the school via U.S. Mail, in exchange for VAVIC's commitment to designate Singer's clients as recruits for the USC water polo team in the future.

58.     In a telephone call with Singer on or about January 3, 2019, VAVIC confirmed this agreement to recruit the children of Singer's clients to the USC water polo team, and thereby to facilitate their admission to USC, in exchange for the school tuition payments Singer made for VAVIC's children.

59.     On multiple occasions between 2014 and 2018, Singer's clients made payments of more than $1.3 million to USC accounts controlled by HEINEL, typically an account for the USC Women's Athletic Board.  Singer's clients paid between $50,000 and $100,000 per student by check sent to HEINEL, typically via U.S. Mail or a private, interstate commercial carrier.

60.     Singer also entered into a sham consulting agreement with HEINEL, pursuant to which, beginning in July 2018, he directed payments of $20,000 per month to HEINEL personally via checks drawn on one of the KWF charitable accounts and sent to HEINEL via U.S. Mail.

61.     HEINEL and Singer discussed this arrangement in a call on or about October 24, 2018, during which HEINEL told Singer that he was "up to date" with his monthly payments, and that she would submit her next invoice on November 1, 2018.

62.     On or about January 3, 2019, Singer mailed a $20,000 payment, from the District of Massachusetts, to HEINEL in California.

63.     In exchange for the bribe payments, HEINEL helped facilitate the admission of more than two dozen students as recruited athletes, even though many of those students had

fabricated athletic credentials and some did not even play the sports they were purportedly being recruited to play.

64.    For example, in or about September 2016, HEINEL agreed with Singer to facilitate the purported recruitment of a student ("USC Applicant 1") to the USC women's crew team even though the applicant had no prior crew experience.

65.    On or about September 20, 2016, Singer sent an email to Janke attaching the transcript and test scores of USC Applicant 1.  Singer wrote:  "For [USC Applicant 1]- to be a coxswain at USC going through Donna [HEINEL].  A profile needs to be completed.  Picture coming."

66.    In a subsequent email exchange, Singer provided Janke with a falsified list of regattas to include on USC Applicant 1's profile.

67.    On or about October 5, 2016, Singer sent USC Applicant 1's profile, transcripts and scores to HEINEL.   The profile included a picture of USC Applicant 1 on a rowing ergometer.

68.    On or about October 7, 2016, Singer reported back to Janke that HEINEL wanted a photo of USC Applicant 1 in a "boat" and asked Janke to find examples online where it is "tough to see the face."

69.    Janke provided Singer with a number of different options—none of which depicted USC Applicant 1—one of which Singer sent to HEINEL.

70.    On or about October 27, 2016, the USC athletic admissions subcommittee granted USC Applicant 1 conditional acceptance to USC, pursuant to which she would be admitted to the university on the condition that she met certain requirements, including that she register with the NCAA and meet all NCAA eligibility requirements.

71. On or about October 29, 2016, Singer sent an email to the father of USC Applicant 1 instructing him to mail a $50,000 check, payable to USC Athletics, to HEINEL at her office address.

72. HEINEL received the check on or about November 2, 2016.

73. On or about March 30, 2017, Masera sent an email to the parents of USC Applicant 1 attaching an invoice in the amount of $200,000 for their purported "pledge" to KWF.

74. On or about April 10, 2017, the parents of USC Applicant 1 wired $200,000 into one of the KWF charitable accounts.

75. Thereafter, HEINEL agreed with Singer to facilitate the purported recruitment of another student ("USC Applicant 2") to the USC women's crew team even though the applicant also had no prior crew experience.

76. At HEINEL's request, Singer directed the parents of USC Applicant 2 to make a donation of $50,000 to an athletic department account at USC that HEINEL controlled.

77. In or about December 2017—after USC Applicant 2 was conditionally admitted to USC as a purported recruit for the women's crew team—HEINEL received a $50,000 check from the parents of USC Applicant 2, payable to an athletic department account that HEINEL controlled.

78. On or about February 6, 2018, the parents of USC Applicant 2 caused $200,000 to be wired into one of the KWF charitable accounts.

79. HEINEL also agreed with Singer to facilitate the purported recruitment of another student ("USC Applicant 3") to USC's women's water polo team even though the applicant was not a competitive water polo player.

80. On or about September 21, 2018, HEINEL sent Singer an email, via wire communication in interstate commerce, asking for a more detailed explanation of USC Applicant 3's high school grades.

81. On or about October 25, 2018, HEINEL emailed Singer, via wire communication in interstate commerce, to ask why USC Applicant 3 had an incomplete on her high school transcript.

82. That same day, HEINEL told Singer on a telephone call that she would simply "white out" the incomplete on the transcript before presenting USC Applicant 3 to the USC athletic admissions subcommittee.

83. HEINEL further agreed with Singer to facilitate the purported recruitment of another student ("USC Applicant 4") to the USC women's volleyball team, even though the applicant was not a competitive volleyball player.

84. In a telephone call on or about October 5, 2018, HEINEL told Singer that, although USC Applicant 4 and the child of another Singer client were being admitted to USC as purported athletic recruits, she wanted to make sure "that doesn't get out."

85. In a telephone call on or about October 31, 2018, HEINEL told Singer, in substance, that USC Applicant 4's parents should direct their bribe payment to the "USC Women's Athletic Board," which she noted would go "directly" to her.

        iii.    <u>Georgetown</u>

86. Between 2007 and 2018, Singer paid ERNST bribes, falsely labeled as "consulting" fees, totaling more than $2.7 million. Singer typically made the payments from one of the KWF charitable accounts and sent them to ERNST via U.S. Mail, including on one instance in June

15

2018, when Singer caused a $100,000 check to be mailed to ERNST's residence in Falmouth, Massachusetts. Singer's clients also paid bribes directly to ERNST.

87.     In exchange for the bribes, ERNST designated at least 12 applicants as recruits for the Georgetown tennis team, including some who did not play tennis competitively, thereby facilitating their admission to Georgetown.

88.     As an example, the daughter of one of Singer's clients ("Georgetown Applicant 1") applied to Georgetown in or about November 2008. The application included numerous false claims about Georgetown Applicant 1's purported tennis achievements, including the claim that Georgetown Applicant 1 was ranked "at the top" of her "age bracket in Japan."

89.     In or about December 2008, Georgetown Applicant 1 received a "likely letter" from Georgetown, indicating that Georgetown had reviewed her application at the direction of ERNST and that as a result, she now had a "greater than 95% chance" of admission to Georgetown.

90.     In or about March 2009, the father of Georgetown Applicant 1 caused two checks, totaling $75,000, to be mailed directly to ERNST in Maryland.

91.     In or about April 2009, after Georgetown Applicant 1 was formally admitted to Georgetown, her father caused an additional $75,000 to be mailed directly to ERNST.

92.     As another example, on or about August 19, 2015, at Singer's instruction, the son of one of Singer's clients ("Georgetown Applicant 2") forwarded to ERNST an email Singer had drafted on his behalf. The email contained falsified information concerning Georgetown Applicant 2's purported tennis abilities. In fact, Georgetown Applicant 2 did not play competitive tennis.

93.     ERNST forwarded the email to a Georgetown admissions officer.

94. On or about August 21, 2015, ERNST, while in the District of Massachusetts, sent an email via wire communication in interstate commerce to the same admissions officer to "confirm my usage of three spots" ERNST had been allocated for student admissions to Georgetown, as part of the tennis recruitment process.

95. ERNST allocated all three spots to the children of Singer's clients, including Georgetown Applicant 2, despite the fact that none of them played competitive tennis.

96. On or about April 22, 2016, Masera sent an email to the parents of Georgetown Applicant 2 attaching an invoice in the amount of $400,000 for their purported "private contribution" to KWF.

97. On or about April 28, 2016, the parents of Georgetown Applicant 2 caused $400,000 to be sent to one of the KWF charitable accounts.

98. Between approximately September 11, 2015 and August 29, 2016, ERNST received checks totaling $700,000 from one of the KWF charitable accounts.

   iv. UCLA

99. In or about 2016, Singer agreed with the parents of an applicant to UCLA ("UCLA Applicant 1") to use bribes to facilitate their daughter's admission to UCLA as a purported soccer recruit, even though she did not play competitive soccer.

100. On or about May 20, 2016, Khosroshahin, on Singer's direction, forwarded UCLA Applicant 1's falsified soccer profile to SALCEDO.

101. On or about May 24, 2016, the parents of UCLA Applicant 1 emailed Singer their daughter's high school transcript and standardized test scores.

102. Singer forwarded the transcript and test scores to SALCEDO, who then, on or about June 6, 2016, forwarded them to a UCLA women's soccer coach.

103.    On or about June 29, 2016, the UCLA Student-Athlete Admissions Committee approved UCLA Applicant 1 for "provisional student-athlete admission," pursuant to which she would be admitted to the university on the condition that she met certain requirements, including that she successfully completed her senior year of high school and participated on the UCLA team as a student-athlete for a minimum of one full academic year.

104.    On or about July 6, 2016, SALCEDO emailed Singer that UCLA Applicant 1 had been provisionally admitted to the university as a student-athlete.

105.    On or about July 7, 2016, Singer directed a payment of $100,000 from one of the KWF charitable accounts to a sports marketing company SALCEDO controlled.

106.    On or about July 8, 2016, Masera emailed a $250,000 invoice to the mother of UCLA Applicant 1. The invoice stated: "Private Contribution – Letter of receipt will be provided upon payment."

107.    On or about July 11, 2016, the father of UCLA Applicant 1 emailed Singer asking him to confirm in writing that the $250,000 would be returned in the event his daughter did not receive final admission to UCLA.

108.    Singer replied that he would return the money in the event UCLA Applicant 1 did not receive final admission to UCLA.

109.    On or about July 15, 2016, the parents of UCLA Applicant 1 donated 2,150 shares of Facebook, Inc. stock to KWF as a purported charitable contribution.

110.    On or about July 18, 2016, Singer mailed Khosroshahin a check for $25,000, drawn on one of the KWF charitable accounts.

111.    On or about July 21, 2016, Masera sent the parents of UCLA Applicant 1 a letter, signed by Singer, acknowledging their purported charitable contribution to KWF of $251,159.

The letter stated: "Your generosity will allow us to move forward with our plans to provide educational and self-enrichment programs to disadvantaged youth."

112.    As yet another example, on or about October 24, 2018, Singer mailed SALCEDO a check for $100,000, drawn on one of the KWF charitable accounts.

113.    In exchange for that bribe, SALCEDO designated the son of another one of Singer's clients ("UCLA Applicant 2") as a recruit to the UCLA men's soccer team, thereby facilitating his admission to UCLA, despite the fact that the student did not play competitive soccer.

114.    Following UCLA Applicant 2's admission to UCLA, Singer paid Khosroshahin an additional $25,000 for facilitating the transaction.

115.    In a telephone call on or about November 30, 2018, Singer told SALCEDO that he had another applicant who was "not, uh, a real soccer player," and asked whether he could do the "same deal" as before, pursuant to which SALCEDO would purport to recruit the student to the UCLA soccer team in exchange for a payment of $100,000.  SALCEDO agreed, telling Singer "we got to do it soon for next fall because we are expediting the process real really, uh, early for next year."

        v.    Wake Forest

116.    In or about 2017, Singer caused $100,000 to be sent from one of the KWF charitable accounts to FERGUSON, comprised of a $10,000 check to the Wake Forest Deacon Club, a $40,000 check to Wake Forest Women's Volleyball, and a $50,000 check to a private volleyball camp FERGUSON controlled.

117.    In exchange for this money, FERGUSON agreed to designate the daughter of one of Singer's client—who had previously applied to Wake Forest and been placed on the wait list— as a recruit to the women's volleyball team, thereby facilitating her admission to the university.

## The Fraud Conspiracy

118.    From in or about 2007 through in or about February 2019, the defendants conspired with others known and unknown to the Grand Jury to use bribery and other forms of fraud to facilitate the admission of Singer's clients to selective colleges and universities in the District of Massachusetts and elsewhere.

## Objects and Purposes of the Fraud Conspiracy

119.    The principal objects of the fraud conspiracy were to commit mail and wire fraud, and honest services mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346. The principal purposes of the conspiracy were to facilitate the admission of applicants to colleges and universities and to enrich the defendants and Singer personally.

## Manner and Means of the Fraud Conspiracy

120.    Among the manner and means by which the defendants and coconspirators known and unknown to the Grand Jury carried out the fraud conspiracy were the following:

    a.    Paying Riddell or another third party to pose as an ACT or SAT exam proctor, or as a student taking the exam, so that Riddell could secretly provide students with answers during the exam, replace the students' exam responses with his own, or take the exam in place of the students;

    b.    Bribing exam administrators Dvorskiy and WILLIAMS to permit Riddell's cheating;

    c.    Submitting the fraudulently obtained ACT and SAT scores as part of the college admissions process, including to colleges and universities in the District of Massachusetts;

d. Having a third party take classes in place of the actual students, with the understanding that grades earned in those classes would be submitted as part of the students' college applications;

e. Submitting falsified applications for admission to universities in the District of Massachusetts and elsewhere that, among other things, included the fraudulently obtained exam scores and class grades;

f. Bribing university athletic coaches and administrators to designate applicants as purported athletic recruits, and as members of other favored admissions categories, with little or no regard for the applicants' athletic abilities and, in some cases, even though the applicants did not play the sport they were purportedly recruited to play;

g. Fabricating athletic "profiles" containing falsified athletic credentials—including fake honors the students purportedly received, elite athletic teams they purportedly played on, and staged photographs of the students purportedly engaged in athletic activities—to submit in support of the students' college applications;

h. Concealing the fraud in order to prevent the Universities and standardized testing entities from revoking the students' admission, expelling them, or invalidating their exam scores; and

i. Recruiting other athletic coaches and university administrators to participate in the fraud and bribery scheme.

## Acts in Furtherance of the Fraud Conspiracy

121. On various dates from in or about 2007 through in or about February 2019, the defendants and coconspirators known and unknown to the Grand Jury committed and caused to be

committed the acts set forth in paragraphs 38 through 117, among others, in furtherance of the fraud conspiracy.

The USC Federal Programs Bribery Conspiracy

122. From in or about 2007 through in or about February 2019, HEINEL, being an agent of USC, conspired with Singer and others known and unknown to the Grand Jury to solicit and accept bribes in exchange for securing the admission of applicants to USC as purported athletic recruits.

Objects and Purposes of the USC Federal Programs Bribery Conspiracy

123. The principal object of the USC bribery conspiracy was to commit federal programs bribery, in violation of Title 18, United States Code, Section 666(a)(1)(B). The principal purposes of the conspiracy were (1) to facilitate the admission of applicants to USC; (2) to enrich HEINEL personally; and (3) to secure additional funding for designated accounts HEINEL controlled at USC.

Manner and Means of the USC Federal Programs Bribery Conspiracy

124. Among the manner and means by which HEINEL and coconspirators known and unknown to the Grand Jury carried out the USC federal programs bribery conspiracy were the following:

a. Soliciting and accepting bribes in exchange for designating applicants as purported athletic recruits, and as members of other favored admissions categories, with little or no regard for the applicants' athletic abilities and, in some cases, even though the applicants did not play the sport they were purportedly recruited to play;

b. Fabricating athletic "profiles" containing falsified athletic credentials— including fake honors the students purportedly received, elite athletic teams they purportedly

played on, and staged photographs of the students purportedly engaged in athletic activities—to submit in support of the students' USC applications; and,

      c.     Concealing the bribes and other falsities to prevent USC from revoking the students' admission or expelling them.

Overt Acts of the USC Federal Programs Bribery Conspiracy

125.    On various dates from in or about 2007 through in or about February 2019, HEINEL and coconspirators known and unknown to the Grand Jury committed and caused to be committed the overt acts set forth in paragraphs 52 through 85, among others, in furtherance of the USC federal programs bribery conspiracy.

The Georgetown Federal Programs Bribery Conspiracy

126.    From in or about 2007 through in or about July 2018, ERNST, being an agent of Georgetown, conspired with Singer and others known and unknown to the Grand Jury to solicit and accept bribes in exchange for securing the admission of applicants to Georgetown as purported tennis recruits.

Objects and Purposes of the Georgetown Federal Programs Bribery Conspiracy

127.    The principal object of the Georgetown bribery conspiracy was to commit federal programs bribery, in violation of Title 18, United States Code, Section 666(a)(1)(B). The principal purposes of the conspiracy were (1) to facilitate the admission of applicants to Georgetown; and (2) to enrich ERNST personally.

Manner and Means of the Georgetown Federal Programs Bribery Conspiracy

128.    Among the manner and means by which ERNST, Singer and coconspirators known and unknown to the Grand Jury carried out the Georgetown bribery conspiracy were the following:

a. Accepting and soliciting bribes in exchange for designating applicants as purported tennis recruits, with little or no regard for their tennis abilities;

b. Fabricating athletic credentials—including fake honors the students purportedly received and tournaments the students played in—to submit in support of the students' Georgetown applications; and,

c. Concealing the bribery and fraud to prevent Georgetown from revoking the students' admission or expelling them.

Overt Acts of the Georgetown Federal Programs Bribery Conspiracy

129. On various dates from in or about 2007 through in or about February 2019, ERNST, Singer and coconspirators known and unknown to the Grand Jury committed and caused to be committed the overt acts set forth in paragraphs 86 through 98, among others, in furtherance of the Georgetown federal programs bribery conspiracy.

The UCLA Federal Programs Bribery Conspiracy

130. From in or about 2016 through in or about 2019, SALCEDO, being an agent of UCLA, conspired with Singer and others known and unknown to the Grand Jury to solicit and accept bribes in exchange for securing the admission of applicants to UCLA as purported soccer recruits.

Objects and Purposes of the UCLA Federal Programs Bribery Conspiracy

131. The principal object of the UCLA bribery conspiracy was to commit federal programs bribery, in violation of Title 18, United States Code, Section 666(a)(1)(B). The principal purposes of the conspiracy were (1) to secure the admission of applicants to UCLA; and (2) to enrich SALCEDO personally.

132. Among the manner and means by which SALCEDO, Singer and coconspirators known and unknown to the Grand Jury carried out the UCLA bribery conspiracy were the following:

a. Soliciting and accepting bribes in exchange for designating applicants as purported soccer recruits, with little or no regard for their soccer abilities;

b. Fabricating soccer credentials to submit in support of the students' UCLA applications; and,

c. Concealing the bribes to prevent UCLA from revoking the students' admission or expelling them.

Overt Acts of the UCLA Federal Programs Bribery Conspiracy

133. On various dates from in or about 2016 through in or about 2019, SALCEDO, Singer and coconspirators known and unknown to the Grand Jury committed and caused to be committed the overt acts set forth in paragraphs 99 through 115, among others, in furtherance of the federal programs bribery conspiracy.

Georgetown Applicant 3 Federal Programs Bribery

134. In or about the summer of 2017, ERNST, being an agent and employee of Georgetown, met with the father of Georgetown Applicant 3 in the District of Massachusetts and elsewhere and solicited a bribe of approximately $220,000 in exchange for designating Georgetown Applicant 3 as a purported recruit to the Georgetown tennis team, and thereby facilitating Georgetown Applicant 3's admission to Georgetown.

135. On or about August 31, 2017, the father of Georgetown Applicant 3 paid ERNST $25,000 by check as partial payment of the approximately $220,000 bribe.

136. On or about September 16, 2017, the father of Georgetown Applicant 3 paid ERNST an additional $25,000 by check as further partial payment of the bribe.

137. In the fall of 2017, the father of Georgetown Applicant 3 paid ERNST approximately $60,000 in cash in multiple installments as additional partial payments of the bribe.

138. In or about November 2017, ERNST sent an email to a Georgetown admissions officer listing Georgetown Applicant 3 as one of "[his] recruits so far" and requesting that "likely letters" be sent to his designated recruits, including Georgetown Applicant 3.

139. On or about February 28, 2018, as a result of ERNST's email, Georgetown sent Georgetown Applicant 3 a letter by United States mail noting that the Committee on Admissions had conducted an initial review of Georgetown Applicant 3's application to the Class of 2022 and had rated Georgetown Applicant 3's admission as "likely." The letter explained that candidates rated "likely" have a greater than 95 percent chance of being admitted to Georgetown and that Georgetown Applicant 3 would receive a final decision by April 1, 2018.

140. In or about the summer of 2018, after Georgetown Applicant 3 was formally admitted to Georgetown, the father of Georgetown Applicant 3 sent ERNST two checks by UPS. The first check, in the amount of $34,955, was made payable to a high school in Bethesda, Maryland, and was for school tuition fees for ERNST's older daughter. The second check, in the amount of $10,580, was made payable to a primary school in Washington D.C. and was for school tuition fees for ERNST's younger daughter. Both payments constituted additional partial payments of the bribe.

141. In or about July 2018, the father of Georgetown Applicant 3 gave ERNST a large quantity of cash as additional partial payment for the bribe.

142.     On or about August 25, 2018, the father of Georgetown Applicant 3 paid ERNST an additional $25,000 by check as partial payment for the bribe.

Racketeering Conspiracy
(18 U.S.C. § 1962(d))

The Grand Jury charges:

143.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-117 of this Superseding Indictment.

144.    From in or about 2007, and continuing through February 2019, in the District of Massachusetts, and elsewhere, the defendants,

> (1) GORDON ERNST,
> (2) DONNA HEINEL,
> (6) MIKAELA SANFORD,
> (9) NIKI WILLIAMS,
> (10) WILLIAM FERGUSON,
> (11) JORGE SALCEDO, and
> (12) JOVAN VAVIC,

being persons associated with or employed by The Key Enterprise, an enterprise engaged in, and the activities of which affected interstate and foreign commerce, conspired with others known and unknown to the Grand Jury to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and (5); consisting of multiple acts indictable under:

    a.  Title 18, United States Code, Section 1341 (relating to mail fraud);

    b.  Title 18, United States Code, Sections 1341 and 1346 (relating to honest services mail fraud);

    c.  Title 18, United States Code, Section 1343 (relating to wire fraud);

    d.  Title 18, United States Code, Sections 1343 and 1346 (relating to honest services wire fraud); and

    e.  Title 18, United States Code, Section 1956 (relating to the laundering of monetary instruments).

145. It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO
### Conspiracy to Commit Mail and Wire Fraud
### and Honest Services Mail and Wire Fraud
### (18 U.S.C. § 1349)

The Grand Jury further charges:

146.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-121 of this Superseding Indictment.

147.     From in or about 2007 through in or about February 2019, in the District of Massachusetts, and elsewhere, the defendants,

     (1)    GORDON ERNST,
     (2)    DONNA HEINEL,
     (6)    MIKAELA SANFORD,
     (9)    NIKI WILLIAMS,
    (10)   WILLIAM FERGUSON,
    (11)   JORGE SALCEDO, and,
    (12)   JOVAN VAVIC,

conspired with others known and unknown to the Grand Jury to commit the following offenses:

a. mail fraud and honest services mail fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property, to wit, ACT and SAT tests and test scores, and admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive, variously, ACT, Inc., the College Board, and the Universities of their right to the honest and faithful services of their test administrators, athletic coaches and university administrators, through bribes and kickbacks, did, for the purpose of executing and attempting to execute the scheme, deposit and cause to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier, in violation of Title 18, United States Code, Sections 1341 and 1346; and,

b.  wire fraud and honest services wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property to wit, ACT and SAT tests and test scores, and admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive, variously, ACT, Inc., the College Board, and the Universities, of their right to the honest and faithful services of their test administrators, athletic coaches and university administrators, through bribes and kickbacks, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

All in violation of Title 18, United States Code, Section 1349.

## COUNT THREE
### Conspiracy to Commit Federal Programs Bribery
(18 U.S.C. § 371)

The Grand Jury further charges:

148.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-117 and 122-125 of this Superseding Indictment.

149.     From in or about 2014 through in or about February 2019, in the District of Massachusetts, and elsewhere, the defendant,

(2)     DONNA HEINEL,

conspired with others known and unknown to the Grand Jury to commit federal programs bribery, that is, to corruptly solicit and demand for the benefit of any person, and accept and agree to accept, anything of value from any person, to wit, William "Rick" Singer and his clients, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of an organization, to wit, USC, involving anything of value of $5,000 or more, that is, in exchange for facilitating the admission to USC for the children of Singer's clients, where USC received benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies, loan guarantees, insurance and other forms of federal assistance in any one-year period, in violation of Title 18, United States Code, Section 666(a)(1)(B).

All in violation of Title 18, United States Code, Section 371.

## COUNT FOUR
### Conspiracy to Commit Federal Programs Bribery
### (18 U.S.C. § 371)

The Grand Jury further charges:

150.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-117 and 126-129 of this Superseding Indictment.

151.    From in or about 2007 through in or about July 2018, in the District of Massachusetts, and elsewhere, the defendant,

### (1) GORDON ERNST,

conspired with others known and unknown to the Grand Jury to commit federal programs bribery, that is, to corruptly solicit and demand for the benefit of any person, and accept and agree to accept, anything of value from any person, to wit, William "Rick" Singer and his clients, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of an organization, to wit, Georgetown, involving anything of value of $5,000 or more, that is, in exchange for facilitating the admission to Georgetown for the children of Singer's clients, where Georgetown received benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies, loan guarantees, insurance and other forms of federal assistance in any one-year period, in violation of Title 18, United States Code, Section 666(a)(1)(B).

All in violation of Title 18, United States Code, Section 371.

Conspiracy to Commit Federal Programs Bribery
(18 U.S.C. § 371)

The Grand Jury further charges:

152.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-117 and 130-133 of this Superseding Indictment.

153.     From in or about 2016 through in or about February 2019, in the District of Massachusetts, and elsewhere, the defendant,

(11)   JORGE SALCEDO,

conspired with others known and unknown to the Grand Jury to commit federal programs bribery, that is, to corruptly solicit and demand for the benefit of any person, and accept and agree to accept, anything of value from any person, to wit, William "Rick" Singer and his clients, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of an organization, to wit, UCLA, involving anything of value of $5,000 or more, that is, in exchange for facilitating the admission to UCLA for the children of Singer's clients, where UCLA received benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies, loan guarantees, insurance and other forms of federal assistance in any one-year period, in violation of Title 18, United States Code, Section 666(a)(1)(B).

All in violation of Title 18, United States Code, Section 371.

## COUNT SIX
Federal Programs Bribery
(18 U.S.C. § 666(a)(1)(B))

The Grand Jury charges:

154. The Grand Jury re-alleges and incorporates by reference paragraphs 1, 20, 24, 35, and 134-142 of this Superseding Indictment.

155. From in or about August 2017 through in or about August 2018, in the District of Massachusetts, and elsewhere, the defendant,

### (1) GORDON ERNST,

being an agent of an organization, namely, Georgetown, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept, anything of value from any person, to wit, the father of Georgetown Applicant 3, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of Georgetown, involving anything of value of $5,000 or more, where Georgetown received benefits in excess of $10,000 under Federal programs involving grants, contracts, subsidies, loan guarantees, insurance and other forms of federal assistance in any one-year period, in violation of Title 18, United States Code, Section 666(a)(1)(B).

Wire Fraud and Honest Services Wire Fraud; Aiding and Abetting
(18 U.S.C. §§ 1343, 1346 and 2)

The Grand Jury further charges:

156. The Grand Jury re-alleges and incorporates by reference paragraphs 1-121 of this Superseding Indictment.

157. On or about the dates set forth below, in the District of Massachusetts, and elsewhere, the defendants set forth below, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property, to wit, ACT and SAT tests and test scores, and admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive, variously, ACT, Inc., the College Board, and the Universities, of their right to the honest and faithful services of their test administrators, athletic coaches and university administrators, through bribes and kickbacks, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing the scheme to defraud, to wit:

| COUNT | DEFENDANT | APPROXIMATE DATE | INTERSTATE WIRE |
|---|---|---|---|
| 7 | GORDON ERNST | Aug. 21, 2015 | Email to Georgetown admissions officer |
| 8 | NIKI WILLIAMS | Nov. 21, 2016 | Fraudulent ACT score submitted to Boston College |
| 9 | MIKAELA SANFORD | Aug. 24, 2017 | Transcript submitted to Boston University |
| 10 | GORDON ERNST | June 24, 2018 | Email to Singer requesting payment to Ernst of $100,000 |
| 11 | DONNA HEINEL | Sept. 21, 2018 | Email to Singer regarding purported USC "athletic recruit" |
| 12 | DONNA HEINEL | Oct. 5, 2018 | Telephone call with Singer |
| 13 | DONNA HEINEL | Oct. 24, 2018 | Telephone call with Singer |
| 14 | DONNA HEINEL | Oct. 25, 2018 | Email to Singer |

| 15 | DONNA HEINEL | Oct. 25, 2018 | Telephone call with Singer |
| 16 | DONNA HEINEL | Oct. 31, 2018 | Telephone call with Singer |
| 17 | JORGE SALCEDO | Nov. 30, 2018 | Telephone call with Singer |
| 18 | JOVAN VAVIC | Jan. 2, 2019 | Telephone call with Singer |

All in violation of Title 18, United States Code, Sections 1343, 1346 and 2.

## COUNTS NINETEEN THROUGH TWENTY-ONE
Mail Fraud and Honest Services Mail Fraud; Aiding and Abetting
(18 U.S.C. §§ 1341, 1346 and 2)

The Grand Jury further charges:

158.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-121 of this Superseding Indictment.

159.    On or about the dates set forth below, in the District of Massachusetts, and elsewhere, the defendants set forth below, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property, to wit, ACT and SAT tests and test scores, and admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive, variously, ACT, Inc., the College Board, and the Universities, of their right to the honest and faithful services of their test administrators, athletic coaches and university administrators, through bribes and kickbacks, did for the purpose of executing and attempting to execute such scheme, knowingly cause to be delivered by mail and by any private commercial interstate carrier according to the direction thereon, the following payments, to wit:

| COUNT | DEFENDANT | APPROXIMATE DATE | MAILING |
|-------|-----------|------------------|---------|
| 19 | GORDON ERNST | June 2018 | $100,000 payment from KWF to Ernst |
| 20 | JORGE SALCEDO | Oct. 24, 2018 | $100,000 payment from KWF to Salcedo |
| 21 | DONNA HEINEL | Jan. 3, 2019 | $20,000 payment from KWF to Heinel |

All in violation of Title 18, United States Code, Sections 1341, 1346 and 2.

## COUNT TWENTY-TWO
### Money Laundering; Aiding and Abetting
### (18 U.S.C. §§ 1957 and 2)

The Grand Jury further charges:

158.    The Grand Jury re-alleges and incorporates by reference paragraphs 1, 20, 35, 86-98, and 126-129 of this Superseding Indictment.

159.    On or about January 7, 2015, in the District of Massachusetts, and elsewhere, the defendant,

### (1) GORDON ERNST,

did knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, that is a wire transfer of $113,062.37 from PNC Bank account x6522 to an account at Leader Bank in order to purchase a home in Falmouth, Massachusetts, where such property was derived from specified unlawful activity, that is, wire fraud and honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346, mail fraud and honest services mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346, and federal programs bribery, in violation of Title 18, United States Code, Section 666.

All in violation of Title 18, United States Code, Sections 1957 and 2.

FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The Grand Jury further finds:

160.    Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 371, 666, 1349 1341, 1343, 1346, or 2, set forth in Counts Two through Twenty-One of this Superseding Indictment, the defendants,

(1) GORDON ERNST,
(2) DONNA HEINEL,
(6) MIKAELA SANFORD,
(9) NIKI WILLIAMS,
(10) WILLIAM FERGUSON,
(11) JORGE SALCEDO, and
(12) JOVAN VAVIC,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the following:

a.   Chevy Chase country club membership, as owned by Ernst;

b.   25 Gang Way, Unit 25, Falmouth, MA 02540, as owned by Ernst;

c.   All funds on deposit in Vanguard SEP IRA account number ending in x9912, held in the name of Gordon M. Ernst;

d.   $2,939,963.78, to be entered in the form of a forfeiture money judgement against Ernst;

e.   $160,000, to be entered in the form of a forfeiture money judgement against Heinel;

f.   $5,000, to be entered in the form of a forfeiture money judgment against Williams;

g.   $50,000, to be entered in the form of a forfeiture money judgment against Ferguson;

40

h. $200,000, to be entered in the form of a forfeiture money judgment against Salcedo;

i. $119,445, to be entered in the form of a forfeiture money judgment against Vavic;

j. All funds on deposit up to $140,000 in Bank of America account number ending in x4999, held in the name of Donna C. Heinel and another;

k. All funds on deposit up to $100,000 in City National Bank account number ending in x8419, held in the name of Jorge Salcedo and another;

l. All funds on deposit up to $50,000 in Wells Fargo bank account number ending in x5954, held in the name of Bill Ferguson Volleyball Camps LLC;

m. All funds on deposit up to $1,138,500 in PNC Bank account number ending in x6522, held in the name of Gordon M. Ernst and another;

n. All funds on deposit up to $289,963.78 in PNC Bank account number ending in x6905, held in the name of Gordon M. Ernst and another; and,

o. All funds on deposit up to $650,000 in Merrill Lynch bank account number ending in x8442, held in the name of Gordon Ernst and another.

161. If any of the property described in Paragraph 153, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants --

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 160 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

## MONEY LAUNDERING FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(1))

The Grand Jury further finds:

162.     Upon conviction of the offense of money laundering in violation of Title 18, United States Code, Sections 1957 and 2, as set forth in Count Twenty-Two of this Superseding Indictment, the defendant,

### (1) GORDON ERNST,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, and any property traceable to such property. The property to be forfeited includes, but is not limited to, the following:

 a.   25 Gang Way, Unit 25, Falmouth, MA 02540 as owned by Ernst;

163.     If any of the property described in Paragraph 162, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of the defendant --

 a.   cannot be located upon the exercise of due diligence;

 b.   has been transferred or sold to, or deposited with, a third party;

 c.   has been placed beyond the jurisdiction of the Court;

 d.   has been substantially diminished in value; or

 e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 162 above.

All pursuant to Title 18, United States Code, Section 982(a)(1).

## RACKETEERING FORFEITURE ALLEGATION
### (18 U.S.C. § 1963(a))

The Grand Jury further finds:

164. Upon conviction of the offense in violation of Title 18, United States Code, Section 1962(d), set forth in Count One of this Superseding Indictment, the defendants,

> (1) GORDON ERNST,
> (2) DONNA HEINEL,
> (6) MIKAELA SANFORD,
> (9) NIKI WILLIAMS,
> (10) WILLIAM FERGUSON,
> (11) JORGE SALCEDO, and
> (12) JOVAN VAVIC,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963:

a. any interest the defendant has acquired or maintained in violation of Title 18, United States Code, Section 1962;

b. any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise established, which the defendant operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and

c. any property constituting, or derived from, any proceeds which the defendant obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of Title 18, United States Code, Section 1962.

The property to be forfeited includes, but is not limited to, the following assets:

a. Chevy Chase country club membership, as owned by Ernst;

b. 25 Gang Way, Unit 25, Falmouth, MA 02540, as owned by Ernst;

c. All funds on deposit in Vanguard SEP IRA account number ending in x9912, held in the name of Gordon M. Ernst;

d. $2,719,963.78, to be entered in the form of a forfeiture money judgement against Ernst;

e. $160,000, to be entered in the form of a forfeiture money judgement against Heinel;

f.  $5,000, to be entered in the form of a forfeiture money judgment against Williams;

g.  $50,000, to be entered in the form of a forfeiture money judgment against Ferguson;

h.  $200,000, to be entered in the form of a forfeiture money judgment against Salcedo;

i.  $119,445, to be entered in the form of a forfeiture money judgment against Vavic;

j.  All funds on deposit up to $140,000 in Bank of America account number ending in x4999, held in the name of Donna C. Heinel and another;

k.  All funds on deposit up to $100,000 in City National Bank account number ending in x8419, held in the name of Jorge Salcedo and another;

l.  All funds on deposit up to $50,000 in Wells Fargo bank account number ending in x5954, held in the name of Bill Ferguson Volleyball Camps LLC;

m.  All funds on deposit up to $1,138,500 in PNC Bank account number ending in x6522, held in the name of Gordon M. Ernst and another;

n.  All funds on deposit up to $289,963.78 in PNC Bank account number ending in x6905, held in the name of Gordon M. Ernst and another; and,

o.  All funds on deposit up to $650,000 in Merrill Lynch bank account number ending in x8442, held in the name of Gordon Ernst and another.

165.  If any of the property described in Paragraph 164, above, as being forfeitable pursuant to Title 18, United States Code, Section 1963(m), as a result of any act or omission of the defendant --

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

     e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 1963(m) to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 164 above.

     All pursuant to Title 18, United States Code, Section 1963.


A TRUE BILL

FOREPERSON


ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS


District of Massachusetts: OCTOBER 22, 2019
Returned into the District Court by the Grand Jurors and filed.


DEPUTY CLERK

10-22-19

1:13 pm