UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES OF AMERICA                )
                                        )
            v.                          )      Criminal No. 19-10081-IT
                                        )
GORDON ERNST,                           )      Leave to File Granted on
WILLIAM FERGUSON,                       )      January 22, 2020
DONNA HEINEL,                           )
JORGE SALCEDO,                          )
JOVAN VAVIC,                            )
NIKI WILLIAMS,                          )
            Defendants.                 )
_____)

<u>GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE SUPERSEDING INDICTMENT</u>

ANDREW E. LELLING
United States Attorney

ALEXIA R. DE VINCENTIS
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant United States Attorneys
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3100
alexia.devincentis@usdoj.gov
eric.rosen@usdoj.gov
justin.oconnell@usdoj.gov
leslie.wright@usdoj.gov
kristen.kearney@usdoj.gov
alexia.devincentis@usdoj.gov

# TABLE OF CONTENTS

PRELMINARY STATEMENT ........................................................................................ 1

LEGAL STANDARDS ................................................................................................... 4

ARGUMENT .................................................................................................................. 5

I.    THE SUPERSEDING INDICTMENT ADEQUATELY ALLEGES A RICO CONSPIRACY (COUNT ONE)......................................................................... 5

    A.    The RICO Statute.................................................................................... 5

    B.    The Superseding Indictment Adequately Pleads an Enterprise. ............................. 8

    C.    The Superseding Indictment Adequately Pleads a Conspiratorial Agreement............................................................................................. 10

        1.    Defendants' assertion that the Superseding Indictment pleads an improper "hub and spoke" conspiracy is meritless.................. 11

        2.    The allegations sufficiently plead that each defendant knowingly joined the conspiracy ............................................... 16

        3.    The allegations sufficiently plead participation in the conduct of the enterprise's affairs............................................. 20

    D.    The Superseding Indictment Adequately Pleads a "Pattern of Racketeering Activity"........................................................................... 21

II.    THE CONSPIRACY TO COMMIT MAIL, WIRE, AND HONEST SERVICES FRAUD COUNT (COUNT TWO) IS NOT DUPLICITIOUS AND IS ADEQUATELY ALLEGED. ........................................................................... 22

III.    THE SUPERSEDING INDICTMENT ADEQUATELY ALLEGES FEDERAL PROGRAMS BRIBERY AND CONSPIRACY TO COMMIT THE SAME (COUNTS THREE THROUGH SIX) ............................................................... 26

IV.    DEFENDANTS' CHALLENGES TO THE SUBSTANTIVE FRAUD COUNTS (COUNTS SEVEN THROUGH TWENTY-ONE) AND PREDICATES FAIL ............ 29

    A.    Honest services fraud........................................................................... 29

        1.    The Superseding Indictment alleges breaches of fiduciary duties.................................................................................... 30

2.      The Superseding Indictment alleges bribes, not merely self-dealing ............................................................................................ 34

3.      The Superseding Indictment alleges intended deception. ......................... 35

4.      The honest services fraud statute is not unconstitutionally vague as applied ................................................................................ 36

B.      Mail and wire fraud ............................................................................. 38

1.      ACT and SAT tests and scores are "property" .......................................... 38

2.      Admission to the universities is "property" ............................................... 41

C.      The mail and wire fraud counts are not duplicitous ............................................. 45

V.      DEFENDANTS' CHALLENGE TO THE SUBSTANTIVE MONEY LAUNDERING COUNT (COUNT TWENTY-TWO) AND PREDICATES FAILS ..... 47

CONCLUSION ............................................................................................................. 49

CERTIFICATE OF SERVICE ...................................................................................... 50

## PRELMINARY STATEMENT

Defendants Gordon Ernst, William Ferguson, Donna Heinel, Jorge Salcedo, Jovan Vavic, and Niki Williams (collectively, the "defendants") have moved to dismiss the Superseding Indictment on various grounds, including principally their contention that it does not adequately plead the crimes charged.  Their motions are without merit and should be denied.

A criminal indictment is required to plead only those facts necessary to provide defendants notice of the charges against them and to enable them to plead double jeopardy in the future.  The 165-paragraph Superseding Indictment in this case far exceeds that minimum requirement, setting forth considerable factual detail of the defendants' alleged efforts to secure university admission for the children of Rick Singer's clients through various forms of bribery and fraud.  The defendants' arguments to the contrary conflate the burdens of pleading and proof, and seek to impose heightened civil pleading standards that have no place in the criminal context.  Indeed, their claims of lack of notice are belied by the detailed legal-sufficiency arguments they make in the same breath.

As to Count One, the defendants cite the absence of allegations that they had knowledge of or participated in conduct between Singer and other alleged co-conspirators to claim that the Superseding Indictment fails adequately to plead an enterprise or a single RICO conspiracy.  Those arguments are flawed for several reasons, beginning with the misplaced premise that RICO conspiracy even requires relationships among co-conspirators.  The essence of a RICO conspiracy is *not* an agreement to commit the underlying racketeering acts, but rather an agreement to further the affairs of an enterprise through a pattern of racketeering activity.  The defendants are alleged to have done just that by agreeing to participate in the affairs of the Key Enterprise, an association-

1

in-fact comprised of two legal entities.  It is a common purpose and relationship between or among those entities, not among the defendants, that is required.

The defendants' arguments are likewise flawed for assuming that an indictment is required to plead specifics of their knowledge of the contours of the RICO conspiracy.  The defendants cite *no* relevant authority for this proposition, because there is none.  They rely instead on cases applying civil pleading standards, and criminal cases that do not concern pleading standards at all, but rather what must be proved at trial.  Those comparisons are, of course, inapt.

The same flaws pervade the defendants' arguments concerning the wire and mail fraud conspiracy alleged in Count Two.  The defendants argue that this count is duplicitous because it purportedly sweeps distinct test-taking and student-athlete recruiting schemes into a single conspiracy charge.  But the defendants' duplicity claim is merely an effort to bootstrap a jury question—whether the facts adduced at trial prove one conspiracy or multiple conspiracies—into a review of the sufficiency of the indictment.  That is an effort the First Circuit has rejected time and again.

The defendants' challenge to the federal programs bribery and fraud charges—Counts Three through Twenty-One—is equally unavailing.  These counts, they contend, are legally deficient because certain bribe payments were made after students were admitted or were paid to university accounts rather than to the defendants personally.  But the defendants ignore certain allegations and misconstrue others.  *When* the payments were made—and even *whether* they were ultimately made—is irrelevant to whether the defendants improperly agreed to accept something of value in exchange for an official act, as the Superseding Indictment alleges.  And whatever monies were directed to university accounts at the defendants' direction, each defendant also received bribe payments personally.

The Superseding Indictment also alleges that the defendants' receipt of those payments violated their duty of honest and faithful services to the testing companies and universities. That, too, is a question of fact for the jury. And the defendants' claims that standardized tests and scores and admission to universities do not constitute property go nowhere. Both possess the key attributes that inform traditional concepts of property: economic value, and the right to control.

The defendants' fallback arguments—vagueness and duplicity—are equally meritless. Their contention that the honest services fraud statute is unconstitutionally vague has never been accepted by any court to consider it. Their duplicity argument similarly ignores black-letter law holding that a single wire or mail fraud count may charge multiple schemes or theories of fraud so long as it is based—as the counts are here—on a single wire or mailing.

Finally, the defendants' arguments for dismissal of Count Twenty-Two and the money laundering predicates are based on the mistaken notion that the bribe monies did not become "proceeds" of a specified unlawful activity until the defendants actually received the bribes. That is simply incorrect, because the underlying crimes were complete as a matter of law well before that point.

In short, the defendants' scattershot motions ignore or misstate the allegations against them, mischaracterize the government's pleading burden, and seek to have this Court decide questions of fact that are properly reserved for the jury after trial. Their hyperbolic and groundless accusations of "prosecutorial overreach" and "strong-arm" tactics provide no substitute for sound legal analysis. For those reasons, and the reasons set forth below, their motions should be denied.

## LEGAL STANDARDS

A criminal defendant cannot "be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury," U.S. Const. amend. V, and he or she has "the right . . . to be informed of the nature and cause of the accusation," U.S. Const. amend. VI. Consistent with these commands, Rule 7(c)(1) of the Federal Rules of Criminal Procedure states that an indictment must provide "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). As the Supreme Court has stated, "the Federal Rules 'were designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure.'" *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (quoting *United States v. Debrow*, 346 U.S. 374, 376 (1953)). "While detailed allegations might well have been required under common-law pleading rules, they surely are not contemplated by Rule 7(c)(1)." *Id.* (internal citation omitted).

"An indictment need not say much to satisfy [Rule 7(c)(1)'s] requirements—it need only outline 'the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense.'" *United States v. Stepanets*, 879 F.3d 367, 372 (1st Cir. 2018) (quoting *United States v. Guerrier*, 669 F.3d 1, 3 (1st Cir. 2011)). While there is no prescribed formula, "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself," provided that the statutory language is "accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.'" *Hamling v. United States*, 418 U.S. 87, 117–18 (1974) (quotations omitted). "[T]he government need not recite all of its evidence in the indictment." *United States v. Innamorati*, 996 F.2d 456, 477 (1st Cir. 1993).

4

It follows from the above that a motion to dismiss is not a permissible vehicle for addressing the sufficiency of the government's evidence to prove the charged offense. *E.g.*, *United States v. Rodriguez-Rivera*, 918 F.3d 32, 35 (1st Cir. 2019) (a motion to dismiss is not "an occasion to force the government to defend the sufficiency of its evidence to be marshalled in support of proving the charged offense"); *Guerrier*, 669 F.3d at 4 ("[C]ourts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations."). Rather, courts entertaining a motion to dismiss an indictment must "take the facts alleged in the indictment as true, mindful that 'the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense.'" *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) (quoting *United States v. Savarese*, 686 F.3d 1, 7 (1st Cir. 2012)).

## ARGUMENT

## I.    THE SUPERSEDING INDICTMENT ADEQUATELY ALLEGES A RICO CONSPIRACY (COUNT ONE).

The defendants contend that Count One of Superseding Indictment should be dismissed because it fails to adequately allege the existence of an "enterprise," the defendants' knowing agreement to join a conspiracy to further that enterprise, or a "pattern of racketeering activity." These claims lack merit.

### A.    The RICO Statute.

The Superseding Indictment charges the defendants with conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(d) of the Racketeering Influenced and Corrupt Organizations Act ("RICO"). Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. §1962(d). The Superseding Indictment alleges that the

defendants conspired to violate Section 1962(c), which provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §1962(c).

The substantive RICO offense under Section 1962(c) has three predominant elements: "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997). The "conduct" element requires participation in the "operation or management of an enterprise through a pattern of racketeering activity." *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). "Enterprise" is a statutory term defined as "includ[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4). This definition is expansive, *see United States v. Turkette*, 452 U.S. 576 (1981), and encompasses associations of legal entities. *E.g.*, *United States v. London*, 66 F.3d 1227, 1243 (1st Cir. 1995); *see also United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1111 (D.C. Cir. 2009) (observing that every circuit to consider the question has held that legal entities may be part of an association-in-fact enterprise). An association-in-fact enterprise requires "three structural features": (1) "a purpose," (2) "relationships among those associated with the enterprise," and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United State*s, 556 U.S. 938, 946 (2009). The term "racketeering activity" is defined as any of several crimes under federal and state law, and a "pattern of racketeering activity" "requires at least two acts of racketeering activity, one of which occurred after the effective date of [the statute] and the last of which occurred within

ten years . . . after the commission of a prior act of racketeering activity," 18 U.S.C. §1961(1) & (5).

The RICO conspiracy offense under Section 1962(d), like all conspiracy provisions, has as its target the act of agreement. *Salinas*, 522 U.S. at 63 ("The relevant statutory phrase in §1962(d) is 'to conspire.'"). The Supreme Court thus held in *Salinas* that, consistent with well-established conspiracy principles, a defendant need not himself or herself commit or agree to commit two or more racketeering acts in order to be guilty of a conspiracy to violate Section 1962(c). *Id.* at 65. It made "no difference" that the substantive offense under Section 1962(c) requires proof of such acts, the Court explained, because a co-conspirator need only "intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense," and "[h]e may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion." *Id.* As the Court further observed, "[t]he RICO conspiracy statute . . . broadened conspiracy coverage by omitting the requirement of an overt act; it did not, at the same time, work the radical change of requiring the Government to prove each conspirator agreed that he would be the one to commit two predicate acts." *Id.* at 64. To be guilty of RICO conspiracy, then, it suffices that the defendant "knew about and agreed to facilitate the conduct of an enterprise's affairs through a pattern of racketeering activity." *United States v. Leoner-Aguirre*, 939 F.3d 310, 316 (1st Cir. 2019) (alteration omitted) (citing *Salinas*, 522 U.S. at 62), *cert. denied*, No. 19-6820, 2020 WL 129919 (U.S. Jan. 13, 2020).[1]

---

[1] In *United States v. Ramirez-Rivera*, 800 F.3d 1 (1st Cir. 2015), the First Circuit quoted a pre-*Salinas* decision for the proposition that a RICO conspiracy conviction requires proof that the defendant "agree[d] to commit, or in fact commit[ted], two or more predicate offenses." *Id.* at 18 (quoting *United States v. Shifman*, 124 F.3d 31, 35 (1st Cir. 1997)); [*see also* D.327 at 5 (citing *Ramirez-Rivera*, 800 F.3d at 18)]. In *Leoner-Aguirre*, the First Circuit acknowledged that its "precedent on the elements of RICO conspiracy has at times been muddled" but held that *Salinas* abrogated *Ramirez-Rivera* on this point. 939 F.3d at 317 & n.5.

### B.      **The Superseding Indictment Adequately Pleads an Enterprise**.

The defendants contend that the Superseding Indictment does not properly allege an association-in-fact enterprise because (1) it fails to plead the structural features of "common purpose" and "relationships" required by *Boyle*, [D.332 at 4–14; D.334 at 9–10; *see also* D.327 at 1; D.336 at 1–2; D.337 at 1; D.338 at 1], and (2) impermissibly relies on a pattern of racketeering activity as a substitute for an association-in-fact enterprise, [D.332 at 14–15; *see also* D.327 at 1; D.337 at 1; D.338 at 1]. These arguments attack a straw man—namely, an enterprise that is not the one the Superseding Indictment pleads. [*Compare* D.334 at 9 ("[T]he Superseding Indictment describes an 'association in fact' comprised of the Key Enterprise and seven independent and unrelated hub-and-spoke defendants . . . ."), *with* SI ¶ 17 ("Together, The Key and KWF constituted an 'enterprise' . . . .")].

The defendants' arguments are premised on the assumption that the Superseding Indictment must contain allegations that tie the various defendants and the alleged "Key Enterprise" together into a continuing unit working to achieve a common purpose. [*See, e.g.*, D.332 at 6]. The Superseding Indictment necessarily cannot satisfy this requirement, they claim, because it does not allege that the individual defendants knew about or participated in the conduct between Singer and the other defendants. But even if that proposition were correct as a matter of law—and the defendants cite no authority to suggest that it is[2] —the Superseding Indictment does

---

[2] The defendants' reliance on civil RICO cases to suggest that the government is required to plead the *Boyle* factors is misplaced. Though courts have held that a civil RICO complaint must allege facts plausibly implying the existence of an enterprise with the structural attributes identified by *Boyle*, [*e.g.*, D.332 at 12 (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374 (3d Cir. 2010))], civil pleading standards are irrelevant to the question of the sufficiency of a criminal indictment. *See, e.g.*, *United States v. Staggs*, 881 F.2d 1527, 1532 n.6 (10th Cir. 1989) (*en banc*) (reliance in the criminal context on cases concerning the sufficiency of civil complaints "is like comparing apples with oranges" because "[t]he underlying processes are structurally different": unlike a civil complaint, "[t]he criminal proceeding is monitored from its inception by a district

not allege an association-in-fact enterprise consisting of the defendants and the Key Enterprise. Rather, the alleged enterprise is the Key Enterprise alone. [SI ¶¶15–17; *see also* D.265 at 1 n.1 (acknowledging that the defendants are not part of the alleged enterprise)]. That enterprise is comprised of The Edge College & Career Network, LLC ("The Key") and the Key Worldwide Foundation ("KWF"), [SI ¶¶15–17], and it exists separately and apart from the defendants. It also exists separately and apart from the alleged pattern of racketeering activity.

The defendants do not argue that the Superseding Indictment is deficient in its description of the enterprise it actually alleges, nor could they credibly do so. The Superseding Indictment alleges that the enterprise "constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise." [SI ¶17]. Even assuming a requirement that the indictment specifically plead the "common purpose" and "relationships" uniting the enterprise's constituent parts,[3] any fair reading of the Superseding Indictment shows that this requirement is satisfied. The Superseding Indictment specifies the enterprise's principal purposes: "to facilitate cheating on college entrance exams"; "to facilitate the admission of students to elite universities as recruited athletes, with little or no regard for their athletic abilities"; and, "to enrich the defendants and Singer personally." [SI ¶36 ("Purposes of the Racketeering Conspiracy")]. It further specifies the principal manner and means used to

---

judge (or a magistrate) and a grand jury, to satisfy probable cause requirements, among other things").

[3] The defendants appear to concede that the Superseding Indictment's allegation that the racketeering conduct spanned from in or about 2011 through February 2019 satisfies any requirement that the indictment plead "longevity." [D.332 at 5–6 (citing SI ¶38)]. Though they note, without elaboration, that KWF did not exist until 2012, [D.332 at 6 n.3 (citing SI ¶16)], they conspicuously do not argue that this provides a basis for dismissal. And indeed, it would not. *Cf. United States v. Mubayyid*, 658 F.3d 35, 48–49 (1st Cir. 2011) ("In general, a defendant can hardly be heard to complain when the government's proof at trial establishes a scheme similar to but somewhat narrower in breadth and malignity than that charged in the indictment." (quotations omitted)).

achieve those objectives: "facilitating cheating on ACT and SAT exams in exchange for bribes by arranging for or allowing a third party . . . to secretly take the exams in place of the actual students, or to replace the students' exam responses with his own"; "designating applicants as purported recruits for competitive college athletic teams, with little or no regard for the applicants' athletic abilities, in exchange for bribes"; and, "concealing the nature and source of the bribe payments by funneling payments through the KWF charitable accounts."  [SI ¶37 ("Manner and Means of the Racketeering Conspiracy")].  The underlying factual allegations state that the bribe money being funneled through KWF to facilitate the test-taking and student-athlete recruiting scheme came from Singer's "clients," [*see* SI ¶¶39–40, 59], and that these activities were orchestrated by personnel common to The Key and KWF, including Singer, who founded the entities, [SI ¶¶15–16], and Steven Masera and Mikaela Sanford, who were each employed by both, [SI ¶¶3, 12].  [*See* SI ¶¶39–142].  These allegations are more than adequate to allege a "relationship" between The Key and KWF.  *See, e.g.*, *London*, 66 F.3d at 1244 (finding evidence sufficient to establish an association-in-fact consisting of a bar and a check-cashing business located inside the bar where the two were operated by the same individual and functioned as "as a symbiotic unit ([the check-cashing business] providing a ready source of cash for [the bar]'s customers; [the bar]'s customers taking advantage of [the check-cashing business]'s convenience)" for the common purpose of economic gain); *United States v. Hosseini*, 679 F.3d 544, 558 (7th Cir. 2012) (finding evidence sufficient to establish an association-in-fact consisting of three legal entities and two individuals who operated the entities where the entities shared funds, employees, and referrals).

### C.   The Superseding Indictment Adequately Pleads a Conspiratorial Agreement.

The defendants also contend that the Superseding Indictment is deficient because its allegations "[a]t most . . . set forth a 'hub-and-spoke' structure[,] with Singer occupying the hub

10

and . . . the []defendants as the spokes, with no common rim linking the individual spokes together" to form a wheel. [D.332 at 12; *see also* D.334 at 9–10; D.327 at 1; D.336 at 1–2; D.337 at 1; D.338 at 1]. The result, they say, is a failure to allege a single RICO conspiracy. [*E.g.*, D.334 at 10]. The defendants further assert that, even if a RICO conspiracy is properly charged, the Superseding Indictment nevertheless fails to allege that the defendants joined it, [D.334 at 11; *see also* D.337 at 1; D.338 at 1], or that they did so by participating in the operation or management of the enterprise or by knowingly agreeing that some co-conspirator would so participate. [D.334 at 13; *see also* D.337 at 1; D.338 at 1]. The first of these arguments misconstrues the nature of a RICO conspiracy, and the second and third conflate the burdens of pleading and proof.

### 1. Defendants' assertion that the Superseding Indictment pleads an improper "hub and spoke" conspiracy is meritless.

The defendants cite the absence of allegations that the individual defendants knew about or participated in the conduct between Singer and other defendants to argue not only that the Superseding Indictment fails to properly allege an association-in-fact, but also that it fails to allege a single conspiratorial agreement. They rely in support of the latter argument on *Kotteakos v. United States*, 328 U.S. 750 (1946), which held that absent evidence at trial of a "rim of the wheel to enclose" various "spokes" who separately agreed with a common "hub," the proof "made out a case, not of a single conspiracy, but of several." *Id.* at 755. *Kotteakos*, however, is inapt, for two reasons. First, the defendants are not charged in Count One with violating the general federal conspiracy statute at issue in *Kotteakos*. They are charged with conspiring to violate RICO, and that statute replaced the "wheel" concept with the "enterprise." And second, *Kotteakos* concerned the evidence required to prove a conspiracy a trial. It did not purport to impose new, heightened pleading requirements in conspiracy cases.

In *United States v. Elliott*, 571 F.2d 880, 902–03 (5th Cir. 1978), several defendants convicted of RICO conspiracy invoked *Kotteakos* to argue on appeal that the government's evidence at trial proved the existence of several conspiracies rather than the single conspiracy alleged in the indictment, resulting in a prejudicial variance.  571 F.2d at 900.  The Fifth Circuit found no merit to the claim because RICO displaced the "wheel" limitation upon which the defendants' argument relied:

> Prior to the enactment of the RICO statute [in 1970], this argument would have been more persuasive.  However, . . . RICO has displaced many of the legal precepts traditionally applied to concerted criminal activity.  Its effect in this case is to free the government from the strictures of the multiple conspiracy doctrine and to allow the joint trial of many persons accused of diversified crimes.

*Id.*  In explaining this conclusion, the Fifth Circuit reviewed the "wheel conspiracy" rationale of *Kotteakos* and "chain conspiracy" rationale of *Blumenthal v. United States*, 332 U.S. 539 (1947), and stated that if those concepts were applicable to the case before it, it "doubt[ed] that a single conspiracy could be demonstrated" because, even assuming a common objective to raise revenue through criminal activity, there was no evidence that each defendant knew that other defendants were engaged in criminal activity, and "[t]he activities allegedly embraced by the illegal agreement . . . [were] simply too diverse to be tied together on the theory that participation in one activity necessarily implied awareness of others."  *Id.* at 900–02.

The enterprise supplied the missing link.  As the Fifth Circuit observed, RICO was enacted for the purpose of "creating a substantive offense which ties together" "highly diverse crimes by apparently unrelated individuals."  *Id.* at 902.  Congress effectuated that purpose by defining a RICO conspiracy as an agreement to violate the "substantive" RICO law—in *Elliot*, as here, "to conduct or participate, directly or indirectly, in the conduct of [the] enterprise's affairs through a

pattern of racketeering activity"—rather than as an agreement to commit any of the crimes through which the affairs of the enterprise were conducted. *Id.* Congress thus "replac[ed] the inadequate 'wheel' and 'chain' rationales with a new [conspiratorial] concept: the enterprise." *Id.* As a result, the court held, "it is irrelevant that each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs." *Id.* at 902–03 (internal footnote omitted).

Several courts of appeals have expressly endorsed *Elliot*'s reasoning. *See United States v. Gonzalez*, 921 F.2d 1530, 1540 (11th Cir. 1991); *United States v. Friedman*, 854 F.2d 535, 562–63 (2d Cir. 1988); *United States v. Tille*, 729 F.2d 615, 619 & n.1 (9th Cir. 1984). They include the First Circuit, which has twice cited *Elliot*'s discussion of RICO's displacement of the "wheel" and "chain" limitations on conspiratorial liability for the proposition that "RICO permits the Government to cast a wider net than it could under traditional conspiracy principles." *United States v. Turkette*, 656 F.2d 5, 8 (1st Cir. 1981), *on remand from* 452 U.S. 576 (1981); *United States v. Tashjian*, 660 F.2d 829, 834 (1st Cir. 1981). Consistent with that endorsement, the First Circuit has stated that "[i]n enacting RICO, Congress intended that a series of agreements that under pre-RICO law would constitute multiple conspiracies could under RICO be tried as a single enterprise conspiracy if the defendants have agreed to commit a substantive RICO offense." *United States v. Carrozza*, 4 F.3d 70, 79 (1st Cir. 1993) (internal quotation omitted).

These cases make plain the flaw in the defendants' argument. Because the gravamen of a RICO conspiracy charge is the agreement to facilitate the affairs of the enterprise, the government is not required to prove, much less plead, that each conspirator-defendant agreed with every other conspirator. *See, e.g.*, *Friedman*, 854 F.2d at 562–63 ("So long as the alleged RICO co-conspirators have agreed to participate in the affairs of the same enterprise, the mere fact that they

13

do not conspire directly with each other does not convert the single agreement to conduct the affairs of an enterprise through a pattern of racketeering activity into multiple conspiracies." (internal quotation omitted)).  Indeed, the government is not required to prove, much less plead, that the defendants knew about the specific racketeering acts of their co-defendants or even that the various defendants knew each other at all.  *E.g.*, *United States v. Rastelli*, 870 F.2d 822, 827–28 (2d Cir. 1989) (a RICO defendant need not have "specific knowledge of every member and component of the enterprise") (collecting cases).  It is sufficient, rather, that the defendants knew the general nature of the enterprise and that the enterprise extended beyond their individual roles. As the Second Circuit has stated:

> To be convicted as a conspirator [under RICO], one must be shown to have possessed knowledge of only the general contours of the conspiracy. . . . The government need not prove that a conspirator-defendant agreed with every other conspirator, or knew all the other conspirators, or had full knowledge of all the details of the conspiracy.

*United States v. Zichettello*, 208 F.3d 72 (2d Cir. 2000) (internal citation, quotation marks, and alterations omitted).

The cases on which the defendants rely are not to the contrary.  All but one of the few criminal cases they have cited in support of their "hub and spoke" theory are *non*-RICO conspiracy cases—in other words, they are cases that involve the very concepts that RICO sought to replace. [*See* D.334 at 10 (citing *United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999) (construing 21 U.S.C. §846, the drug conspiracy statute)); *see also* D.265 at 8–9 (citing, in addition, *United States v. Monserrate-Valentin*, 729 F.3d 31, 44 (1st Cir. 2013) (construing conspiracy under 18 U.S.C. §1951(a), the Hobbs Act); *United States v. Pappathanasi*, 383 F. Supp. 2d 289, 296–97 (D. Mass. 2005) (construing 18 U.S.C. §371, the general federal conspiracy statute))].  *See generally United States v. Stratton*, 649 F.2d 1066, 1074 n.10 (5th Cir. 1981) ("[R]eliance on cases distinguishing

14

single and multiple conspiracies under the 'wheel' and 'chain' notions of conspiracy is misplaced, since RICO replaces the conceptual devices of 'wheels' and 'chains' with the 'enterprise.'" (citing *Elliott*, 571 F.2d at 902)).  The sole criminal RICO case on which the defendants have relied, *United States v. Rodriguez-Torres*, 939 F.3d 16, 24 (1st Cir. 2019), [D.332 at 11; *see also* D.265 at 12], says nothing about a "hub and spoke" conspiracy at all.

The vast majority of cases the defendants have cited are civil cases concerning the adequacy of an alleged RICO enterprise, in which courts have relied on the traditional conspiratorial concept of a "wheel" to inform assessment of whether a group of individuals and/or entities constitutes an association-in-fact enterprise under *Boyle*.  [*See* D.334 at 9 (citing *In re Pharma. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 183 (D. Mass. 2003); D.332 at 10–12 (citing *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 327; *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 173–74 (D. Mass. 2003)); *see also* D.265 at 7 (citing *New York Auto. Ins. Plan.*, No. 97 Civ. 3164(KTD), 1998 WL 695869, at *5 (S.D.N.Y. Oct. 6, 1998); *First Nationwide Bank v. Gelt Funding, Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993)); D.268 at 11 (citing *Ezell v. Lexington Ins. Co.*, 286 F. Supp. 3d 292, 298 (D. Mass. 2017); *Gov't Emps. Ins. Co. v. Analgesic Healthcare, Inc.*, Civ. No. 16-11970-RGS, 2017 WL 1164496, at *2 (D. Mass. Mar. 28, 2017))].  Whatever the merit of that reliance, these cases have no bearing on the analytically distinct question of the nature of the agreement required to demonstrate a conspiracy to further the affairs of a RICO enterprise.

Finally, even if the "hub and spoke" limitation on conspiratorial liability applied to RICO—which it does not—the defendants' motions would still fail because whether there existed a single conspiracy or multiple conspiracies is a question of fact for the jury.  As *Kotteakos* makes

15

clear, the question whether a conspiracy has a "hub and spoke" structure is just another way of asking whether a single conspiracy or multiple conspiracies have been proved notwithstanding that only one was charged.  *See* 328 U.S. at 755.  The First Circuit has repeatedly held that that question "is, of course, a question of fact for the jury."  *United States v. LiCausi*, 167 F.3d 36, 45 (1st Cir. 1999); *accord, e.g.*, *United States v. Bedini*, 861 F.3d 10, 14 (1st Cir. 2017); *United States v. Niemi*, 579 F.3d 123, 127 (1st Cir. 2009); *United States v. Villarman-Oviedo*, 325 F.3d 1, 12 (1st Cir. 2003); *Portela*, 167 F.3d at 696; *United States v. Wihbey*, 75 F.3d 761, 774 (1st Cir. 1996); *United States v. Sepulveda*, 15 F.3d 1161, 1190–91 (1st Cir. 1993); *United States v. Mena-Robles*, 4 F.3d 1026, 1033 (1st Cir. 1993); *United States v. David*, 940 F.2d 722, 732 (1st Cir. 1991); *United States v. Drougas*, 748 F.2d 8, 17 (1st Cir. 1984).

In sum, a "rim" linking the defendants is not required as a matter of pleading or proof of a RICO conspiracy.  The link is the "enterprise."  And regardless, the question is reserved for the jury.

### 2.       The allegations sufficiently plead that each defendant knowingly joined the conspiracy.

The defendants next argue that the Superseding Indictment fails to adequately allege that they knowingly joined the conspiracy.  While proof of a RICO conspiracy at trial does not require evidence that the defendants knew one another or the full scope of each other's activities in furtherance of the enterprise, it does, as noted above, require evidence that the defendants knew the general nature of the enterprise and that the enterprise extended beyond their individual roles. *Rastelli*, 870 F.2d at 828.  But the defendants are wrong to suggest that the particulars of that knowledge must be pled in the Superseding Indictment—and even if they were not, the allegations of the Superseding Indictment would nonetheless be sufficient.

16

The defendants do not, because they cannot, point to any authority requiring that a conspiracy indictment—RICO or otherwise—allege the factual bases of a defendant's knowledge of the conspiracy in any particular detail. The question in the cases on which the defendants rely was not what must be pled *in an indictment* to satisfy the requirements of Rule 7(c)(1), but rather what must be proved *at trial*. [*See* D.334 at 10–12 (citing *United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002) (sufficiency of evidence to support conviction); *Rastelli*, 870 F.2d at 828 (same); *United States v. Guillette*, 547 F.2d 743, 750 (2d Cir. 1976) (same); *United States v. Harris*, No. 07-10143-JTM, 2009 WL 4059388, at *10 (D. Kan. Nov. 20, 2009) (same); *In re Gambino*, 421 F. Supp. 2d 283, 311 (D. Mass. 2006) (same); *Blue Cross & Blue Shield of New Jersey, Inc. v. Phillip Morris, Inc.*, 113 F. Supp. 2d 345, 366 (E.D.N.Y. 2000) (reviewing motion for summary judgment); *Gussin v. Shockey*, 725 F. Supp. 271, 277 (D. Md. 1989) (same)); *see also* D.265 at 10–11 (citing, in addition, *United States v. Viola*, 35 F.3d 37, 44–45 (2d Cir. 1994) (sufficiency of evidence to support conviction)]. Those are "are two wholly independent inquiries." *Savarese*, 686 F.3d at 7–8; *see also Turkette*, 656 F.2d at 8 (decisions concerning sufficiency of evidence to sustain a conviction did not "suggest any grounds for holding [an] indictment legally invalid"). The Superseding Indictment alleges that the defendants "conspired," [SI ¶144], thereby "impl[ying] knowing agreement." *United States v. Barrios-Ramos*, 732 F. App'x 457, 458 (7th Cir. 2018) (unpublished); *accord Schnautz v. United States*, 263 F.2d 525, 529 (5th Cir. 1959) (collecting cases). In 103 paragraphs describing acts undertaken by the defendants and others in furtherance of the conspiracy, the Superseding Indictment also provides notice of the many ways in which they knowingly agreed to further the affairs of the enterprise. [SI ¶¶39–142]. No more is required. *See United States v. Wells*, 766 F.2d 12, 22 (1st Cir. 1985) ("Viewed in its entirety, an indictment is sufficient if it describes all of the elements of the charged offense using the words

of the relevant criminal statute."); *United States v. Salerno*, No. S 86 CR 245 (MJL), 1987 WL 7934, at \*3 (S.D.N.Y. Mar. 10, 1987) ("The scienter element of knowingly and willfully combining, conspiring and agreeing to conduct and participate in the affairs of the enterprise is a sufficient allegation to withstand a motion to dismiss or sever. *An indictment need not set forth the evidence underlying the statutory language*." (emphasis added)). *Cf. United States v. Stierhoff*, 500 F. Supp. 2d 55, 61 (D.R.I. 2007) (rejecting contention that that government was required "to allege every component of the willfulness requirement in an indictment" as "flawed because it fail[ed] to distinguish between what the government must allege in an indictment and *what it must prove at trial*"), *aff'd*, 549 F.3d 19 (1st Cir. 2008).

And even if more were required, the Superseding Indictment provides it.  It contains considerable factual detail, describing how, in exchange for bribes, Williams allowed a third party to take college placements exams in place of students or to replace their exam responses with his own, [SI ¶¶39–48], and Ernst, Ferguson, Heinel, Salcedo, and Vavic facilitated multiple students' admission at their respective institutions by falsely designating the students as athletic recruits, [SI ¶¶55–117].[4]  The Superseding Indictment further alleges that the bribes were in many cases paid by checks from KWF, [*e.g.*, SI ¶¶57, 60, 86, 105, 111, 116], and in some cases by checks sent directly to the defendants by Singer's clients, [SI ¶59].  In all cases, the students were children of those clients.  [*See, e.g.*, SI ¶¶45, 57, 59, 95, 113, 117].  While the defendants are correct that the Superseding Indictment alleges that they each agreed with Singer to participate in the scheme, their efforts to fault the Superseding Indictment for "appear[ing] to treat the Key Enterprise as

---

[4] Vavic's contention that the Superseding Indictment fails to allege that he embraced the conspiracy's objective of "facilitat[ing] the admission of students to elite universities as recruited athletes, with little or no regard for their athletic abilities," [D.334 at 12 (emphasis omitted) (quoting SI ¶36)], is discussed *infra* at Part IV.A.3.

interchangeable with Singer but fail[ing] to state such a connection," [D.332 at 15; *see also* D.327 at 6; D.334 at 6], is incorrect and, in any event, inconsistent with the principle that "a court should examine an indictment as a whole and should refrain from reading it in a hypertechnical manner," *United States v. Fermin Castillo*, 829 F.2d 1194, 1197 (1st Cir. 1987) (internal quotations omitted), including by "read[ing] it to include facts which are necessarily implied by the specific allegations made," *United States v. Barbato*, 471 F.2d 918, 921 (1st Cir. 1973). *Accord Stepanets*, 879 F.3d at 372 ("[I]n seeing whether an indictment is up to snuff, a court must reject arguments that embrace technical niceties at the expense of common sense."). The Superseding Indictment specifically alleges that "Singer founded and, together with others, operated" the two entities that, together, constitute the charged enterprise. [SI ¶14]. And an enterprise can, of course, only act through its members. Here, Singer was the leader of the Key Enterprise.

It has been held that where "the evidence establishes that each defendant, over a period of years, committed several acts of racketeering activity in furtherance of the enterprise's affairs, the inference of an agreement" "to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes" "is unmistakable."[5] *Elliott*, 571 F.2d at

---

[5] Defendants' earlier attempt to liken themselves to the defendant in *Viola*, [*see* D.265 at 10–11 (citing 35 F.3d at 43–45)], only serves to highlight the sufficiency of the indictment here. In *Viola*, the Second Circuit reversed the RICO conspiracy conviction of Michael Formisano, a "janitor and handyman" employed "to perform menial tasks" at the waterfront warehouse of a wholesale coffee company owned by co-defendant Anthony Viola. 35 F.3d at 43–44. The evidence at trial "consisted of approximately forty witnesses, including three cooperating witnesses, and extensive recorded conversations obtained through over one year's electronic surveillance of Viola's office," and it showed that Viola used his influence to facilitate the importation of drugs arriving at the waterfront. *Id.* at 40. It also showed that certain defendants stole goods from the pier and adjacent warehouses and sold them on the black market. *Id.* With respect to Formisano, however, "[t]he entirety of the proof . . . showed that, acting under Viola's instructions, he transported some stolen beer and lamps to buyers and returned most of the proceeds from the sales to Viola." *Id.* at 43. The Second Circuit reasoned that while this evidence, "coupled with the fact that Formisano was present when Viola ordered another employee to load the stolen goods on a delivery truck," might otherwise be sufficient to support an inference that Formisano

903; *accord United States v. Ashman*, 979 F.2d 469, 491–92 (7th Cir. 1992).  It necessarily follows

that an indictment that alleges such conduct is more than sufficient to satisfy the pleading standard,

and to place the defendants on notice of the charges against them.  The defendants' claim that the

Superseding Indictment fails to allege that they knowingly joined the conspiracy must therefore

fail.

### 3. The allegations sufficiently plead participation in the conduct of the enterprise's affairs.

Equally unavailing is the defendants' contention that the Superseding Indictment is

deficient because it fails to allege that they personally participated in the operation or management

of the enterprise or knowingly agreed that another conspirator would do so.  As an initial matter,

although the First Circuit has not decided the question, *Rodriguez-Torres*, 939 F.3d at 28 n.6, the

defendants concede that the *Reves* requirement that a defendant personally participate in the

operation or management of the enterprise to be liable under §1962(c) does not apply to RICO

conspiracy under §1962(d).  [*See* D.334 at 13 (citing jury instructions to that effect in *United States

v. Babich*, No. Crim. No. 16-10343 (D. Mass. Apr. 4, 2019))].  And indeed, every court of appeals

to decide the issue has so held, reasoning that RICO conspiracy "is an agreement, not to operate

or manage the enterprise, but personally to facilitate the activities of those who do."  *Brouwer v.*

---

was aware of the broader enterprise, any such inference was undermined by the fact that Formisano
was "hardly even mentioned" in the "wealth of evidence presented at trial to show the existence
and scope of the Viola enterprise."  *Id.* at 44.  "Additionally, there was nothing about the nature of
the stolen goods or magnitude of the transactions involving Formisano that logically would lead
him to suspect he was part of a larger enterprise."  *Id.* at 44–45.

Even setting aside the fact that *Viola* involved a sufficiency-of-the-evidence review, it
bears no resemblance to the case at hand.  The defendants here are alleged to have repeatedly
engaged in conduct at the core of the college admissions scheme.  Taking the facts as true, they
did so over the course of years, and with significant personal financial benefit.  [*See* SI ¶¶39–115].
Their associations with the enterprise were, in other words, not merely "incidental or tenuous,"
*Viola*, 35 F.3d at 44—they were ongoing and integral to the scheme.

*Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000); *accord United States v. Mouzone*, 687 F.3d 207, 217–18 (4th Cir. 2012); *United States v. Wilson*, 605 F.3d 985, 1019–20 (D.C. Cir. 2010); *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004); *Smith v. Berg*, 247 F.3d 532, 537–38 (3d Cir. 2001); *Zichettello*, 208 F.3d at 98–99; *United States v. Posada-Rios*, 158 F.3d 832, 856–58 (5th Cir. 1998); *United States v. Castro*, 89 F.3d 1443, 1452 (11th Cir. 1996).

In any event, given that the Superseding Indictment alleges that the defendants conspired directly with the founder and leader of the Key Enterprise entities, the suggestion that it is inadequate to allege an agreement that some co-conspirator would participate in the enterprise's operation or management fails for the reasons set forth above.   And any argument that the defendants did not themselves "participate in the conduct of the enterprise's affairs" is foreclosed by First Circuit precedent holding, post-*Reves*, "that a defendant who is 'plainly integral to carrying out' the enterprise's activities may be held criminally liable under RICO."  *Shifman*, 124 F.3d at 36 (quoting *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994)).  The defendants were "plainly integral to carrying out" the test-taking and student-athlete recruiting scheme at the center of the Key Enterprise conspiracy, which could not have taken place without them.

> **D.**     **The Superseding Indictment Adequately Pleads a "Pattern of Racketeering Activity."**

The defendants also argue that the acts alleged in the Indictment cannot, as a matter of law, constitute honest services fraud, mail or wire fraud, or money laundering, and that the Superseding Indictment therefore fails to plead the requisite pattern of racketeering activity.  [D.327 at 7–19; D.332 at 21–26; D.334 at 14–19; D.336 at 2–6; *see also* D.337 at 1; D.338 at 1].  Those claims fail for the same reasons that their challenges to the substantive fraud and money laundering counts do, as discussed *infra*.

21

II.   **THE CONSPIRACY TO COMMIT MAIL, WIRE, AND HONEST SERVICES FRAUD COUNT (COUNT TWO) IS NOT DUPLICITIOUS AND IS ADEQUATELY ALLEGED.**

Relying on many of the same arguments discussed above, the defendants next contend that the mail and wire fraud conspiracy charged in Count Two must be dismissed because it is duplicitous.  [D.332 at 15–19; D.334 at 18–19; *see also* D.327 at 1; D.336 at 2; D.337 at 1; D.338 at 1].  This argument lacks merit and, once again, conflates the burdens of pleading and proof.

Designed to ensure adequate notice and jury unanimity, the doctrine of duplicity prohibits the joining of two or more distinct offenses in a single count.  *United States v. Prieto*, 812 F.3d 6, 11 (1st Cir. 2016) ("This rule is born out of two concerns. One concern is that a criminal defendant facing such an indictment might not know which charge to prepare to defend against.  A second concern is that a jury could find a defendant guilty without actually reaching unanimity." (citations omitted)).  The defendants assert that Count Two charges not a single overarching conspiracy but at least two distinct conspiracies and therefore runs afoul of this prohibition.  But Count Two charges only one offense:  a single conspiracy to "use bribery and other forms of fraud to facilitate the admission of Singer's clients to selective colleges and universities."  [SI ¶118].   That the conspiracy had two objects—to commit mail fraud and honest services mail fraud, and wire fraud and honest services wire fraud, [SI ¶¶119, 147]—and was executed through various manner and means—including bribing exam administrators to permit cheating on college entrance exams, and bribing university athletic coaches and administrators to designate applicants as purported athletic recruits, [SI ¶120]—does not render it duplicitous.  To the contrary, it is black-letter law that "the conspiracy is the crime, and that is one, however diverse its objects." *Braverman v. United States*, 317 U.S. 49, 54 (1942) (citation and quotation marks omitted); *see also, e.g.*, *United States v. Holt*, 777 F.3d 1234, 1263 (11th Cir. 2015) ("[I]t is often possible . . . to divide a single [ ] conspiracy

into subagreements," but "this does not necessarily mean that more than one conspiracy exists. . . . [T]he key is to determine whether the different sub-groups are acting in furtherance of one overarching plan." (quotations and citations omitted)); *United States v. Rugiero*, 20 F.3d 1387, 1392 (6th Cir. 1994) ("The fact that a conspiracy can be divided into distinctive sub-groups does not mean that there is more than one conspiracy.  As long as the different sub-groups are committing acts in furtherance of one overall plan, the jury can still find a single, continuing conspiracy." (quotations omitted)); *United States v. Smith*, 789 F.2d 196, 200 (3d Cir. 1986) ("[A] finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies.")

In arguing that the single conspiracy charged in Count Two is nonetheless duplicitous, the defendants rely on the absence of allegations that an indictment is not required to plead—and seemingly, on factors the evidence is not even required to prove.  They point, for example, to the absence of allegations that they each engaged in the components of the conspiracy, [*see* D.332 at 17; *see also* D.334 at 18], but there is no requirement that they have done so.  The defendants confuse the manner and means of the conspiracy—cheating on college entrance exams and purporting to recruit athletes—with its legal objects:  committing mail and wire fraud.  Moreover, the law is clear that a defendant may be convicted of involvement in a multi-prong conspiracy even if the defendant is found to have participated in only one of its objects.  *See Griffin v. United States*, 502 U.S. 46, 47, 49–51, 57 (1991) (analogizing to cases involving a single count charging the commission of an offense by two or more means to conclude that a defendant's participation in one of a single conspiracy's dual objectives was sufficient to sustain conviction).

Similarly, the defendants point to the absence of allegations of direct associations among them, [D.334 at 18], but that is also not a requirement for conviction, much less pleading.  *See*

*United States v. Berroa*, 856 F.3d 141, 154 (1st Cir. 2017) (each defendant need not "kn[o]w of or [have] had contact with all other members" or "kn[o]w of all of the details of the conspiracy or participate[] in every act in furtherance of the conspiracy"); *United States v. Drougas*, 748 F.2d 8, 17 (1st Cir. 1984) (Even if "every defendant did not participate in every transaction necessary to fulfill the aim of their agreement [that] does not transform a continuing plan into multiple conspiracies."). And, while the evidence must prove the defendants' knowing agreement, there is no requirement that the particulars of that knowledge be pled in the Superseding Indictment, as discussed above. [*See supra* Part I.C.2]. Count Two alleges that the defendants "conspired" in furtherance of an overarching plan to gain admission to college through various forms of bribery and fraud, and in doing so is sufficient to plead a single conspiracy.

Tellingly, the defendants do not marshal any persuasive authority to support their duplicity claim. Collectively, they cite three cases that purport to further their claim, [*see* D.332 at 15–19; D.334 at 18–19], two of which are entirely inapposite: In both *United States v. Newell*, 658 F.3d 1 (1st Cir. 2011), and *United States v. Hinton*, 127 F. Supp. 2d 548 (D.N.J. 2000), the courts found duplicitous counts that *on their face* bundled multiple discrete violations of the same statute into a single count. *See Newell*, 658 F.3d at 20–26 (finding duplicity where counts charging violations of 18 U.S.C. §666 "listed multiple instances of the misapplication of funds occurring within discrete one-year windows" despite the fact that each misapplication was "enough to make out an independent violation of §666"); *Hinton*, 127 F. Supp. 2d at 554–555 ("The vice here is . . . that schemes against six separate unrelated financial institutions are lumped into a single count contrary to the language of [18 U.S.C.] §1344," the bank fraud statute, which "defines one of the elements of bank fraud as a scheme to defraud 'a financial institution,' not a scheme to defraud financial

institutions.").[6]   The defendants' sole support thus comes from *United States v. Munoz-Franco*, 986 F. Supp. 70 (D.P.R. 1997), a District of Puerto Rico case that itself does not cite *any* authority supporting its view and has been roundly criticized.   *See United States v. Ohle*, 678 F. Supp. 2d 215, 222 & n.5 (S.D.N.Y. 2010) (rejecting *Munoz-Franco* as incompatible with "the strong preference for juries to determine the question of whether multiple or single conspiracies exist and how this preference affects the pleading requirements").   As one court explained in declining to dismiss as duplicitous a conspiracy count that contained only "boilerplate allegations of a single conspiracy" and a description of overt acts that was divided into two distinct sets, "the Court of Appeals has repeatedly cautioned that the determination whether a conspiracy is single or multiple is an issue of fact 'singularly' well suited to determination by a jury," even in instances where the pleadings on their face appear "more consistent with two conspiracies than one." *United States v. Gabriel*, 920 F. Supp. 498, 504 (S.D.N.Y. 1996) (Rakoff, J.) (stating that "if it were within the power of the Court to do, this Court would dismiss . . . for duplicity" a conspiracy count that "on any but a superficial reading, appears to actually allege two distinct conspiracies," but declining to do so "on the basis of the pleadings alone"), *aff'd*, 125 F.3d 89 (2d Cir. 1997).   So, too, in this circuit.   [*See supra* Part I.C.1.]

Count Two is accordingly not subject to dismissal.[7]

---

[6] The court in *Hinton* observed that "the crucial difference between mail fraud and bank fraud cases" is that "while mail fraud turns on the mere existence of the scheme accompanied by an act of mailing, bank fraud turns on the execution of the scheme." 127 F. Supp. 2d at 553.

[7] As Heinel implicitly recognizes, [*see* D.332 at 19 n.9], dismissal is in any event not ordinarily the remedy for duplicity.   1A CHARLES ALLEN WRIGHT AND ANDREW D. LEIPOLD, FEDERAL PRACTICE AND PROCEDURE §145 (4th ed. 2008).   Instead, the government can decouple the charges or select the singular charge on which it intends to proceed. *Id.*; *United States v. Abakporo*, 959 F. Supp. 2d 382, 391 (S.D.N.Y. 2013).

III.    **THE SUPERSEDING INDICTMENT ADEQUATELY ALLEGES FEDERAL PROGRAMS BRIBERY AND CONSPIRACY TO COMMIT THE SAME (COUNTS THREE THROUGH SIX).**

The federal program bribery statute, 18 U.S.C. §666, punishes "whoever, . . . being an agent of . . . a State . . . government, or any agency thereof," "accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more." *Id.* §666(a)(1)(B). The First Circuit has held that this statute criminalizes only bribes, not gratuities. *United States v. Fernandez*, 722 F.3d 1, 6 (1st Cir. 2013). "The essential difference between a bribe and an illegal gratuity is the intention of the bribe-giver to effect a *quid pro quo*," *id.* at 19 (quoting *United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir. 1993))—that is, an agreement to exchange a thing of value for official action. *United States v. Sun–Diamond Growers of California*, 526 U.S. 398, 404–05 (1999). That is what the Superseding Indictment alleges in Counts Three through Six: agreements by Heinel, Ernst, and Salcedo to accept payments in exchange for facilitating admission to their respective universities for the children of Singer's clients.

The defendants' argument that the Superseding Indictment alleges a gratuity theory beyond the scope of §666 is yet another example of their efforts to blur the burdens of pleading and proof. Despite their extended discussion of payments made after students' admissions, the defendants appear to recognize that payments need not actually be made prior to official action in order to constitute a bribe. [*See* D.332 at 19–20]; *Fernandez*, 722 F.3d at 19 ("The core difference between a bribe and a gratuity is not the time the illegal payment is made, but the *quid pro quo* . . . ." (quoting *United States v. Griffin*, 154 F.3d 762, 764 (8th Cir. 1998))); *id.* at 23 ("[A] bribe can be promised before, but paid after, the official's action on the payor's behalf." (quoting *United States*

*v. Jennings*, 160 F.3d 1006, 1015 n.3 (4th Cir. 1998))).  They contend, instead, that the Superseding Indictment is deficient because it fails to allege any pre-conduct agreement for payments—as Heinel's motion puts it, "the SI alleges either a corresponding payment made *after* the student's admission or else no corresponding payment at all. . . .  The SI fails, however, to allege any sort of agreement regarding payments intended to effect a quid pro quo."  [D.332 at 19–20].  But that is flatly untrue.  The Superseding Indictment specifically alleges, repeatedly, that the defendants agreed to recruit students as purported athletes "in exchange for" payments Singer and the parents directed to them.  [*E.g.*, SI ¶¶56, 63, 87, 113, 117].  When the payment was paid—and even whether it was ultimately made—is irrelevant to whether the defendant agreed to accept something of value in exchange for an official act.  And there is simply no reasonable way to read the Superseding Indictment as Heinel proposes:  that she sought to wield her influence to secure admissions spots for under-qualified recruits for free.  The plain language of the allegations is that she and her co-defendants did so in exchange for money.[8]

The defendants' argument that the Superseding Indictment fails to allege a *quid pro quo* because payments were made to university accounts is also unavailing.  [D.332 at 21; *see also* D.336 at 3; D.337 at 1; D.338 at 1].  As an initial matter, despite having joined in this argument, Ernst and Salcedo have no basis for making it.  The Superseding Indictment alleges that Ernst received more than $2,700,000 in the form of payments made directly to him, [SI ¶¶86, 90–91, 98], and that Salcedo received $200,000 in the form a $100,000 payment made directly to him and

---

[8] Heinel's argument that the Superseding Indictment fails to allege payments corresponding to her efforts to admit USC Applicants 3 and 4 in the fall of 2018, [D.332 at 20 (citing SI ¶¶79–85)], ignores the allegation that she entered into a sham consulting agreement with Singer pursuant to which she personally received $20,000 per month beginning in July of that year, [SI ¶60].  *See generally United States v. Lopez-Cotto*, 884 F.3d 1, 8 (1st Cir.), *cert. denied*, 139 S. Ct. 124 (2018) (recognizing that a charge under 18 U.S.C. §666 can be based on a stream of benefits).

a $100,000 payment made to a sports marketing company he controlled.   [SI ¶¶105, 112].

Likewise, although the Superseding Indictment alleges that *some* payments in exchange for

Heinel's and Ferguson's actions were made to university accounts, not all were.   In addition to the

more than $1,300,000 paid into USC accounts controlled by her, Heinel also personally received

payments of $20,000 per month for several months.   [SI ¶¶59–60, 62, 71–72, 76–77].   Ferguson's

payments similarly included not only a $10,000 check to the Wake Forest Deacon Club and a

$40,000 check to Wake Forest Women's Volleyball, but also a $50,000 check to a private

volleyball camp Ferguson controlled.[9]   [SI ¶116].   Thus, even assuming, *arguendo*, that payments

made to university accounts controlled by the defendants could not constitute bribe monies—a

point the government disputes[10]—the Superseding Indictment still supplies ample basis for the

bribery charges in this case.

---

[9] Vavic, who received both payments to a USC account that funded his water polo team and tuition payments for his children, did not join in this argument.   [SI ¶¶55, 57].

[10] Heinel cites a passing rhetorical question by the court at the sentencing hearing in *United States v. Bizzack*, No. 19-cr-10222-DPW-1 (Oct. 30, 2019), to argue that payments to university accounts cannot constitute bribes.   [D.332 at 21].   But the court—which accepted the defendant's plea to conspiracy to commit wire fraud and honest services fraud in that case—reached no such conclusion.   Instead, the court simply asked a series of questions in exploring the question of what bribe amount was reasonably foreseeable to Bizzack, a parent who made a payment to a university account Heinel controlled.   Likewise, Heinel omits mention of the court's later observation likening the defendants to "people who think that life is a series of encounters with maitre d's who, *you give them a little bit of money and you get in the side door*. . . .   That's the way of I think of this case, crudely stated."   Sentencing Tr. at 89:6–10 (emphasis added); *see also id.* at 100:17–23 ("I think of people who couldn't even aspire to spend $100 to get services to get them in the back door, who don't have enough money to give to the maitre d' to get in.   And that's fundamentally corrosive to our society.   So, do I think this is a serious crime?   You bet I think this is a serious crime.   The[m] that's got gets, or tries to, and that's wrong.").

Heinel's reliance on *United States v. Choy*, 309 F.3d 602 (9th Cir. 2002), [D.332 at 21], is similarly misplaced.   In that case, the court merely held that payment of an expense to a third party "in preparation for offering a bribe" to a government official was "too attenuated" to fall "within the proscription of the bribery statute."   *Id.* at 606.   That bears no resemblance to the facts of this case, where the defendants are alleged to have received payments personally, as well as to accounts

## IV.   DEFENDANTS' CHALLENGES TO THE SUBSTANTIVE FRAUD COUNTS (COUNTS SEVEN THROUGH TWENTY-ONE) AND PREDICATES FAIL.

The defendants collectively raise a multitude of arguments as to why the Court should dismiss all or part of the mail, wire, and honest services allegations in the Superseding Indictment. None of their claims has merit.

### A.   Honest services fraud.

The honest services fraud statute defines a "scheme or artifice to defraud" for purposes of 18 U.S.C. §§1341 and 1343 as including a "scheme or artifice to deprive another of the intangible right of honest services."   18 U.S.C. §1346.   The statute was enacted in 1988 in response to *McNally v. United States*, 483 U.S. 350 (1987), which had invalidated the courts of appeals' reading of "scheme or artifice to defraud" in §§1341 and 1343 to include deprivations not only of money or property, but also of intangible rights.  *Skilling v. United States*, 561 U.S. 358, 399–402 (2010).  In *Skilling*, the Supreme Court held that §1346 applies to "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." *Id.* at 407.

The defendants argue on several grounds that the substantive counts and predicates based on this statute must be dismissed, asserting that the Superseding Indictment does not adequately allege a cognizable fiduciary duty, [D.327 at 7–9; D.334 at 16–17; D.336 at 5–6], a bribe in breach of any such duty, [D.332 at 21–22; D.334 at 17 n.3], or intended deception, [D.334 at 14–16], and that the honest services fraud statute is unconstitutionally vague as applied, [D.327 at 9–14].  [*See also* D.336 at 2–4; D.337 at 1; D.338 at 1].  These arguments are addressed in turn.

---

that benefited them professionally, in exchange for which they secretly agreed to facilitate the admission of certain applicants as purported athletic recruits.

### 1.   The   Superseding   Indictment   alleges   breaches   of fiduciary duties.

The defendants' first argument begins with the uncontroversial assertion that a breach of a fiduciary duty is a prerequisite to honest services fraud.  *See Skilling*, 561 U.S. at 407 (identifying the honest-services doctrine's "solid core" as involving "offenders who, *in violation of a fiduciary duty*, participated in bribery or kickback schemes" (emphasis added)).  Where their argument then founders, however, is in the contention that the Superseding Indictment fails to allege that they had any such duties to breach.

In suggesting that he had no fiduciary duty to USC, Vavic seizes upon the First Circuit's acknowledgment that honest services fraud has "'mainly been used to punish fraud against the citizenry perpetrated by government officials.'"  [D.334 at 16 (quoting *United States v. Martin*, 228 F.3d 1, 17 (1st Cir. 2000))].  But as the remainder of the very sentence Vavic quotes makes clear, "courts both before *McNally* . . .  and after the passage of §1346 have been willing to expand the doctrine to the employer-employee relationship."  *Martin*, 228 F.3d at 17 (internal citations and footnotes omitted); *see also United States v. Frost*, 125 F.3d 346, 366–68 (6th Cir. 1997) (university professors with influence over whether graduate students received degrees breached fiduciary duty in violation of §1346 by knowingly accepting plagiarized dissertations).  So, too, after *Skilling*, which explicitly recognized that "[t]he existence of a fiduciary relationship" is "usually beyond dispute" where it involves, among other things, "employee-employer" relationships.  *Skilling*, 561 U.S. at 407 n.41; *see also United States v. Nouri*, 711 F.3d 129, 137 n.1 (2d Cir. 2013) (citing *Skilling* to dismiss in a footnote defendant's argument that he did not owe a fiduciary duty to his employer).  Here, of course, the Superseding Indictment specifically alleges that Vavic and his co-defendant coaches were employees of universities who, in that capacity, owed a duty of honest and faithful services.  [SI ¶¶1–2, 5–7].  It is unsurprising, then,

that one of Vavic's co-defendants concedes that honest services fraud has been applied in the private sector context, [D.327 (Williams) at 7–8], and another, similarly situated co-defendant makes no lack-of-fiduciary-duty argument at all, [D.332 (Heinel) at 21–22].

Salcedo takes a somewhat different tack. Citing Justice Scalia's concern in *Skilling* that there was no "universal agreement concerning the source of the fiduciary obligation," *Skilling*, 561 U.S. at 417 (Scalia, J., concurring) (emphasis omitted), Salcedo assumes that state law is the source and asserts that California law creates no duty here. [D.336 at 5–6]. Salcedo's assumption is wrong: the Court's opinion in *Skilling* suggests that federal, not state, standards govern §1346 prosecutions, *see id.* at 411–12 (stating that the Court's construction of the statute "establish[ed] a uniform national standard," and emphasizing that the statute draws its content from the pre-*McNally* cases, which did not require a violation of state law, *see e.g.*, *United States v. Mandel*, 591 F.2d 1347, 1361 (4th Cir. 1979) (collecting cases), as well as from other federal statutes defining bribes and kickbacks), and a majority of courts of appeals, including the First Circuit, have so held, *see, e.g.*, *United States v. Sawyer*, 85 F.3d 713, 726 (1st Cir. 1996) ("*Sawyer I*") ("[P]roof of a state law violation is not required for conviction of honest services fraud."); *United States v. Sawyer*, 239 F.3d 31, 41–42 (1st Cir. 2001) ("*Sawyer II*") (reaffirming that "establishing honest services mail fraud under §1341 does not require proof of a violation of any state law" and collecting cases); *United States v. Weyhrauch*, 548 F.3d 1237, 1244 (9th Cir. 2008) (collecting cases and noting that "[t]he majority of circuits . . . have held that the meaning of 'honest services' is governed by a uniform federal standard inherent in §1346"), *vacated and remanded on other grounds*, 561 U.S. 476 (2010).[11] *See generally Mississippi Band of Choctaw Indians v. Holyfield*,

---

[11] The Fifth Circuit alone requires that state law be the source of the fiduciary duty allegedly breached. *See United States v. Brumley*, 116 F.3d 728, 734 (5th Cir. 1997) (*en banc*).

490 U.S. 30, 43 (1989) ("'[I]n the absence of a plain indication to the contrary, Congress when it enacts a statute is not making the application of the federal act dependent on state law.'" (alteration omitted) (quoting *Jerome v. United States*, 318 U.S. 101, 104 (1943))).  Moreover, California law would not point toward dismissal even if it did apply:  the Superseding Indictment does in fact allege that Salcedo was entrusted with meaningful "'control and decision-making power over important and valuable university assets,'" [D.336 at 6 (citing *Regents of the Univ. of California v. Aisen*, No. 15-CV-1766-BEN (BLM), 2016 WL 4097072, at *5 (S.D. Cal. Apr. 18, 2016))], in the form of coveted athletic-recruit admissions slots that UCLA entrusted Salcedo, the head men's soccer coach, to fill with qualified candidates.[12]  [*See* SI ¶¶6, 99–115].

Although differently situated, Williams is likewise not beyond §1346's reach.  Indeed, the honest-services doctrine has been applied in analogous circumstances.  In *United States v. Milovanovi*c, 678 F.3d 713, 723 (9th Cir. 2012), as amended (May 22, 2012), the Ninth Circuit, sitting *en banc*, reversed the dismissal of an indictment charging an independent contractor with a bribery-based scheme to help unqualified, non-resident applicants obtain commercial drivers' licenses by cheating on exams, falsely certifying that skills tests were successfully completed, and falsely using in-state addresses.  *Id.* at 717, 724.  Because the allegations asserted that the victim state "reposed a special trust in [the defendants] to ensure the integrity of the testing of [licensing] applicants, and thus relied on the provision of their honest services in administering the tests and certifying the results," the court concluded that "a jury could find that [the defendants'] conduct fell within the ambit of . . . §1346."  *Id.* at 725.  That the defendants' contracts purported to label them as independent contractors was irrelevant.  *Id.* at 724; *see also United States v. Harper*, No.

---

[12] Ernst and Ferguson join in Salcedo's motion but offer no argument as to why they would not be subject to a fiduciary duty under the laws of the states that apply to them.  [D.337 at 1; D.338 at 1].

13-CR-601 (RJD), 2015 WL 6029530, at *4 (E.D.N.Y. Oct. 15, 2015) (rejecting sufficiency challenge in similar scenario).  *Cf. United States v. Lupton*, 620 F.3d 790, 801 (7th Cir. 2010) ("[P]rivately agreed upon 'employment labels,' like the 'independent contractor' one [the defendant] purportedly wore here, 'may bring some employment relationships *within* the sphere of agency status [for purposes of 18 U.S.C. §666] but they do not necessarily squeeze all other employment relationships *out* of that sphere.'" (quoting *United States v. Hudson*, 491 F.3d 590, 595 (6th Cir. 2007))).

As these and other cases recognize, fiduciary duties for purposes of §1346 encompass "trusting relationship[s] in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." *Milovanovi*c, 678 F.3d at 724; *accord United States v. Rybicki*, 354 F.3d 124, 127, 141–42 & n.17 (2d Cir. 2003) (*en banc*) (surveying per-*McNally* case law to conclude that state law applies to "an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers)"); *United States v. deVegter*, 198 F.3d 1324, 1329 (11th Cir. 1999) (statute applies to a "breach of loyalty by a private sector defendant" that "contravene[s]—by inherently harming—the purpose of the parties' relationship").  The two cases Williams cites for the proposition that an independent contractor does not "typically" owe a fiduciary duty are not to the contrary, [D.327 at 8]:  not only are they state contract-law cases without dispositive import for the reasons already discussed, but they merely state the "normal rule" that the courts saw "nothing in the record to suggest . . . any reason to depart from" in those cases.  *Spring Inv'r Servs., Inc. v. Carrington Capital Mgmt., LLC*, Civ. No. 10-10166, 2013 WL 1703890, at *7 (D. Mass. Apr. 18, 2013); *accord Bennett Importing v. Cont'l Airlines*, Civ. No. 87-29, 1998 WL 34031697, at *5 (D. Mass. Dec. 27, 1998).  Here, there is a reason.  The

Superseding Indictment does not "only allege[] that Williams was compensated to administer the ACT and SAT examinations," as Williams contends.  [D.327 at 8].  It also alleges that test administrators must typically certify that they will administer the test in accordance with the ACT or SAT administration manual and ensure that the materials are used for the examinee only.  [SI ¶¶30–31; *see also* SI ¶45 (alleging that the acts of allowing a third party to take the exams or replace the students' responses with his own was "in violation of the duty of honest services [Williams] owed to ACT and the College Board")].  The inference of a relationship of trust is clear, and "[i]t is within the province of the trier of fact to determine after hearing the evidence whether a fiduciary duty exists between the parties based on a position of trust."  *Milovanovi*c, 678 F.3d at 724; *accord, e.g.*, *United States v. Halloran*, 821 F.3d 321, 340 (2d Cir. 2016).

## 2. The Superseding Indictment alleges bribes, not merely self-dealing.

Citing *Skilling*'s, the defendants claim that the honest-services counts and predicates must be dismissed because they fail to allege bribes.  [D.332 at 21–22 (citing *Skilling*, 561 U.S. at 408–09); *see also* D.337 at 1; D.338 at 1].  This claim relies primarily on the same arguments the defendants made in connection with federal program bribery charges, and it fails for the same reasons.  [*See supra* Part III].

Vavic's added contention that the Superseding Indictment does not allege a bribe because he received certain payments in exchange for the designation of "future" recruits goes nowhere.  [D.334 at 12, 17 n.3].  He seeks to characterize those payments as legal gratuities, given not as an illicit *quid pro quo*, but "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future."  *Sun-Diamond*, 526 U.S. at 405.  But that is not what the Superseding Indictment alleges.  It alleges, instead, that the payments were made in exchange for Vavic's commitment to designate recruits for the USC water polo team.  [SI

¶57]. The fact that this *quo* was to take place in the "future" is of no moment, for bribes include payments "made with the intent to retain the [payee's] services on an 'as needed' basis, so that whenever the opportunity presents itself the [payee] will take specific action on the payor's behalf." *United States v. Bryant*, 655 F.3d 232, 241 (3d Cir. 2011) (quotation omitted); *accord United States v. Kincaid–Chauncey*, 556 F.3d 923, 943 n.15 (9th Cir. 2009), *abrogated on other grounds by Skilling*, 561 U.S. 358; *United States v. Ganim*, 510 F.3d 134, 148–51 (2d Cir. 2007) (Sotomayor, J.); *Jennings*, 160 F.3d at 1014. Vavic's reliance on *Sun-Diamond* is misplaced: Unlike the illegal gratuity statute interpreted in that case, honest services bribery does not require a link between each payment and a specific act. *See Ganim*, 510 F.3d at 145–47 (explaining that *Sun–Diamond*'s requirement of a direct nexus under 18 U.S.C. §201(c)(1)(A) has no applicability to §1346); *Sawyer II*, 239 F.3d at 40 n.8 (same). It requires only what the Superseding Indictment alleges—"that a particular payment is made in exchange for a *commitment* to perform official acts to benefit the payor in the future." *Ganim*, 510 F.3d at 147.

### 3.    The Superseding Indictment alleges intended deception.

The argument that the Superseding Indictment fails to allege intended deception is insubstantial. [D.334 at 14–16; *see also* D.337 at 1; D.338 at 1]. Joined by Ferguson, Vavic claims that because the Superseding Indictment does not specifically state that the two students whose admissions he facilitated and the students whose admission he agreed to facilitate in the future were under- or un-qualified, it is inadequate to allege that he intended to defraud USC. *See generally Sawyer I*, 85 F.3d at 732 n.16 ("[W]hile it may be difficult to conceive of a scheme to deprive someone of the right to honest services without intending to deceive that person, the intent to deceive must nonetheless be established."). In fact, however, the Superseding Indictment repeatedly alleges that the manner and means of the defendants' scheme involved recruiting

applicants "with little or no regard for the applicants' athletic abilities," [*e.g.*, SI ¶120f], and "[c]oncealing the fraud in order to prevent the Universities . . . from revoking the students' admission[] [or] expelling them," [SI ¶120h].  It also alleges that conspirators "conceal[ed] the nature and source of the bribe payments by funneling payments through the KWF charitable accounts," [SI ¶37e], and that Vavic specifically received private school tuition payments for his children "under the guise of a fabricated scholarship," [SI ¶57].  Vavic and Ferguson cannot, and in fact do not, complain of lack of notice.  Nor can Ernst, who also joins this argument notwithstanding the express allegation that his "recruits" included students who did not even play the sport for which they were designated.  [*E.g.*, SI ¶87].

### 4.    The honest services fraud statute is not unconstitutionally vague as applied.

The defendants contend that the honest services fraud statute is unconstitutionally vague as applied because it "does not provide adequate notice as to what type of relationships and conduct will violate the . . . statute."  [D.327 at 10; *see also* D.336 at 3–4; D.337 at 1; D.338 at 1].  The defendants' argument draws largely from Justice Scalia's concurring opinion in *Skilling*, which "expressed similar concerns regarding the 'indeterminate' source and scope of the fiduciary obligation requirement and argued that the majority's pruning of §1346 to encompass only bribery and kickback schemes did not solve this indeterminacy."  *United States v. Scanlon*, 753 F. Supp. 2d 23, 27 (D.D.C. 2010) (citing *Skilling*, 561 U.S. at 418 n.1 (Scalia, J., concurring)), *aff'd*, 666 F.3d 796 (D.C. Cir. 2012).  That position "did not carry the day" in the context of the facial challenge at issue in *Skilling*, however, *id.* at 27, and it is no more availing in the context of the as-applied challenge advanced here.

Whatever the various sources courts might consult to determine whether a fiduciary duty exists, [*see* D.327 at 11 (citing *United States v. Smith*, 985 F. Supp. 2d 547, 597–98 (S.D.N.Y.

2014); *United States v. Lusk*, No. 2:15-cr-00124, 2017 WL 508589, at *10 (S.D.W. Va. Feb. 7, 2017)], the defendants were on notice that those sources include federal law.  As discussed above, there is a clear consensus that federal law can supply the requisite fiduciary duties, and federal law has done so in the context of relationships that mirror the relationships the defendants had with the entities they defrauded.  *See, e.g.*, *Milovanovic*, 678 F.3d at 724; *Rybicki*, 354 F.3d at 141–42; *see also Smith*, 985 F. Supp. 2d at 588 ("[I]t is not only the language of the statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well." (citing *Screws v. United States*, 325 U.S. 91, 104 (1945)).  The defendants therefore cannot tenably complain that they lacked notice that their conduct could support an honest-services fraud prosecution.  *Cf. Skilling*, 561 U.S. at 407 (holding that "[a]lthough some applications of the pre-*McNally* honest-services doctrine occasioned disagreement among the Courts of Appeals," §1346 was not facially void-for-vagueness because "these decisions do not cloud the doctrine's solid core . . . .").

Furthermore, while the defendants argue about the *potential* for differences between federal- and state-law fiduciary duties, [*see* D.327 at 12–13], they fail to identify any *actual* differences that would substantiate their claim.  Indeed, despite being the primary architect of the void-for-vagueness challenge, Williams offers only a generalized description of the types of fiduciary duties recognized under the laws of various states.  [*See* D.327 at 12–13].  A party challenging the constitutionality of a statute bears the burden of proving that claim, however, *United States v. Sampson*, 486 F.3d 13, 20 (1st Cir. 2007), and merely suggesting that a statute *might* be unconstitutionally vague as applied to *some* conduct is not enough, *see United States v. Zhen Zhou Wu*, 711 F.3d 1, 15 (1st Cir. 2013) (as-applied vagueness challenge requires showing that "a statute is vague as applied to *the particular facts at issue*, for a defendant who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to

the conduct of others" (quotations omitted)).  Only Salcedo makes a specific argument concerning

the state law he assumes applies to him, and he does so unsuccessfully.  *See supra* Part IV.A.1 &

n.12.  The defendants' vagueness challenge therefore fails even on its own terms.  *See Smith*, 985

F. Supp. 2d at 599 ("[R]egardless of whether the fiduciary duty at issue in this case is based on

state or federal law, [the] [d]efendants have not cited any law suggesting any daylight between the

two that would create a notice issue here."), *aff'd sub nom. United States v. Halloran*, 664 F. App'x

23 (2d Cir. 2016); *see also Halloran*, 821 F.3d at 338 (rejecting as-applied vagueness challenge

where both state and federal law proscribed defendant's conduct).

### B.   <u>Mail and wire fraud.</u>

The mail and wire fraud statutes proscribe, *inter alia*, "any scheme or artifice to defraud . . .

for obtaining money or property by means of false or fraudulent pretenses, representations, or

promises." 18 U.S.C. §§1341 & 1343.  The defendants argue that the mail and wire fraud counts

and predicates must be dismissed because the Superseding Indictment purportedly fails to allege

that the defendants deprived the entities they defrauded of a cognizable property interest, [D.327

at 14–18; D.332 at 22–26; *see also* D.337 at 1; D.338 at 1], and because the counts are purportedly

duplicitous, [D.332 at 26–28; *see also* D.327 at 1; D.336 at 3; D.337 at 1; D.338 at 1].  These

arguments are without merit.

### 1.   ACT and SAT tests and scores are "property."

The test-taking scheme is alleged to have defrauded ACT, Inc. and the College Board of

two property interests: (1) their confidential business information in the form of the ACT and SAT

examinations, and (2) their tangible score reports.  [*See* SI ¶¶18–19, 26–34, 147, 157, 159].  Both

are "property" within the meaning of 18 U.S.C. §§1341 & 1343.  *United States v. Hedaithy*, 392

F.3d 580, 594–97 (3d Cir. 2004); *United States v. Al-Ame*, 434 F.3d 614, 616 (3d Cir. 2006).

In *Hedaithy*, the defendants participated in a scheme by which imposters were paid to sit for the Test of English as a Foreign Language ("TOEFL"), a standardized test administered by the Educational Testing Service ("ETS").   392 F.3d at 582.   The goal of the scheme was to create the false appearance that the defendant and others had taken and achieved an acceptable score on the TOEFL exam so that they could remain eligible to live in the United States under student visas. *Id.*   The Third Circuit *rejected* the defendant's argument that the government had failed to plead and prove that scheme involved deprivation of "property."  *Id.* at 593–605.   The court reasoned that the "TOEFL exam and its questions constituted the confidential business information of ETS" and therefore constituted intangible property under *Carpenter v. United States*, 484 U.S. 19 (1987). *Hedaithy*, 392 F.3d at 594–96.   The TOEFL score reports constituted tangible property; although the "score reports represent the end result of the services provided by ETS, they are nonetheless tangible items produced by ETS, and ETS reserves the right to convey these items only to those individuals who meet its proscribed conditions." *Id.* at 596–97.   The same is true of the ACT and SAT exams and score reports here.

Williams makes no effort to distinguish *Hedaithy*, and the arguments she does advance fail to call its holding into question.   She points to numerous cases in which courts have found "certain allegations of intangible rights" insufficient to establish a property right, [D.327 at 14–15 (citing cases involving allegations of a "right to a fair bid" and "right to a fair election," among others)], but *Carpenter* made clear that a property right need not be a tangible one.[13]   *Carpenter*, 484 U.S. at 25 ("Here, the object of the scheme was to take the [newspaper's] confidential business

---

[13] Williams also cannot take shelter in *United States v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997), [D.327 at 16–17], in which the First Circuit reversed the wire fraud convictions of an Internal Revenue Service employee who accessed confidential taxpayer files without authorization but did not use or intend to use the information.  *Czubinski*, 106 F.3d at 1074–76.   What was lacking in *Czubinski* was not a property right, but property deprivation.  *Id.*

information—the publication schedule and contents of [upcoming] column[s]—and its intangible nature does not make it any less "property" protected by the mail and wire fraud statutes."). *Carpenter* also forecloses Williams's efforts to argue that ACT, Inc. and the College Board had no property right because they received the full registration fees notwithstanding the alleged fraud, [D.327 at 16], for the Court specifically rejected the argument that a scheme to defraud the victim of confidential business information requires a monetary loss.  484 U.S. at 26–27 ("[I]t is sufficient that the [newspaper] has been deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information and most private property for that matter.").  For the same reason, this Court's conclusion—for the purpose of sentencing several of the defendants' co-conspirators—that the testing companies did not suffer "reasonably foreseeable pecuniary harm" within the meaning of the Sentencing Guidelines also does not advance Williams's cause:  the conclusion that pecuniary harm cannot be quantified for sentencing purposes is altogether different than saying that it is required for purposes of conviction.  [D.327 at 16 (citing *United States v. Abbott*, Crim. No. 19-10117, Mem. and Order (Sept. 13, 2019), and Probation Office's Submission in Response to Court's Order (Sept. 11. 2019))].

Lastly, *Berroa* is inapposite.  *Berroa* involved a scheme whereby the defendants sought admission to practice medicine in Puerto Rico but failed to pass at least one of the two required gatekeeping exams.  856 F.3d at 147.  As a result, they turned to an employee of the Puerto Rico Board of Medical Examiners to create fraudulent score reports.  *See id.* at 148.  They were charged with mail fraud, but, presumably because "[t]he Supreme Court has broadly and unequivocally instructed that '[s]tate and municipal licenses' generally 'do not rank as property' . . . under §1341," the indictment did not allege the defendants defrauded the Board out of a property interest in the medical licenses.  *Id.* at 149 (quoting *Cleveland v. United States*, 531 U.S. 12, 15 (2000)).

40

Instead, it alleged the defendants used their fraudulent licenses to obtain payment for medical services and issue prescriptions, a connection the First Circuit found too attenuated. *Id.* at 149–50.

Williams asserts that the ACT and SAT exams and score reports do not constitute "property" for "the same reasons that the licenses at issue in *Berroa* did not." [D.327 at 17–18]. But "[i]n *Cleveland*, the Supreme Court held that Louisiana's unissued video poker licenses were not 'property' in the first instance because [they] was merely representative of the state's sovereign power to regulate." *Hedaithy*, 392 F.3d at 598 (citing *Cleveland*, 531 U.S. at 21). Unlike the state of Louisiana and the commonwealth of Puerto Rico, ACT, Inc. and the College Board are "private business[es] that provide[] a service and report[] test results in pursuit of a profit-seeking endeavor," with "no sovereign power to regulate." *Hedaithy*, 392 F.3d at 600. As such, *Berroa*'s discussion of *Cleveland* has no bearing on this case.

### 2.    Admission to the universities is "property."

The remaining defendants contend that the Superseding Indictment is likewise deficient in failing to allege that the student-athlete recruitment scheme deprived the victim universities of any cognizable property right. That is so, they say, because admission to the universities does not qualify as property, and, even if it did, the allegations fail to allege any "tangible economic harm" resulting from their scheme. [*See* D.332 at 22–26; *see also* D.334 at 17–18; D.336 at 2–3]. Both assertions are mistaken.

The defendants' argument that admission to the universities is not "property" runs headlong into *Frost*, in which the Sixth Circuit held that the University of Tennessee had a property interest in its unissued diplomas. 125 F.3d at 367. The Court explained:

> Ultimately, a university is a business: in return for tuition money and scholarly effort, it agrees to provide an education and a degree.

> The number of degrees which a university may award is finite, and the decision to award a degree is in part a business decision. Awarding degrees to inept students, or to students who have not earned them, will decrease the value of degrees in general. More specifically, it will hurt the reputation of the school and thereby impair its ability to attract other students willing to pay tuition, as well as its ability to raise money.

*Id.* The unissued diplomas were accordingly "property," *id.*, and so they are here.

The defendants' attempt to distinguish *Frost* on the ground that it involved honest services fraud rather than ordinary mail or wire fraud is unavailing. [D.332 at 25–26 n.10]. The Sixth Circuit concluded that "[a] professor . . . owes a fiduciary duty to *protect the property* of his employer university, just like any other employee," and thus framed the relevant analysis as whether "the University has a *property right* in a degree which it has not issued yet." *Id.* at 367 (emphasis added); *see also id.* at 369 (stating that "[d]espite the literal terms of §1346, we . . . have construed the intangible right to honest services in the private sector as ultimately dependent upon the property rights of the victim"). The defendants fail to explain how "property" could possibly mean anything different in the honest services fraud context than in the context of a traditional mail or wire fraud charge, and indeed, the Sixth Circuit treated the two as interchangeable. *See id.* at 367 (assuming the applicability of the wire-fraud prohibition on treating an unissued regulatory license as property and distinguishing an unissued university degree). Moreover, the Sixth Circuit's analysis drew on factors the Supreme Court has identified as key components of "traditional concepts of property"—economic value, and the right to control. *See Cleveland*, 531 U.S. at 21–24. The defendants cite *Cleveland* to argue that these factors do not necessarily establish a property right, but in doing so they divorce the Court's findings from key context. [D.332 at 24]. Economic value did not establish a property interest in that case because state licenses "pre-issuance do not generate an ongoing stream of revenue," *id.* at 22, and the right to

exclude did not do so because it rested on the state's "sovereign right to exclude applicants deemed unsuitable," *id.* at 14, 24; *see also id.* ("A right to exclude *in that governing capacity* is not one appropriately labeled 'property.'" (emphasis added)).  This case, in contrast, falls squarely within traditional theories of property rights.

The purported requirement that the fraud resulted in "tangible economic harm" is meanwhile one of the defendants' own making.  The mail and wire fraud statutes do not require that harm result from the fraudulent scheme; they require only that harm to the victim be *contemplated*.  *E.g.*, *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) ("It is not required that the victims of the scheme in fact suffered harm, but the government must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims." (quotations omitted)); *United States v. Rosen*, 130 F.3d 5, 9 (1st Cir. 1997) (similar).  Moreover, to the extent the defendants suggest that the contemplated harm must be quantifiable pecuniary harm, [*see* D.332 at 25–26 (citing the sentencing materials in *United States v. Abbott*)], they cite no law for that proposition.  The law of this circuit contains no such requirement; the First Circuit has described the harm required to be contemplated as merely "some 'articulable harm' befalling the fraud victim or 'some gainful use' of the object of the fraudulent scheme by the perpetrator, regardless of whether this use is profitable in the economic sense."  *Rosen*, 130 F.3d at 9 (quoting *United States v. Czubinski*, 106 F.3d 1069, 1074–75 (1st Cir. 1997)).

The Second Circuit cases the defendants cite as imposing a requirement of "tangible economic harm" no more support their cause.  [D.332 at 24–25 (citing *United States v. Finazzo*, 850 F.3d 94, 109 (2d Cir. 2017); *Binday*, 804 F.3d at 570)].  Quoting from *Binday* for the proposition that "courts have 'repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain,'" [D.332 at 24–25

(quoting 804 F.3d at 570)], the defendants argue that here there could be no "tangible economic harm" because "the universities received the full payment of tuition in exchange for the admission of these students," [D.332 at 25]. The defendants' omission of what immediately follows the selected quote is telling. The Second Circuit continued by stating that it "ha[s] upheld convictions for mail and wire fraud where the deceit affected the victim's economic calculus or the benefits and burdens of the agreement." *Binday*, 804 F.3d at 570. "[N]o 'pecuniary harm' need be inflicted or intended," it explained, "so long as the deceit goes to 'an essential element of the bargain.'" *Binday*, 804 F.3d at 570 & n.11 (quoting *United States v. Schwartz*, 924 F.2d 410, 421 (2d Cir. 1991)). Such deceits include those that cost the victim "good will" or result in "reputational harm" that "could lead . . . to economic losses." *United States v. Finazzo*, 850 F.3d 94, 111 & n.18 (2d Cir. 2017); *see also United States v. Treadwell*, 593 F.3d 990, 997 (9th Cir. 2010) ("The intent to induce one's victim to give up his or her property on the basis of an intentional misrepresentation causes 'harm' by depriving the victim of the opportunity to weigh the true benefits and risks of the transaction, regardless of whether or not the victim will suffer the permanent loss of money or property.").

As discussed extensively throughout the course of these and related proceedings, the harm to the universities—whether specifically quantifiable or not—was clear. [*See, e.g.*, D.420]. The defendants' argument thus fails even under the very cases on which they rely.[14]

---

[14] Salcedo's argument that he cannot have deprived UCLA of money because "UCLA was not legally authorized to accept any financial consideration in connection with an admissions decision," [D.336 at 4; D.337 at 1; D.338 at 1], merits little discussion. If by this assertion Salcedo means that he cannot be criminally liable for diverting to his own pockets bribe money that would otherwise have been paid to the university, he attacks a theory of fraud the Superseding Indictment does not allege. If instead he means to suggest that he is effectively shielded from liability for accepting bribes because the university itself could not have accepted them, that unsupported contention is frivolous.

### C. __The mail and wire fraud counts are not duplicitous__.

The defendants next argue that even if the Superseding Indictment alleges a scheme to defraud the victims of property, the substantive mail and wire fraud counts must be dismissed as duplicitous because they allege property and honest services theories of mail or wire fraud in the same count. That proposition is incorrect as a matter of law. An indictment is duplicitous only if two *offenses* are alleged in the same count, and it is well settled that the unit of prosecution of mail and wire fraud is the mailing or the wire. *See United States v. Luongo*, 11 F.3d 7, 9 (1st Cir. 1993) (each use of the wires constitutes a separate offense under 18 U.S.C. §1343); *see also United States v. Verrecchia*, 196 F.3d 294, 297 (1st Cir. 1999) (claims of duplicity are assessed by identifying the "unit of prosecution" for the charged offense). Accordingly, a single count may charge two theories of wire or mail fraud—property or honest services—provided that it charges only one use of the wires, or one mailing. *See, e.g.*, *United States v. Caldwell*, 302 F.3d 399, 407–08 (5th Cir. 2002) (mail fraud count alleging a scheme to obtain money by false and fraudulent representations and to deprive victim of the right to honest services was not duplicitous because it contained only one allegation of use of the mail); *United States v. Goldberg*, 913 F. Supp. 629 (D. Mass. 1996) (same); *see also Luongo*, 11 F.3d at 9 (each use of the wires constitutes a separate offense under 18 U.S.C. §1343). *Cf. Martin*, 228 F.3d at 16, 18 (examining evidence to determine whether jury could have found communications were used to effect "*either*" "one of the two possible schemes to defraud," namely, "to effect a scheme under either the property theory or the honest services theory"). That the definition of honest services fraud is in turn limited to bribe and kickback schemes, [*see* D.332 at 27], requires that the Court instruct the jury on that limitation but does not convert a count incorporating two theories of the offense into distinct offenses. *See Nouri*, 711 F.3d at 138–39.

45

The defendants' further complaint that the mail and wire fraud counts reference both the test-taking and student-athlete recruiting prongs of the scheme, [D.332 at 28–27 (quoting SI ¶¶157, 159)], likewise does not implicate the doctrine of duplicity. The mail and wire fraud counts describe the property the scheme sought to obtain in the conjunctive, [SI ¶¶157 ("to wit, ACT and SAT tests and test scores, *and* admission to the Universities" (emphasis added)), 159 (same)], and where each count refers to a specific interstate wire or mailing that links to factual allegations contained elsewhere in the indictment, the defendants cannot credibly complain of lack of notice as to how they are alleged to have participated in the scheme to fraudulently obtain that property. [*See* SI ¶¶94 (wire charged in Count Seven), 48 (Count Eight), 86 (Count Ten), 80 (Count Eleven), 84 (Count Twelve), 61 (Count Thirteen), 81 (Count Fourteen), 82 (Count Fifteen), 85 (Count Sixteen), 115 (Count Seventeen), 58 (Count Eighteen), 86 (mailing charged in Count Nineteen), 112 (Count Twenty), 62 (Count Twenty-One); *see also* ¶¶156, 158 (incorporating for purposes of these counts ¶¶1–121)]. Moreover, even if these twin means of committing the larger college admissions fraud—college recruitment and exam cheating—were regarded as separate schemes altogether, the indictment would withstand scrutiny because it is well-established that a single count of wire or mail fraud may encompass multiple schemes, or a single scheme comprised of multiple sub-schemes. Thus, "where a mail fraud count alleges only *one* instance of use of the mail in furtherance of multiple schemes (or a single scheme with multiple objects), the jury can find the defendant guilty of only *one* mail fraud offense on that count—regardless whether the jury finds that the defendant devised one or all of the alleged schemes associated with that particular use of the mail." *Caldwell*, 302 F.3d at 408. Likewise, there is no issue of jury unanimity, insofar as a jury need not be unanimous as to the manner in which a charged fraud is executed. *See United States v. LaPlante*, 714 F.3d 641, 647 (1st Cir. 2013) ("A jury, faced with divergent factual theories

in support of the same ultimate issue, may decide unanimously, as is the case here, that the government has proven a scheme to defraud even if they may not be unanimous as to the precise manner in which it occurred." (quotations omitted)).  And even if there were such a requirement, it could be safeguarded with jury instructions and a special verdict form.  *See, e.g.*, *Newell*, 658 F.3d at 23 (recognizing that a jury instruction requiring unanimity cures duplicity); *United States v. Ramirez-Martinez*, 273 F.3d 903, 915 (9th Cir. 2001) (same), *overruled on other grounds by United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007).  This argument therefore provides no basis for dismissal.

## V.   DEFENDANTS' CHALLENGE TO THE SUBSTANTIVE MONEY LAUNDERING COUNT (COUNT TWENTY-TWO) AND PREDICATES FAILS.

The defendants' final arguments pertain to money laundering, which is charged as a substantive offense against Ernst in Count Twenty-Two and identified as a predicate offense in the RICO conspiracy charged against all the defendants in Count One.  [SI ¶¶144, 159].  Specifically, Count Twenty-Two charges Ernst with money laundering in violation of 18 U.S.C. §1957, which prohibits certain monetary transactions involving property "constituting, or derived from, proceeds" of a specified unlawful activity, *id.* §1957(a) & (f), and Count One alleges as a RICO predicate money laundering in violation of 18 U.S.C. §1956, which prohibits financial transactions involving "proceeds" of specified unlawful activity that are "inten[ded] to promote the carrying on of specified unlawful activity" or are "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," *id.* §1956(a)(1)(B)(i).  "Specified unlawful activity" includes bribery and fraud. 18 U.S.C. §1956(c)(7); *id.* §1957(f)(3).

The defendants conspicuously do *not* contend that the Superseding Indictment is insufficient to allege that their efforts to mask the source of their bribes amounted to concealment.

Instead, their attack on the Superseding Indictment's money laundering allegations centers on the term "proceeds."[15] They claim that the money paid to them in exchange for facilitating cheating on standardized tests or facilitating the admission of students as purported athletic recruits could not constitute "proceeds" of specified unlawful activity because the Superseding Indictment "alleges nothing more than that the parents paid 'clean' money to Singer, who then used that money to pay [the defendants]."[16]  [D.327 at 18–19; *see also* D.336 at 7; D.337 at 1; D.338 at 1]. The unstated assumption—made apparent by the defendants' citation to *United States v. Harris*, 666 F.3d 905, 910 (5th Cir. 2012) ("Money does not become proceeds of illegal activity until the unlawful activity is complete.")—is that no bribery or fraud was complete until *they* actually received the money.  That is wrong.  The money laundering statute does not require that the person conducting the transaction be the person who committed the specified unlawful activity, *see, e.g.*, *United States v. Richard*, 234 F.3d 763, 768 (1st Cir. 2000), and here, the parents' mail and wire fraud crimes were complete the moment a wire or mailing was sent in furtherance of their fraud scheme—which occurred, at the latest, upon their payment to KWF, *see, e.g.*, *United States v. Smith*, 818 F. Supp. 132, 133 (D. Md. 1993) (rejecting challenge to money laundering charge where "[d]efendants fatally confuse completion of the wire fraud *scheme* with completion of the *crime* of wire fraud.  The crime of wire fraud is complete when the defendants, on one occasion, cause interstate wires to be used in execution *or furtherance* of a scheme to defraud."), *aff'd*, 44 F.3d 1259 (4th Cir. 1995); *United States v. Potter*, 463 F.3d 9, 17 (1st Cir. 2006) (wire

---

[15] The defendants also argue that the money laundering lacks an underlying "specified unlawful activity" because the bribery and fraud allegations fail to state an offense.  [D.334 at 18 n.4; *see also* D.337 at 1; D.338 at 1].  That claim fails for the reasons already discussed.

[16] Though Ernst has ostensibly joined in this argument, [D.338 at 1], the Superseding Indictment alleges that at least some bribes were paid directly to him, and that he then used those bribe proceeds to buy a home.  [SI ¶¶86, 90, 159].

fraud offense complete upon use of wires in furtherance of scheme to defraud). Indeed, the parents' federal programs bribery crimes were complete upon offer. *Fernandez*, 722 F.3d at 16 (mere offer or agreement sufficient for purposes of federal programs bribery); *see also United States v. Wyly*, 193 F.3d 289, 296 (5th Cir. 1999) (rejecting argument that bribe monies were not "proceeds" of the bribery scheme until they were transferred to the intended recipient as inconsistent with law criminalizing the "offer or acceptance" of a bribe). *Cf. United States v. Misla-Aldarondo*, 478 F.3d 52, 68 (1st Cir. 2007) (efforts to conceal source of extortion monies via payment to third-party intermediary sufficient to establish money laundering even if Hobbs Act extortion and money laundering were "complete only upon the [subsequent] arrival of the funds in [the defendant]'s hands"). The Superseding Indictment thus adequately alleges that the defendants knowingly conducted transactions that involved the "proceeds" of specified unlawful activity.

## **CONCLUSION**

An indictment is sufficient if it contains all of the essential elements of the offense charged, fairly informs the defendants of the charges against which they must defend, and equips the defendant to make a later double jeopardy argument. The Superseding Indictment satisfies those standards. Accordingly, the defendants' motions to dismiss should be denied.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:  */s Alexia R. De Vincentis*
ALEXIA R. DE VINCENTIS
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Date: January 22, 2020                    Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

 */s Alexia R. DeVincentis*
ALEXIA R. DE VINCENTIS
Assistant United States Attorney

Date: January 22, 2020