UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | |
| | * | Criminal No. 19-10081-IT |
| GORDON ERNST, | * | |
| DONNA HEINEL, | * | |
| WILLIAM FERGUSON, and | * | |
| JOVAN VAVIC, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

November 23, 2020

After Defendants Gordon Ernst, William Ferguson, Donna Heinel, and Jovan Vavic

moved to dismiss[1] a one-count Indictment [#1] charging them and others with a Racketeering

Conspiracy, the government filed a 165-paragraph Superseding Indictment [#272], again alleging

Racketeering Conspiracy but adding factual allegations and twenty-one new counts. Defendants

Ernst, Ferguson, Heinel, and Vavic sought dismissal of the Superseding Indictment. Motion to

Dismiss as to Heinel [#331]; Motion to Dismiss as to Vavic [#333]; Motion to Join as to

Ferguson [#338]; Motion to Join as to Ernst [#337]; Motion to Join as to Vavic [#465].

Following a hearing on the motions, the government noted its intent to supersede again to

"address some of the concerns the Court identified at the recent hearing." Gov't's Proposed Jury

---

[1] See Motion to Dismiss Indictment as to Jovan Vavic [#264]; Motion for Joinder by William
Ferguson [#266]; Motion to Dismiss Indictment as to Donna Heinel [#267]; Motion for Joinder
as to Gordon Ernst [#269].

Instructions 3 [#490]. The government subsequently filed a Second Superseding Indictment [#505], adding further factual allegations and charges.

Defendants have expressed concern that by superseding, the government has again mooted the Defendants' motions to dismiss *after* the Defendants engaged in resource-intensive briefing and without resolution of the substantive legal issues raised in Defendants' motions. Status Report 4 [#537]. As a matter of law in this Circuit, however, "the grand jury's return of a superseding indictment does not void the original indictment." United States v. Vavlitis, 9 F.3d 206, 209 (1st Cir. 1993) (citing United States v. Friedman, 649 F.2d 199, 202 (3d Cir. 1981) and United States v. Holm, 550 F.2d 568, 569 (9th Cir. 1977)). Accordingly, in the interest of resolving the disputed legal issues while conserving the parties' resources, the court addresses the pending motions as they pertain to the Superseding Indictment [#272]. For the reasons discussed below, the court rejects various theories put forth by the government as to how these Defendants may be proven guilty of the offenses charged. Nonetheless, because the Superseding Indictment meets the minimal requirements of technical sufficiency so as to call for a trial on the merits, the charges survive. Accordingly, Defendants' motions to dismiss are DENIED.[2]

## I.   THE FACTS ALLEGED IN THE SUPERSEDING INDICTMENT

In or about 2007, Rick Singer founded the Edge College & Career Network, LLC (also known as "The Key"). Superseding Indictment ("SI") ¶ 15 [#272]. The Key operated as a for-profit college counseling and preparation business. Id. In or about 2012, Singer founded the Key Worldwide Foundation ("KWF"), a purported charity, as a non-profit corporation. Id. ¶ 16. The

---

[2] The court will, however, dismiss the original Indictment [#1] as to these Defendants as moot where the government filed no opposition to the motions to dismiss and has responded instead solely by filing the Superseding Indictment [#272].

government alleges that, together, The Key and KWF ("the Key Enterprise") was an ongoing organization whose members functioned as a continuing unit with a common purpose of achieving the objectives of the enterprise. Id. ¶ 17. The government alleges these objectives included: (a) to facilitate cheating on college entrance exams; (b) to facilitate the admission of students to elite universities as recruited athletes, with little or no regard for their athletic abilities; (c) to enrich Defendants and Singer personally; and, (d) to provide additional funds for designated accounts associated with university athletic programs controlled by Defendants. Id. ¶ 36.

The Superseding Indictment alleges that Defendants conspired to further the alleged enterprise by (a) facilitating cheating on ACT and SAT exams; (b) taking high school and college classes on behalf of students and submitting completed coursework to universities as if the students had taken the classes themselves; (c) designating applicants as purported recruits for competitive college athletic teams with little or no regard for the applicants' athletic abilities, in exchange for bribes; and (d) concealing the nature and source of bribe payments by funneling payments through KWF's "charitable" accounts. Id. ¶ 37.

Donna Heinel was employed as the senior associate athletic director at the University of Southern California ("USC"). Id. ¶ 2. The Superseding Indictment alleges that Singer bribed Heinel to designate students as recruited athletes, and that Heinel accepted these bribes. Id. ¶ 52. According to the Superseding Indictment, between 2014 and 2018, Singer's clients made payments of more than $1.3 million (between $50,000 and $100,000 per student) to USC accounts controlled by Heinel, typically to an account dedicated to the USC Women's Athletic Board, and in addition, Singer directed payments of $20,000 per month from KWF to Heinel personally as part of a sham consulting agreement. Id. ¶ 60.

Jovan Vavic was the water polo coach at USC. Id. ¶ 7. The Superseding Indictment alleges that Singer bribed Vavic to designate students as recruited athletes, and that Vavic accepted these bribes. Id. ¶ 52. The payments to Vavic allegedly included $250,000 to a USC account controlled by Vavic that funded USC's water polo team and private school tuition payments for Vavic's children made under the guise of a fabricated scholarship from KWF. Id. ¶¶ 55, 57.

Ferguson was employed as the women's volleyball coach at Wake Forest University ("Wake Forest"). Id. ¶ 5. The Superseding Indictment alleges that in or about 2017, Singer sent a total of $100,000 from one of KWF's charitable accounts to Ferguson, including a $10,000 check to the Wake Forest Deacon Club, a $40,000 check to Wake Forest Women's Volleyball, and a $50,000 check to a private volleyball camp that Ferguson controlled. Id. ¶ 116. The Superseding Indictment alleges that, in return, Ferguson agreed to designate the daughter of one of Singer's clients as a recruit to the women's volleyball team, facilitating her admission to Wake Forest. Id. ¶ 117.

Ernst was employed as the head coach of men's and women's tennis at Georgetown University ("Georgetown"). Id. ¶ 1. The Superseding Indictment alleges that between 2007 and 2018, Singer paid Ernst bribes, falsely labelled as "consulting" fees, totaling more than $2.7 million. Id. ¶ 86. The Superseding Indictment alleges that in exchange for the bribes, Ernst designated at least 12 applicants as recruits for the Georgetown tennis teams, including students who did not play tennis competitively, thereby facilitating their admission to Georgetown. Id. ¶ 87.

4

II.     THE CHARGES BROUGHT IN THE SUPERSEDING INDICTMENT

Count One of the Superseding Indictment charges all Defendants with Racketeering

Conspiracy in violation of 18 U.S.C. § 1962(d). SI ¶ 144 [#272].

Count Two of the Superseding Indictment charges all Defendants with conspiracy to

commit mail and wire fraud and honest services mail and wire fraud in violation of 18 U.S.C.

§ 1349. Id. ¶ 147.

Counts Three and Four allege that Heinel and Ernst, respectively, conspired to commit

federal programs bribery in violation of 18 U.S.C. § 371. Id. ¶¶ 149, 151.

Count Six alleges that Ernst committed federal programs bribery, in violation of 18

U.S.C. § 666(a)(1)(B). Id. ¶ 155.

Counts Seven, Ten through Sixteen, and Eighteen, charge Ernst, Heinel, and Vavic with

individual substantive counts of wire fraud and honest services wire fraud, in violation of 18

U.S.C. §§ 1343 and 1346. Id. ¶ 157.

Counts Nineteen and Twenty-One charge Ernst and Heinel, respectively, with substantive

mail fraud and honest services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346. Id.

¶ 159a.

Count Twenty-Two charges Ernst with money laundering in violation of 18 U.S.C.

§ 1957. Id. ¶ 159b.

III.    THE LEGAL STANDARD

Pursuant to Federal Rule of Criminal Procedure Rule 12(b)(1), "[a] party may raise by

pretrial motion any defense . . . that the court can determine without a trial on the merits."

Defendants' motions here are brought under  Rule 7(c)(1), which provides that an indictment

must provide "a plain, concise, and definite written statement of the essential facts constituting

the offense charged." This rule derives from the Fifth Amendment's guarantee that defendants be first indicted by a grand jury before being held to answer for a criminal charge and the Sixth Amendment's guarantee for the accused "to be informed of the nature and cause of the accusation." United States v. Stepanets, 879 F.3d 367, 372 (1st Cir. 2018) (citing U.S. Const. Amends. V and VI).

A court must exercise its authority to dismiss cautiously, however, because dismissing an indictment "directly encroaches upon the fundamental role of the grand jury." Whitehouse v. U.S. D. Ct. for the D. of R.I., 53 F.3d 1349, 1360 (1st Cir. 1995). "[I]n the ordinary course of events, a technically sufficient indictment handed down by a duly empaneled grand jury 'is enough to call for trial of the charge on the merits.'" United States v. Guerrier, 669 F.3d 1, 4 (1st Cir. 2011) (quoting Costello v. United States, 350 U.S. 359, 363 (1956)). "An indictment need not say much to satisfy [Rule 7(c)(1)'s] requirements—it need only outline 'the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense.'" Id. at 3. That means an indictment will generally be sufficient if it "tracks the language of the underlying statute" provided "that the excerpted statutory language sets out all of the elements of the offense without material uncertainty." United States v. Troy, 618 F.3d 27, 34 (1st Cir. 2010). "In other words, the statutory language may be used in the indictment to describe the offense, 'but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.'" Troy, 618 F.3d at 34 (quoting Hamling v. United States, 418 U.S. 87, 117–18 (1974) (internal citations omitted)).

Furthermore, a motion to dismiss must only "attack the facial validity of the indictment . . . [rather than] challeng[ing] the government's substantive case." United States v. Ngige, 780 F.3d 497, 502 (1st Cir. 2015). As a result, the court must "take the facts alleged in the indictment as true, mindful that the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." Id. (internal quotations omitted).

IV.   ANALYSIS

A.   Whether the Superseding Indictment is Sufficiently Specific—All Counts

Defendants argue the Superseding Indictment must be dismissed because it fails to set forth "the essential facts constituting the offense charged" and "sufficiently apprise[] the defendant of what he must be prepared to meet." Vavic Mem. 7 [#334] (citations omitted). Although all Defendants join in the motion as to the lack of specificity, only Defendants Ferguson and Vavic put forth arguments as to why the factual allegations brought against them are insufficient as a matter of law. Indeed, the Superseding Indictment has the least to say as to these two Defendants, particularly Ferguson.

Vavic argues that the Superseding Indictment fails to "identify the source or scope of . . . [his fiduciary] duty; the 'two students' alleged to have been designated as recruits in exchange for the bribes; the dates and details of the related payments; or any specifics about the 'future' clients [Vavic] purportedly agreed to designate as recruits." Vavic Mem. 7 [#334]. Ferguson argues that, with the exception of paragraphs 116 and 117 of the Superseding Indictment—which allege that he accepted a $50,000 bribe to designate a recruit at Wake Forest—the Superseding Indictment fails to allege any facts that would support the government's charge that Ferguson

knew of and joined the conspiracies charged in Counts One and Two of the Superseding Indictment. Hr'g Tr. 78:12–80:14 [#486].

The government has put forth enough to allow Vavic and Ferguson, and by extension all four Defendants, to defend the charges and to ensure that they do not face the prospect of double jeopardy for the same underlying offense. The deficiencies identified by Ferguson and Vavic go to the specifics of the offense elements—that is, the scope of Vavic's duties to USC or how exactly Ferguson, for instance, conspired to operate or manage a RICO enterprise. These are questions that the government will need to prove with facts at trial, but the government's failure to provide the specific factual allegations in the Superseding Indictment does not create confusion—or at least an unfair level of confusion—as to the conduct that the government is alleging gives rise to the present charges. Accordingly, the Superseding Indictment is not subject to dismissal for a lack of specificity.

   B.   The Substantive Fraud Allegations—Counts Seven, Ten to Sixteen, Eighteen, Nineteen, and Twenty-One

The federal mail fraud statute makes it unlawful for anyone to use the mail in furtherance of "any scheme or artifice to defraud, or . . . [to] obtain[] money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341.[3] After the Supreme Court concluded that the statute protected only money and property rights, see McNally v. United States, 483 U.S. 350 (1987), Congress responded by defining "scheme or artifice to defraud" to

_____

[3] The wire fraud statute similarly prohibits the use of wire communication for such fraud. See 18 U.S.C. § 1343. The court analyzes the mail and wire fraud statutes together and interchangeably. See Pasquantino v. United States, 544 U.S. 349, 355 n.2 (2005) ("we have construed identical language in the wire and mail fraud statutes *in pari materia*"); see also United States v. Sidoo, No. 19-cr-10080-NMG, 2020 WL 3440990 at *6 (D. Mass. June 23, 2020).

include "a scheme or artifice to deprive another of the tangible right of honest services." See 18

U.S.C. § 1346. For each of the substantive fraud counts alleged in the Superseding Indictment,

the government alleges both types of fraud: that Defendants fraudulently deprived the

universities of their money or property; and that Defendants deprived the universities of their

intangible rights to the honest services of their employees.[4] Defendants argue that the object of

the alleged fraud, "admission of applicants to colleges and universities," SI ¶¶ 119, 147a [#272],

does not constitute money or property. Defendants also challenge the honest services fraud

allegations, arguing that the Superseding Indictment fails to allege a fiduciary relationship

between the Defendants and their employers, fails to allege a bribe or kickback, and fails to

allege any intended deception of the Defendants' employers.[5] For the reasons set forth below, the

court finds that admission slots are not money or property under the federal property fraud

statutes but that the government may proceed on the theory that Defendants committed wire or

mail fraud by depriving the universities of the honest services of its employees.

> 1. *Whether the Superseding Indictment States an Offense for Property Fraud*

The government advances three theories for why admission to universities constitutes a

cognizable property right under federal law: 1) that admission to universities is a form of

---

[4] The Superseding Indictment also alleges that these Defendants schemed to deprive test companies of their money or property and their right to honest services. SI ¶¶ 147a, 157 [#272]. However, the factual allegations concern Defendants' misuse of their positions as coaches in the admissions scheme, not the test-taking scheme. Therefore, the court focuses here on the alleged fraud as it pertains to admissions.

[5] In their pleadings, Defendants argue further that the government improperly charged both wire fraud and honest services wire fraud (or, alternatively, both mail fraud and honest services mail fraud) in single counts. Heinel Mem. 26–27 [#332]. At the hearing on the pending motions, Defense counsel withdrew this argument. Hr'g Tr. 33–34 [#486].

property, 2) that the federal property fraud statutes are implicated where a defendant has interfered with a victim's "right to control" the use of its assets, and 3) that the Defendants defrauded the universities of money or property by depriving them of their employees' services. Gov't's Opp'n 41–44 [#371]. The court addresses each theory in turn.

The government contends that admissions slots fall within "the range of property interests held to be cognizable under the mail and wire fraud statutes, which . . . criminalize fraudulent schemes to deprive others of intangible as well as tangible property rights."  Gov't's Supp. 3 [#467] (citing Carpenter v. United States, 484 U.S. 19, 26–27 (1987)). In Carpenter (a case decided after McNally but before the statutory amendment adding honest services fraud), the Court considered whether confidential business information—namely, non-public information regarding publicly traded stocks—constituted "money or property" under the federal property fraud statutes. 484 U.S. at 25–26. The Court held that the tangibility of the confidential business information was not the central inquiry; instead the dispositive analysis was whether it constituted "property." Id. at 25. Citing cases dating back to the start of the 20th century, federal statutes, and learned treatises, the Court concluded that "confidential business information has long been recognized as property" and thus was subject to the protections of the federal property fraud statutes. Id. at 26. The Court then reasoned that the news matter at issue was no different than other types of confidential business information since it constituted the publisher's "'stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and to be distributed and sold to those who will pay money for it, as for any other merchandise.'" Id. (citing Int'l News Serv. v. Associated Press, 248 U.S. 215, 236 (1918)).

In arguing that admission slots also constitute property, the government relies primarily on United States v. Frost, a case discussing a university's property right in its unissued degrees.

125 F.3d 346, 367 (6th Cir. 1997). Defendants contend that Frost is inapposite and that, to the extent there is any ambiguity in the question, the rule of lenity requires dismissal of the claims insofar as they allege mail or wire fraud. Heinel Reply 19–20 [#390].

In Frost, the Sixth Circuit concluded that a university had a property right in an unissued degree, reasoning:

> Ultimately, a university is a business: in return for tuition money and scholarly effort, it agrees to provide an education and a degree. The number of degrees which a university may award is finite, and the decision to award a degree is in part a business decision. Awarding degrees to inept students, or to students who have not earned them, will decrease the value of degrees in general. More specifically, it will hurt the reputation of the school and thereby impair its ability to attract other students willing to pay tuition, as well as its ability to raise money.

Id. at 367. The context for this ruling, however, was not a charge that the defendants had fraudulently deprived the university of property under the federal property fraud statutes, but that defendants had deprived the university of honest services. That is, the court considered whether the degrees were "property" solely for purposes of determining whether the defendants were violating their fiduciary duties to the university when fraudulently awarding university degrees (i.e., whether the defendants had a duty to protect the university's unissued degrees). Notably, the Sixth Circuit did not wrestle with whether the degrees amounted to "intangible property rights" under the standard set forth in Carpenter.

The Supreme Court considered intangible rights further and clarified the reach of the federal fraud statutes in Cleveland v. United States. 531 U.S. 12 (2000). At issue in Cleveland were false statements that the defendants had made in applications for video poker licenses submitted to the state of Louisiana. Although the Court accepted that Louisiana had a "substantial economic stake in the video poker industry" including an interest in "public confidence and trust that gaming activities . . . are conducted honestly and are free from criminal

11

and corruptive elements," the Court nonetheless held that fraudulent statements made in the application process did not constitute federal fraud because the licenses did not constitute "property in the hands of the victim." Id. at 15, 20–22. The Court found that, instead of depriving Louisiana of "property" in the traditional sense, the defendants had deprived the State of its "right to choose the persons to whom it issues video poker licenses." Id. at 23 (internal citations omitted). And although the State may have a protected interest in its ability to issue licenses to whom it wants, the Court found that any such right was "far from composing an interest that 'has long been recognized as property'" as was the case in Carpenter. Id. at 23 (citing Carpenter, 484 U.S. at 26). In reaching this conclusion, the Court rejected the argument that an unissued gaming license was akin to other cognizable property rights such as a not-yet-licensed patent, finding that although both the State and the patent holder may hold a right to exclude, the State's right to exclude was not, by itself, sufficient to conclude that the item at issue was a form of property. Id. Instead, the Court took into account other considerations, such as that the State was not in the business of monetizing the licenses, did not hold onto the licenses so as to monetize the licenses, and did not "sell" the licenses in the ordinary commercial sense of the term. Id.

Importantly, the Court expressly did not find that interference with a selection process could never constitute federal property fraud. The Court considered the government's argument that the State's choice of licensees was similar to a franchisor's right to select its franchisees, which the Court implied to constitute a property right. Id. at 24. But the Court rejected the comparison between the selection of a franchisee and the selection of whom to issue a video poker licenses since "a franchisor's right to select its franchisees typically derives from its ownership of a trademark, brand name, business strategy, or other product that it may trade or sell in the open market." Id. In contrast, the Court noted, Louisiana's interest in licensing "rests

12

instead upon the State's sovereign right to exclude applicants deemed unsuitable to run video poker operations" which, the Court found, "is not one appropriately labeled 'property.'" Id.

In May 2020, the Supreme Court issued its decision in Kelly v. United States, in which it once again held that courts should not extend the reach of the federal property fraud statutes beyond cases where the object of the fraud was a victim's money or property. 140 S. Ct. 1565, 1574 (2020). At issue in Kelly were convictions of public officers who engaged in a scheme to shut down lanes of the George Washington Bridge as an act of political retribution. Id. at 1569. In Kelly, the government presented two theories for why the lane realignment scheme targeted the government's money or property. The first was that the defendants had "commandeer[ed]" the physical lanes as part of their scheme and that the lanes themselves were the government's property. Id. at 1572. The second was that the defendants had deprived the Port Authority of the labor of its employees who performed the wrongful lane realignment. Id. The Court rejected both arguments, finding instead that the scheme was not directed towards obtaining the government's property—be it the bridge lanes or the labor of its employees—but instead towards improperly altering "a regulatory decision about the toll plaza's use." Id. at 1573. And although the Court noted that the defendants' conduct may have ultimately imposed "incidental (even if foreseen)" costs on the victim, those costs were not what the defendants "sought to obtain" by their malfeasance, but instead an "incidental byproduct" thereof. Id. at 1574. In closing, the Supreme Court reemphasized its "oft-repeated instruction" that the federal property fraud statutes "bar only schemes for obtaining property." Id.

Applying the Supreme Court's precedent in Carpenter, Cleveland, and Kelly to the charges brought against the Defendants here, the court concludes that the charged object of the fraud—admission to universities—does not constitute "property" under the federal property

fraud statutes. While the government argues that admission to universities "falls squarely within traditional theories of property rights," it provides little to no support for that assertion beyond the citation to the Sixth Circuit's decision in <u>Frost</u>. Gov't's Opp'n 43 [#371]. But <u>Frost</u>'s discussion of property in the context of honest services fraud is of little help in defining "property" after the Supreme Court's subsequent rulings in <u>Cleveland</u> and <u>Kelly</u> emphatically rejected novel and expansive interpretations of the term. Indeed, the underlying rationale in <u>Frost</u> for why universities have a property right in their unissued degrees—that awarding unearned degrees would decrease the value of degrees in general and hurt the reputation of the school, thus hindering its ability to collect money through donations and tuition—would also have also been true of Louisiana's interest in only awarding gaming licenses to qualified applicants. Nevertheless, the Court in <u>Cleveland</u> did not find that to be enough. Likewise, the Sixth Circuit's focus in <u>Frost</u> on the consequential costs to the schools that may have resulted from the alleged scheme may be correct in considering whether the faculty defendants owed a fiduciary duty to ensure the university did not issue unearned degrees, but to the extent that the government seeks to extend that decision to *property* fraud instead of honest services fraud, the argument runs contrary to the Supreme Court's admonishment in <u>Kelly</u> that it is not enough that the scheme incidentally causes a loss of property; instead the question is whether the loss of property was the *object* of the charged fraud.

Beyond the rationale expressed in <u>Frost</u> in the context of honest services fraud, there is little indication that university admission slots can be considered "property" under the Supreme Court's construction of the term. In contrast to the confidential business information at issue in <u>Carpenter</u>—where the Court could cite to a hundred years of caselaw, statutes, and treatises to support the proposition that confidential business information is a form of "property"—here, the

14

government provides no basis from which the court can conclude that universities treat the admissions slots as a form of property. For example, there is no argument presented that the universities hold onto admission slots in order to trade or sell admission to the universities in the ordinary commercial sense of the word. Cf. Cleveland, 531 U.S. at 23 (rejecting the comparison of Louisiana's unissued permits to unlicensed patents since Louisiana was not in the business of holding onto the licenses so that they may sell them in the commercial sense). Nor is there any argument that when the universities offered the students admission, they also conveyed to the students ownership over the universities' property rights, such as "a trademark, brand name, business strategy, or other product that [the admittees] may trade or sell in the open market." Id. at 24. Instead, the wrong identified by the government is that Defendants' conduct harmed the integrity of the admissions process. While the court accepts that there is substantial value in having integrity in the admissions process, the court is not persuaded that integrity in the admissions process constitutes the universities' "property" for purposes of the property fraud statute. Instead, to the extent that the universities were deprived of integrity and fairness in the admissions process, the honest services fraud statutes—not the property fraud statutes—provide the framework to address the offense.

Following the Supreme Court's 2020 decision in Kelly v. United States, the government refocused its arguments on two alternative theories. See Gov't's Supp. 1 [#467]. However, the court finds neither theory persuasive.

The first argument is that "mail or wire fraud prosecution is proper where the alleged scheme deprives a private victim of the right to control the use of its assets." Id. at 1, 3 (collecting cases applying this theory). Under this theory, a defendant may be guilty of federal property fraud where his scheme "den[ies] the victim the right to control its assets by depriving it

15

of information necessary to make discretionary economic decisions." <u>United States v. Binday</u>, 804 F.3d 558, 570 (2d Cir. 2015) (citing <u>United States v. Rossomando</u>, 144 F.3d 197, 201 n.5 (2d Cir. 1998)).[6] However, as the Second Circuit recently emphasized in <u>United States v. Finazzo</u>, the right to control theory is not so broad as to criminalize "every non-disclosure or misrepresentation that could affect someone's decision of how to use his or her assets." 850 F.3d 94, 111 (2d Cir. 2017). Instead it is bounded by two important constraints. First, it requires that the government show that the defendant deprived the victim of "potentially valuable *economic* information." <u>Id.</u> at 112 (collecting cases emphasizing the economic nature of the information) (quotation omitted and emphasis added). Second, "[t]he fraudulent scheme must implicate *tangible* economic harm." <u>Id.</u> at 111 (emphasis added). Here, the Superseding Indictment alleges neither. If the government were to proceed to trial and prove that Defendants committed property fraud by depriving the universities of the right to control their assets, the essential elements of the offense charged would have been so modified that there would be a substantial likelihood of Defendants being "convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted [them]." <u>Russell v. United States</u>, 369 U.S. 749, 770 (1962). Thus, the government's present reliance on the right to control theory to support its property fraud allegations frustrates Defendants' rights to be indicted by a grand jury.

---

[6] The Supreme Court has not yet stated its position on the "right-to-control" theory as applied to the federal property fraud statutes. For its part, the First Circuit relied on the "right-to-control" in upholding convictions in <u>United States v. Bucuvalas</u>, 970 F.2d 937, 945 (1st Cir. 1992). However, the Supreme Court expressly abrogated <u>Bucuvalas</u> in <u>Cleveland</u>. 531 U.S. at 18. For the purposes of argument, the court assumes the validity of the right-to-control theory under the parameters set by the Courts of Appeal that have applied it.

The second alternative argument put forth by the government is that the Defendants committed property fraud by wrongly obtaining "access to the labor of a university's extensive, highly trained workforce." Gov't's Supp. Mem. 4 [#467]. However, in <u>Kelly</u>, the Supreme Court emphasized that the time and labor of employees may only constitute the basis for property fraud where obtaining that time and labor was the object of the fraud and not its "implementation costs." 140 S. Ct. at 1573–74. Here, the Superseding Indictment plainly states that the object of the fraud was admission to the universities. SI ¶¶ 119, 147a, 157, 159a [#272]. The wrongful taking of the time and labor of the universities' staff thus constitutes the "incidental byproduct" of the charged scheme, not the scheme's object.

In concluding that, as a matter of law, the government cannot secure a conviction on the theory that Defendants committed property fraud, the court also considers the Supreme Court's refrain that the federal property fraud statutes should not be used as a backdoor for expanding the scope of federal criminal jurisdiction without a clear statement by Congress. <u>See</u> <u>Cleveland</u>, 531 U.S. at 24 ("We resist the Government's reading of § 1341 as well because it invites us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress. Equating issuance of licenses or permits with deprivation of property would subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities"); <u>McNally</u>, 483 U.S. at 360 ("If Congress desires to go further, it must speak more clearly than it has"); <u>Kelly</u>, 140 S. Ct. at 1574 ("If U.S. Attorneys could prosecute as property fraud every lie a state or local official tells in making such a decision, the result would be—as <u>Cleveland</u> recognized—'a sweeping expansion of federal criminal jurisdiction'"). Indeed, just three years ago the First Circuit expressly rejected a similar expansion of federal criminal jurisdiction in <u>United States v. Berroa</u>. 856 F.3d 141 (1st Cir. 2017). There, the Circuit was

unpersuaded because "under the government's theory, virtually any false statement in an application for a medical license could constitute a federal crime." Id. at 150. Here, the government seeks to go even further; under its construction, any false statement in an application for admission, whether to pre-kindergarten or to college, would constitute a federal offense punishable by up to twenty years in prison.

Finally, the court is guided by the foundational principle in criminal law that "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" Cleveland, 531 U.S. at 25 (citing Rewis v. United States, 401 U.S. 808, 812 (1971)). The government's arguments for why the property fraud statutes extend to university admissions have some persuasive force and another judge in this court, in a carefully reasoned opinion in a related case, has agreed with the government's arguments. See United States v. Sidoo, No. 19-cr-10080-NMG, 2020 WL 3440990, at *7 (D. Mass. June 23, 2020). In view of the analysis set forth above, the court concludes that, at minimum, there is a serious question as to whether the property fraud statute reaches the conduct alleged in the Superseding Indictment. Where such a serious disagreement exists, the court must consider the principle of lenity. Furthermore, as the Supreme Court stated in Cleveland, the principle of lenity "is especially appropriate in construing [the federal mail fraud statute] because, as this case demonstrates, mail fraud is a predicate offense under RICO, 18 U.S.C. § 1961(1) . . . and the money laundering statute, § 1956(c)(7)(A)." 531 U.S. at 25. Thus, even if the court were persuaded that admission to universities could constitute "property," the principle of lenity would require the court's ruling here today.

18

2. *Whether the Superseding Indictment States an Offense for Honest Services Fraud*

Finally, Defendants raise several challenges to the substantive honest services fraud allegations. The court addresses each of these arguments below.

Defendants contend that the Superseding Indictment fails to allege that the Defendants owed a fiduciary duty to the universities. Salcedo Mem. 5–6 [#336]. But the Superseding Indictment alleges that each of the Defendants, in the capacity in which they were employed, owed a duty of honest and faithful services to the universities that so employed them. SI ¶¶ 1, 2, 5, 7 [#272]. Furthermore, the Superseding Indictment provides factual allegations that support this legal conclusion; namely, that Defendants were employed in high-ranking positions within the universities that allegedly provided Defendants with the ability to influence university decisions. Id. These allegations satisfy the government's pleading standards and leave the question of the sufficiency of proof as to whether there was a fiduciary relationship as a question of fact for the jury.[7]

Defendants next argue that the Superseding Indictment fails to allege a bribe or kickback. See Heinel Mem. 21–22 [#332]; Vavic Mem. 17 n.3 [#334]. Citing Skilling v. United States, 561

---

[7] Likewise, Defendants' argument that the honest services fraud statute is unconstitutionally vague is unavailing. Outside of the context of the First Amendment, courts consider "whether a statute is vague *as applied* to the particular facts at issue," because a defendant "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." United States v. Zhen Zhou Wu, 711 F.3d 1, 15 (1st Cir. 2013) (emphasis added). This is because "objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." Maynard v. Cartwright, 486 U.S. 356, 361 (1988). Here, there is no vagueness as applied to Ernst, Vavic, Ferguson, and Heinel. As noted above, the Defendants are alleged to have been employed in roles of trust and confidence at their respective universities.

U.S. 358, 408–09 (2010), Defendants correctly contend that an honest services offense requires the government to prove not merely self-dealing, but participation in a bribery or kickback scheme. As discussed in Section IV.E, below, the Superseding Indictment adequately alleges that Defendants engaged in a bribery scheme insofar as they are alleged to have entered into a quid pro quo where they exchanged money for official acts.

Finally, Defendants argue that the Superseding Indictment fails to allege any intended deception and thus the alleged honest services fraud fails as a matter of law. Vavic Mem. 14–16 [#334]. However, the Superseding Indictment specifically alleges that all Defendants designated athletic recruits not based on their merit as recruits, but in return for bribe payments made by Singer and the recruits' parents and that these bribe payments and unmerited designations were concealed so as to frustrate the universities' ability to detect the illicit quid pro quo. See SI ¶¶ 37, 52, 57, 58, 60, 63, 82, 86, 87, 117, 120 [#272]. These allegations, while sometimes threadbare and general as to certain Defendants, are nevertheless enough to "apprise the defendant of the charged offense." United States v. Savarese, 686 F.3d 1, 7 (1st Cir. 2012). Again, the factual sufficiency of the charges is a question for the jury.

### C.  The Conspiracy Charge—Count Two

Count Two of the Superseding Indictment charges Defendants in a conspiracy to commit Mail and Wire Fraud and Honest Services Mail and Wire Fraud in violation of 18 U.S.C. § 1349. SI ¶¶ 146–47 [#272]. Defendants move to dismiss this count as duplicitous insofar as it charges multiple, distinct, and separate conspiracies in a single count. Vavic Mem. 18–19 [#334]. The government rebuts that there is one charged offense, "a single conspiracy to 'use bribery and other forms of fraud to facilitate the admission of Singer's clients to selective colleges and universities.'" Gov't Opp'n 22 [#371] (quoting SI ¶ 118 [#272]).

As the First Circuit explained in United States v. Prieto, the prohibition on duplicitous charges exists to address two concerns. 812 F.3d 6, 11 (1st Cir. 2016). First, a duplicitous charge does not provide a defendant with sufficient notice insofar as the defendant "might not know which charge to prepare to defend against." Id. (citing United States v. Huguenin, 950 F.2d 23, 26 (1st Cir. 1991)). Second, where an indictment is duplicitous, a jury may return a conviction without unanimity as to each of the multiple charges. Id. (citing United States v. Valerio, 48 F.3d 58, 63 (1st Cir.1995)).

Here, Defendants contend that the government has charged multiple distinct conspiracies in two different ways. First, Defendants contend that the government has impermissibly joined the athletic recruitment scheme and the test-taking scheme into a single conspiracy where there was no overlap between the two. Vavic Mem. 19 [#334]. Second, Defendants contend that the government has impermissibly joined the individual Defendants into a single conspiracy where there are no alleged connections between the relationships Singer had with each of the individual Defendants. Id. at 18. Defendants' points are well-taken; the factual allegations in the Superseding Indictment do not readily lend themselves to the conclusion that these Defendants were part of a single overarching conspiracy. That is, there is a dearth of factual allegations that support a common goal, interdependence among the participants, and overlap among the participants, which are the qualities that courts have generally looked for to determine if the evidence supports finding a single conspiracy. United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999) (citing United States v. Gaviria, 116 F.3d 1498, 1533 (D.C. Cir. 1997)).

But considerations of whether the facts support a common goal, interdependence among the participants, and overlap among the participants is not the question at the stage of a motion to dismiss for duplicity. Instead, the inquiry at this stage is a limited one: does the *charge* in the

21

indictment consist of one offense or more. Here, on its face, Count Two of the Superseding Indictment charges only one conspiracy to unlawfully obtain ACT and SAT tests and test scores and admission to universities, through mail and wire fraud and honest services mail and wire fraud. SI ¶¶ 146–47 [#272]. In this way, the Superseding Indictment avoids the risks that underlie duplicitous charges because Defendants know exactly the conspiracy that is alleged (a unitary conspiracy) and if the jury returns a conviction it will have been on a unitary conspiracy. Thus, the problem presented by the Superseding Indictment is not that it is legally deficient for duplicity, but that the facts may not support the charge that the government has brought.

Defendants contend that where the facts and the charge are so far apart, the court should dismiss the indictment or order that the government reformulate the charge to align with the alleged facts. But this court cannot prejudge the factual sufficiency for the charges brought on a motion to dismiss an indictment. Guerrier, 669 F.3d at 4 ("[A] technically sufficient indictment handed down by a duly empaneled grand jury 'is enough to call for trial of the charge on the merits'"). As applied here, that means that the question of whether there are facts that can prove the government's charge of a unitary conspiracy will be a question for the jury. Cf. United States v. LiCausi, 167 F.3d 36, 45 (1st Cir. 1999)  (citing United States v. Drougas, 748 F.2d 8, 17 (1st Cir. 1984)) ("[w]hether a single conspiracy or a multiple conspiracy exists is, of course, a question of fact for the jury"); see also United States v. Gabriel, 920 F. Supp. 498, 504 (S.D.N.Y. 1996), aff'd, 125 F.3d 89 (2d Cir. 1997) ("if it were within the power of the Court to do, this Court would dismiss . . .  for duplicity . . .   [b]ut the [Second Circuit] Court of Appeals has

repeatedly cautioned that the determination of whether a conspiracy is single or multiple is an issue of fact singularly well suited to determination by a jury") (internal quotation omitted).[8]

### D. The RICO Conspiracy Charge – Count One

While Count Two, discussed in the previous section, charged Defendants with a conspiracy to fraudulently obtain ACT and SAT tests and test scores and admission to universities, Count One goes further; it charges Defendants with a Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d), specifically that Defendants conspired to violate 18 U.S.C. § 1962(c), that is, to conduct or participate in the conduct of the affairs of an enterprise affecting interstate commerce through a pattern of racketeering activity. SI ¶¶ 143–53 [#272].

Defendants contend that, as with Count Two, the facts alleged in the Superseding Indictment provide little support for the proposition that there was a *single* conspiracy. Vavic Mem. 10 [#334]. The government responds that it will be able to prove a single conspiracy at trial, and that the RICO statute does not require a single conspiracy. Gov't's Opp'n 15, 25 [#371]. As discussed below, the government will be required to demonstrate at trial a single

---

[8] Defendants cite United States v. Munoz-Franco, in which the court dismissed a conspiracy charge on the basis that "[a] simple reading of the allegations of the indictment shows that these were two separate conspiracies which did not merge." 986 F.Supp. 70, 72 (D.P.R. 1997). However, the court may not second guess the factual sufficiency of the allegations on a motion to dismiss, and may only dismiss an indictment where the government will not be able to prove its case as a matter of law. See United States v. Brissette, 919 F.3d 670, 676 (1st Cir. 2019) (noting that a pretrial dismissal based on the insufficiency of the alleged facts is only warranted where "as a matter of law, the government is incapable of proving its case beyond a reasonable doubt." (citing United States v. Hall, 20 F.3d 1084, 1088 (10th Cir. 1994) (emphasis in original)).

conspiracy. Nonetheless, because the Superseding Indictment does charge the required single RICO conspiracy, the charge will not be dismissed on this ground.

Defendants also argue that the Superseding Indictment provides no factual support for the assertion that the Defendants joined an agreement to further or facilitate the operation or management of the charged RICO enterprise. Vavic Mem. 11–13 [#334]. Again, the government contends that this is a question for trial, but also argues that even if it cannot prove that Defendants entered into a conspiracy to operate or manage the enterprise, it can still secure a conviction on the basis that these Defendants were "integral" to furthering the charged enterprise's objectives. Gov't's Opp'n 21 [#371]. As discussed below, the government will be required to demonstrate at trial that the conspiracy was to operate or manage the charged RICO enterprise, and cannot secure a conviction merely by demonstrating that Defendants were "integral" to furthering the objectives of the enterprise. Nonetheless, where the government contends that it can prove that Defendants conspired to operate or manage the RICO enterprise, the question of the ultimate sufficiency of the proof is for the jury.

Finally, Defendants contend that the RICO predicates fail for the reasons discussed in relation to the substantive fraud counts and because of legal flaws in the government's money laundering allegations. Vavic Mem. 14 [#334]; Williams Mem. 18 [#327]. These challenges to the RICO conspiracy charge, as discussed below, are not persuasive.

### 1. *Whether the Government has Alleged a Single Conspiracy*

Defendants' first challenge essentially parallels Defendants' challenge to Count Two. That is, Defendants argue that there is no evidence of a single conspiracy since the charged Defendants constitute, "[a]t most . . . a 'hub-and-spoke' structure with Singer occupying the hub and . . . [Defendants] as the spokes, with no common rim linking the individual spokes together."

24

Heinel Mem. 12 [#332]. However, as with Count Two, at the end of the day, whether the government can prevail on the charge of a single conspiracy is a question that goes to the sufficiency of the evidence (and, thus, will be decided by the jury).

Unlike with Count Two, the government presents another rebuttal; it argues that because this conspiracy charge is brought under the RICO statute, the government does not, in fact, need to prove a single conspiracy (in other words, the fact that it can prove a single conspiracy is mere surplusage). The court considers this argument in connection with the elements of the RICO conspiracy charge, which the parties dispute.

### 2. *The Elements of the Underlying RICO Offense and Overview of the Elements of the Conspiracy Charge*

The Superseding Indictment does not charge Defendants with a violation of a substantive RICO offense, that is 18 U.S.C. § 1962(a), (b), or (c). Rather, the Superseding Indictment charges Defendants with a conspiracy to commit a RICO offense under 18 U.S.C. § 1962(d). SI ¶¶ 143–53 [#272]. Nonetheless, the court reviews the elements of the underlying substantive RICO offense to orient the discussion.

The substantive RICO offense that Defendants are charged with conspiring to violate, 18 U.S.C. § 1962(c), provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The elements of this substantive offense are well-characterized and are not disputed. To prove a violation of § 1962(c), the government must establish: (1) that there was an enterprise that affected interstate or foreign commerce, (2) that the defendant was associated with or employed by the enterprise, (3) that the defendant participated in the conduct of the enterprise's affairs, and

(4) that the defendant's participation was through a pattern of racketeering activity. United States v. Shifman, 124 F.3d 31, 35 (1st Cir. 1997) (citing Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1558 (1st Cir.1994)), abrogated in part on other grounds by, Salinas v. United States, 52 U.S. 522 (1997).

The conspiracy provision of the RICO statute provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). The challenge presented in interpreting and applying the statute here is the relationship between the substantive provision and the conspiracy provision. The Supreme Court provided some guidance on this question in Salinas v. United States, where the Court considered whether a conviction for RICO conspiracy required the government to prove that the conspirator himself committed or agreed to commit the two or more predicate acts that serve as a prerequisite for the substantive RICO offense. 522 U.S. 52 (1997). The Court noted that, under "well-established principles," id. at 63, "'[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense," id. (quoting United States v. Socony–Vacuum Oil Co., 310 U.S. 150, 253–54 (1940), "so long as they share a common purpose," id. at 64, and "intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." Id. at 65. The Court rejected the requirement that the government must prove that each conspirator agreed that *he* would be the one to commit two predicate acts. Id. at 64. Following Salinas, the First Circuit explained "that RICO conspiracy does not require proof that a defendant 'himself committed or agreed to commit the two predicate acts requisite for a substantive RICO offense under § 1962(c).'" United States v. Cianci, 378 F.3d 71, 90 (1st Cir. 2004) (quoting Salinas, 522 U.S. at 61–66). Rather, the defendant "'must intend to further an endeavor which, if completed, would satisfy all

of the elements of a substantive criminal offense, but it suffices that he adopt the goal of

furthering or facilitating the criminal endeavor.'" Id. (quoting Salinas, 522 U.S. at 65).

In September 2019, two panels of this Circuit again addressed the elements of a RICO

conspiracy offense post-Salinas. In United States v. Leoner-Aguirre, the court explained that, in

light of Salinas, "[t]he government's burden in proving a violation of the conspiracy offense,

section 1962(d), is to show that the defendant 'knew about and agreed to facilitate' a substantive

RICO violation." 939 F.3d 310, 316 (1st Cir. 2019) (citing Salinas, 522 U.S. at 66). The court

continued that "conspiracy to violate subsection (c) requires proof that the defendant knew about

and agreed to facilitate 'the conduct of [an] enterprise's affairs through a pattern of racketeering

activity.'" Id. at 316 (quoting 18 U.S.C. § 1962(c)). Similarly, in United States v. Rodriguez-

Torres, the court explained that "[b]roadly speaking . . . , a RICO-conspiracy conviction requires

proof that the defendant knowingly joined the conspiracy, agreeing with one or more

coconspirators 'to further [the] endeavor which, if completed, would satisfy all the elements of a

substantive [RICO] offense.'" 939 F.3d 16, 23–24 (1st Cir. 2019) (quoting Salinas, 522 U.S. at

65).

The court now turns back to the parties' arguments with this framework in mind.

3. *Whether the Superseding Indictment Sufficiently Pleads a Conspiracy to Violate the Substantive RICO Statute*

a. *Enterprise Affecting Interstate Commerce*

Tracking the elements of the substantive offense, Defendants' proposed jury instructions

for the RICO conspiracy charge require the government to prove that the enterprise alleged in the

indictment that affected interstate or foreign commerce existed, see Defs.' Proposed Jury

Instructions 8–9 [#491], while the government includes no such separate requirement, see

Gov't's Proposed Jury Instructions 7 [#490]. Although the First Circuit has not addressed the question directly, see Rodriguez-Torres, 939 F.3d at 38 & n.12, by applying the First Circuit's general directive that the government must show that the defendant knowingly joined the conspiracy to further the endeavor "which, if completed, would satisfy all of the elements of a substantive offense," the court concludes that the government must show that the conspiracy, if completed, would involve an enterprise that affected interstate or foreign commerce.

Defendants' opening briefs turn next to the requirements for such an enterprise, arguing that the enterprise alleged by the government is too disparate to constitute an "association-in-fact" enterprise under the Supreme Court's holding in Boyle v. United States. Heinel Mem. 4–14 [#332] (citing 556 U.S. 938, 946 (2009)); Vavic. Mem. 9–11 [#334]. An "enterprise" is defined in the statute to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In Boyle, the Court reiterated that an enterprise-in-fact "'is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" 556 U.S. at 945 (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)). The enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose." Id. In their opening briefs, Defendants argued that the enterprise charged in the Superseding Indictment was "comprised of the Key Enterprise and seven independent and unrelated hub-and-spoke defendants who individually 'associated' with Singer through bilateral transactions." Vavic Mem. 9 [#334]. This, Defendants argued, fell far short of Boyle's requirements of common purpose, relationships among those associated with the enterprise, and longevity. Heinel Mem. 4–14 [#332] (citing 556 U.S. at 946).

28

The government responds that "the alleged enterprise is the Key Enterprise *alone*." Gov't's Opp'n 9 [#371] (citing SI ¶¶ 15–17 [#272]) (emphasis added). And, indeed, the Superseding Indictment specifically alleges that "The Key and KWF" constitute the "association in fact of entities engaged in, and activities of which affected, interstate and foreign commerce." SI ¶ 17 [#272]. Thus, the government contends, it only needs to meet the <u>Boyle</u> standard as to the entities comprising the so-called Key Enterprise. Gov't's Opp'n 9 [#371]. Defendants do not dispute in their reply that the Key Enterprise, as it has been framed by the government, meets the requirements of an "association-in-fact" enterprise under the <u>Boyle</u> standard.

However, this framing of the RICO enterprise undermines the government's assertion that it need not prove a single conspiracy. That assertion is based on <u>United States v. Elliott</u>, where the Fifth Circuit found that the concept of a RICO "enterprise" replaced the outdated "conspiracy" model. Gov't's Opp'n 13 [#371] (citing <u>Elliott</u>, 571 F.2d 880, 902 (5th Cir. 1978) and collecting cases adopting <u>Elliott</u>). In <u>Elliott</u>, the Fifth Circuit held that by enacting the RICO statute, Congress put aside foundational principles of conspiracy law in order to allow the government to bring "mass prosecutions" of organized crime in the absence of a "single agreement or common objective." 571 F.2d at 902. As the Fifth Circuit explained, while the government would typically need to prove a rim connecting the spokes in order to prove a single conspiracy, Congress did away with this requirement when it passed RICO and substituted "a new statutory concept: the enterprise." <u>Id.</u> As the government puts it, "[t]he enterprise supplied the missing link." Gov't's Opp'n 12 [#371]. But while the concept of an "enterprise" may supply the missing link for those who are part of the enterprise, here the government is placing Defendants outside of the enterprise (thereby relieving the government from satisfying even the minimal requirements set forth in <u>Boyle</u>).

29

Given this apparent inconsistency in the government's reasoning, it is not surprising that the government has not identified a single case where a court has interpreted the RICO statute as the government does here. In contrast, Defendants have put forth nearly twenty cases, albeit cases involving civil RICO liability,[9] where courts have *rejected* rimless hub and spoke RICO conspiracies where the plaintiffs could not meet the "relatively undemanding standard of Boyle" insomuch as the allegations "fail[ed] the basic requirement that the components function as a unit, that they be 'put together to form a whole.'" In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 374 (3d Cir. 2010) (quoting Boyle, 556 U.S. at 945); see also Heinel Reply 4 [#390] (collecting nineteen similar cases). Accordingly, the court concludes that, as the Superseding Indictment does not contend that Defendants are part of the alleged enterprise, the government will need to prove a single conspiracy to obtain a conviction for the charged RICO conspiracy and cannot simply rely on the enterprise for the missing link.

b. *Employed by or Associated with the Enterprise*

It is an element of 18 U.S.C. § 1962(c) that the defendant was "employed by or associated with" the alleged enterprise. Again, following the First Circuit and Supreme Court's general directive, the court finds that the government must establish that the charged conspiracy,

---

[9] The government criticizes Defendants for citing civil RICO cases. See Gov't's Opp'n 15 [#371]. But, the First Circuit has repeatedly stated that "'it is appropriate to rely on civil RICO precedent when analyzing criminal RICO liability.'" United States v. Marino, 277 F.3d 11, 33 (1st Cir. 2002) (quoting Shifman, 124 F.3d at 35 n.1). Furthermore, the civil cases cited by Defendants are interpreting and applying the Boyle standard, which involved a criminal RICO charge.

if completed, would have Defendants employed by or associated with the charged enterprise, namely the Key Enterprise.

Consistent with this requirement, the Superseding Indictment charges that all Defendants were "persons associated with or employed by the Key Enterprise." SI ¶ 144 [#272]. Defendants argue that if they are not part of the enterprise-in-fact under Boyle, they cannot be associated with the enterprise, and the charge must be dismissed for "[u]nder the RICO statute, only those persons employed by *or associated with* the enterprise are criminally liable," Heinel Reply 2 [#390] (citing 18 U.S.C. §§ 1962(c), (d)). But here Defendants are conflating two separate requirements, one that defines the enterprise as discussed above, and the other that requires the defendant to be an associate or employee of that enterprise. The term "associate" is quite broad. See Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1559 (1st Cir. 1994) (explaining that "one who, for example, buys an insurance policy from an enterprise and depends on the solidarity of that enterprise, for protection against defined risks, has an association with, and may be said to have 'associated with,' the enterprise). Thus, "outsiders" (e.g., those outside the association-in-fact enterprise as defined by Boyle) may still be "associated with" an enterprise. See Reves v. Ernst & Young, 507 U.S. 170, 185 (1993) (holding as much in the context of 18 U.S.C. § 1962(c)). Accordingly, as the Defendants are allegedly "associated with" the enterprise, the government's assertion that the alleged enterprise is limited to the Key Enterprise does not require dismissal of the Superseding Indictment.

> c. *Conduct or Participate in the Conduct of the Enterprise's Affairs*

Once the government has clarified that the alleged RICO enterprise is the Key Enterprise, Defendants argue that the Superseding Indictment fails to adequately allege that they, together,

knowingly joined a conspiracy to operate or manage the Key Enterprise's affairs. Specifically, Defendants contend that there are no facts in the Superseding Indictment that support the government's allegation that the Defendants knew of the alleged RICO enterprise (the Key Enterprise), much less joined an agreement to operate or manage the Key Enterprise. Vavic Mem. 13–14 [#334]; Heinel Reply 12–15 [#390].

Once again, to the extent that Defendants' challenge is that the facts do not support the government's allegations, that is a question for the jury. However, the government also argues: (1) that the government need not prove that Defendants themselves conspired to operate or manage the alleged enterprise on a RICO conspiracy charge, and (2) if it cannot prove that the Defendants conspired to operate or manage the alleged enterprise, it can still secure a conviction so long as it can show that the Defendants were "integral to carrying out" the alleged scheme. Gov't's Opp'n 20–21 [#371].

To consider these arguments, the court starts with the element of the underlying substantive RICO provision that requires proving that the person associated with the enterprise "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs." Defendants' contention that this language requires "operation or management" of the enterprise is based on the Supreme Court's decision in Reves v. Ernst & Young, 507 U.S. 170 (1993). There, analyzing the statutory text in light of its legislative history, the Court concluded that the statutory provision requiring "conduct or participat[ion]" in the enterprise's affairs requires proof that the defendant engaged in the "operation or management of the enterprise." Id. at 172, 185. In reaching this conclusion, the Court rejected the argument that "conduct" means "carry on . . . so that almost any involvement in the affairs of an enterprise would satisfy the 'conduct or participate' requirement," and also rejected the notion that "participate" was a "synonym for 'aid

32

and abet.'" Id. at 178–79. The Court found instead that "'conduct' requires an element of direction," and "'participate' . . . require[s] some part in that direction," so that "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." Id. at 179. The Court focused on the response of Senator McClellan, a sponsor of the bill, to concerns that "RICO would reach many crimes not necessarily typical of organized crimes," where he explained "that the critical limitation was not to be found § 1961(1)'s list of predicate crimes but in the statute's other requirements, including those under § 1962." Id. at 182. Specifically, Senator McClellan pointed to the requirement that "'an individual not only commits such a [predicate] crime but engages in a pattern of such violations, and uses that pattern to obtain or operate an interest in an interstate business.'" Id. (quoting 116 Cong.Rec. 18940 (1970)). The Court concluded that one is not liable under § 1962(c) "unless one has participated in the operation or management of the enterprise itself." Id.

The government acknowledges that the "conduct" element of the substantive RICO offense under Section 1962(c) "requires participation in the 'operation or management of an enterprise . . .'" under Reves. Gov't's Opp'n 6 [#371] (citing Reves, 507 U.S. at 183). Nonetheless, the government argues that under First Circuit decisions issued after Reves "a defendant who is 'plainly integral to carrying out the enterprise's activities may be held criminally liable under RICO.'" Id. at 21 (quoting Shifman, 124 F.3d at 36 (quoting United States v. Oreto, 37 F.3d 739, 750 (1st Cir. 1994))).

But the government's reliance on Shifman and Oreto is misplaced as the government has placed Defendants outside of the alleged enterprise. As the First Circuit emphasized in both Shifman and Oreto:

> Special care is required in translating <u>Reves</u>' concern with "horizontal"
> connections—focusing on the liability of an outside adviser—into the "vertical"
> question of how far RICO liability may extend within the enterprise but down the
> organizational ladder. In our view, the reason the accountants were not liable in
> <u>Reves</u> is that, while they were undeniably involved in the enterprise's decisions,
> they neither made those decisions nor carried them out; in other words, the
> accountants were outside the chain of command through which the enterprise's
> affairs were conducted.

<u>Shifman</u>, 124 F.3d at 36; <u>Oreto</u>, 37 F.3d at 750.

Furthermore, the First Circuit has, since <u>Shifman</u> and <u>Oreto</u>, reiterated that "[t]he crucial words . . . are 'operation and management,' which effectively communicate to a jury that in order for a defendant to have been an associate of the RICO enterprise, his participation needs to have had 'an element of direction' of the enterprise's affairs." <u>United States v. Cianci</u>, 378 F.3d 71, 95 (1st Cir. 2004) (quoting <u>Reves</u>, 507 U.S. at 178). Accordingly, the court will follow the plain holding in <u>Reves</u>, and not an inapplicable quote from <u>Shifman</u>, in defining the underlying substantive offense to require Defendants' participation in the "operation or management of the enterprise itself." <u>Reves</u>, 507 U.S. at 183.

The next issue is the relationship between the conspiracy charge and this element. As noted above, the First Circuit's general guidance directs that "a RICO-conspiracy conviction requires proof that the defendant knowingly joined the conspiracy, agreeing with one or more coconspirators 'to further [the] endeavor which, if completed, would satisfy all the elements of a substantive [RICO] offense.'" <u>Rodriguez-Torres</u>, 939 F.3d at 23–24 (quoting <u>Salinas</u>, 522 U.S. at 65). From this, the court agrees with the government that the Defendants need not have personally participated in the operation or management of an enterprise in order to be liable for RICO conspiracy under § 1962(d).

34

But the court disagrees with the government's view that Reves' operation or management test is irrelevant to a RICO conspiracy charge. Notably, the First Circuit, presented with the same question, recently reaffirmed that it has not yet articulated how the Reves "operation or management" test applies in the context of a RICO conspiracy (and declined to do so where it did not need to do so in the case before it). See Rodriguez-Torres, 939 F.3d at 28 n.6. Accordingly, the court must resolve this question on its own without the benefit of First Circuit precedent.

As it did in its arguments to the Circuit in Rodriguez-Torres, the government cites out-of-circuit caselaw to argue that the court should do away with the "operation or management" test in the context of a RICO conspiracy charge. See Gov't's Opp'n 20–21 [#371] (citing decisions from other circuits). On review, the court does not find these decisions to constitute persuasive support for the government's argument here. In United States v. Wilson, for example, the D.C. Circuit jumps, without any explanation, from the premise that Salinas "indicates that an individual defendant need not himself participate in the operation or management of an enterprise"—a proposition that the Defendants here do not contest—to the much broader conclusion that "the Reves operation or management test does not apply to conspiracy under § 1962(d)." 605 F.3d 985, 1019 (D.C. Cir. 2010). In United States v. Mouzone, another case cited by the government, the Fourth Circuit does the same thing. 687 F.3d 207, 217 (4th Cir. 2012). There, the Circuit found that, under Salinas, "§ 1962(d) liability does not require that a defendant have a role in directing an enterprise." But, as with the D.C. Circuit, the Fourth Circuit jumps from that premise to expressly rejecting the Defendants' request that the jury be instructed that "to conduct or participate . . . in the conduct of [an] enterprise's affairs" means "some part in directing those affairs." In other words, the Circuit appears to hold that Reves' analysis of the

meaning of the substantive RICO statute does not apply in the context of a conspiracy to violate the substantive provision. As with the D.C. Circuit, the Fourth Circuit provides no analysis explaining how the statutory phrase "conduct or participate" can hold one meaning in the context of § 1962(c) but then take on a different meaning in the context of § 1962(d).

At the same time, other cases cited by the government do not go so far as to render the Reves decision meaningless in the context of a RICO conspiracy charge. For instance, in United States v. Castro, the Eleventh Circuit noted that "the Reves 'operation or management' test does not apply to section 1962(d) convictions." 89 F.3d 1443, 1452 (11th Cir. 1996). However, the Circuit still required proof that the defendant "'agreed' to affect the operation or management" of the alleged enterprise.

To be sure, the government is correct that some Courts of Appeal have reasoned that a Defendant may be guilty of a RICO conspiracy even where the Defendant did not conspire to operate or manage a RICO conspiracy but simply "agrees to facilitate a scheme *which includes* the operation or management of a RICO enterprise." Smith v. Berg, 247 F.3d 532, 538 (3d Cir. 2001) (emphasis added); see also United States v. Fernandez, 388 F.3d 1199, 1230 (9th Cir. 2004) ("We adopt the Third Circuit's Smith test, which retains Reves' operation or management test in its definition of the underlying substantive § 1962(c) violation, but removes any requirement that the defendant have actually conspired to operate or manage the enterprise herself"); Brouwer v. Raffensperger, Hughes & Co., 199 F.3d 961, 967 (7th Cir. 2000) ("It is an agreement, not to operate or manage the enterprise, but personally to facilitate the activities of those who do"). These Courts of Appeal that have concluded that one is guilty of a RICO conspiracy so long as he does *something* that "facilitate[s] a scheme which includes the operation or management of a RICO enterprise" follow a similar line of reasoning. Namely, the courts

reason that since the Supreme Court in Salinas did not require a criminal defendant to have necessarily agreed to "undertake *all* of the acts necessary for the crime's completion," 522 U.S. at 53 (emphasis added), that therefore a defendant may be guilty of RICO conspiracy "even if the defendant did not personally agree to do, or to conspire with respect to, *any* particular element," Berg, 247 F.3d at 537 (emphasis added).

      With due respect to these Courts of Appeal, the cited decisions overread Salinas and underread Reves. This court interprets the Supreme Court's statement in Salinas that a defendant need not "agree to undertake all of the acts necessary for the crime's completion" to simply mean that the conspirator need not agree to undertake each element of substantive offense *himself*. Cf. Salinas, 522 U.S. 61 (framing the question presented as whether a RICO conspiracy conviction requires proof that Defendant "himself committed or agreed to commit the two predicate acts requisite for a substantive RICO offense under § 1962(c)"). The court does not read Salinas to hold that a Defendant may be guilty of a RICO conspiracy without entering a conspiracy to violate each element of the RICO statute. Cf. id. ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense"); id. at 65 ("a person [may] be convicted of conspiracy so long as he 'agrees with such other person or persons that they or one or more of them will engage in conduct that constitutes such crime'") (citing Model Penal Code § 5.03(1)(a) (1962)).

      Likewise, the court finds that some of the Courts of Appeal have given short shrift to the importance of the Supreme Court's holding in Reves. Citing the broader proposition that a person can be guilty of a conspiracy to violate an offense "short of agreeing to undertake *all* of the acts necessary for the crime's completion," Salinas, 522 U.S. at 65 (emphasis added), these courts have treated the "operation or management" element of the RICO offense as, essentially,

dispensable in the context of a RICO conspiracy charge. But, in Reves, the Supreme Court emphasized that the operation or management of an enterprise was not some bit element of the RICO offense, but was instead *the offense* that Congress was targeting by promulgating the RICO statute. 507 U.S. at 183 (citing 116 Cong.Rec., at 18940)); see also id. at 185 ("The United States correctly points out that RICO's major purpose was to attack the 'infiltration of organized crime and racketeering into legitimate organizations'"); id. at 182 ("It is clear from other remarks, however, that Congress did not intend RICO to extend beyond the acquisition or operation of an enterprise"); id. at 181 ("The first line of S. 1861 reflected its expanded purpose: 'to prohibit the infiltration or management of legitimate organizations by racketeering activity or the proceeds of racketeering activity'"). While the court accepts the general proposition that a conspirator need not agree to undertake *all* of the acts necessary for the crime's completion, the court cannot subscribe to the idea that an individual can be guilty of conspiring to violate the RICO statute without entering an agreement on the quintessential quality of a RICO offense, operation or management of an enterprise. Cf. Morissette v. United States, 342 U.S. 246, 263 (1952) ("The spirit of the doctrine which denies to the federal judiciary power to create crimes forthrightly admonishes that we should not enlarge the reach of enacted crimes by constituting them from anything less than the incriminating components contemplated by the words used in the statute").

For these reasons, the court concludes that the criminal endeavor at issue is operation or management of an enterprise by prohibited means. Accordingly, the government will need to show for this element that the Defendants agreed to further an endeavor of operating or managing the Key Enterprise. In other words, the government will need to prove a conspiracy to violate RICO. In so finding, the court rejects any suggestion that this element may be satisfied by

proving only that the Defendants agreed to "carry on" or "aid and abet" the activities of the entity. See Reves, 507 U.S. at 178–79.

            *d.*   *Conduct the Enterprise's Affairs through a Pattern of Racketeering Activity.*

The final element of the underlying substantive offense that Defendants are accused of conspiring to violate, 18 U.S.C. § 1962(c), requires the government to prove the conduct of the enterprise's affairs "through a pattern of racketeering activity" which is defined in the statute to mean "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). Accordingly, to prove the conspiracy charge, the government will need to prove that the charged conspiracy, if completed, would have committed at least two acts of racketeering activity. The Superseding Indictment alleges that the racketeering activity for the charged conspiracy constitutes mail fraud and honest services mail fraud, wire fraud and honest services wire fraud, and money laundering. The court's discussion of the fraud statutes in the context of the substantive counts applies here and need not be restated.

That leaves the money laundering predicate offense. The elements of the underlying offense are that an individual or entity, (1) "'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity,'" (2) "'conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity,'" (3) "'knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.'" United States v. Ayala-Vazquez, 751 F.3d 1, 14–15

39

(1st Cir. 2014) (quoting 18 U.S.C. § 1956(a)(1)(B)(i)).[10] Defendants contend here that the government has not sufficiently alleged the money laundering predicate offense insofar as "nowhere in the allegations does it set forth any allegations that support money laundering." Hr'g Tr. 85:10–20 [#486].

But the Superseding Indictment is not as threadbare as Defendants contend. The Superseding Indictment alleges that the RICO conspirators "conceal[ed] the nature and source of the bribe payments by funneling payments through the KWF charitable accounts." SI ¶ 37e [#272]. The Superseding Indictment also includes specific factual allegations detailing individual payments from parents to the KWF charitable accounts and from the KWF charitable accounts to alleged coconspirators, including the Defendants. Id. ¶¶ 57, 60, 74, 78, 86, 97, 98, 109, 111. In the context of a RICO conspiracy charge, the government has satisfied its pleading obligations where the indictment "adequately details 'the locations [where the alleged conspiracy operated], the principal actors, and, with some detail, the specific types of predicate crimes to be committed and the modus operandi of the conspiracy.'" United States v. Costa, No. 19-CR-10190-PBS, 2020 WL 5034300, at *3 (D. Mass. Aug. 26, 2020) (citing United States v. Glecier, 923 F.2d 496, 500 (7th Cir. 1991)). The allegations contained in the Superseding Indictment clear this bar with regards to the money laundering predicate offense.

Defendants also contend that the Superseding Indictment's factual allegations giving rise to the money laundering predicate offense do not, as a matter of law, constitute money

---

[10] The motions to dismiss do not challenge the money laundering allegation outside of the context of the RICO predicate acts. Hr'g Tr. 87:24–88:2 [#486]. Outside of the RICO charge, only Defendant Ernst is charged with a money laundering offense. SI, Count Twenty-Two [#272].

laundering. Williams Mem. 18–19 [#327]. The gist of Defendants' argument is that "the money paid by the parents to Singer is not alleged to be the proceeds of illegal activity" and that, instead, "the parents paid 'clean' money to Singer, who then used that money to pay [Defendants]." Id. at 19. However, as the government argues in its Opposition 47 [#371], the funds paid into the KWF for the purpose of committing the alleged mail and wire fraud were proceeds from unlawful activity as soon as they were paid by the parents to KWF for the purpose of facilitating the alleged fraud. Thus, Defendants' contention that they were paid with "clean" money under the facts alleged in the Superseding Indictment is unpersuasive.

### E. The Federal Programs Bribery and Conspiracy to Commit Federal Programs Bribery Charges—Counts Three, Four, and Six

Counts Three and Four charge Defendants Heinel and Ernst with conspiracy to commit federal programs bribery and Count Six charges Defendant Ernst with the substantive offense of federal programs bribery. The federal programs bribery statute makes it an offense for an agent of an organization that receives federal grants in excess of $10,000 to "corruptly solicit[] or demand[] for the benefit of any person, or accept[] or agree[] to accept, any thing of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B). However, both the Supreme Court and the First Circuit have emphasized that the exchange of money—even in connection with an official act— is not sufficient to prove criminal bribery under federal law. Instead, there must be "a quid pro quo—a specific intent to give or receive something of value in exchange for an official act." United States v. Fernandez, 722 F.3d 19 (1st Cir. 2013) (citing United States v. Sun–Diamond Growers of California, 526 U.S. 398, 404–05 (1999)).

41

Defendants argue that the Superseding Indictment must be dismissed because "for each of the applicants whose admission [Defendants] purportedly facilitated, the [Superseding Indictment] alleges either a corresponding payment made *after* the student's admission or else no corresponding payment at all." Heinel Mem. 19–20 [#332]. According to Defendants, "absent allegations concerning an agreement for a payment – or a payment – made in advance of and in exchange for [Defendants'] presentation to [the athletic subcommittee], the government has not adequately charged [Defendants] under section 666." However, Defendants' argument provides no support for their assertion that, in order for a payment to be a bribe, the payment must be made in "in advance of" Defendants' efforts to secure admission to the universities. Indeed, this contention runs afoul of binding precedent that the central inquiry is whether there has been an "intent to give or receive something of value *in exchange for* an official act." Fernandez, 722 F.3d at 22 (citing Sun–Diamond, 526 U.S. at 404–05). Here, the Superseding Indictment explicitly alleges such a quid pro quo and thus is not subject to dismissal for failing to allege an offense. SI ¶¶ 56, 63, 87, 113, 117 [#272].[11]

Finally, Defendants contend that the government has failed to allege a bribe where the alleged bribe money was paid into accounts that were owned by the universities. To the extent that the alleged bribes were paid *only* to university accounts, Defendants' argument would present a more difficult question. However, for both Ernst and Heinel, the government has included allegations of bribe payments paid to accounts not associated with the universities.

---

[11] To be clear, the timing of the payments may very well constitute evidence that the payments constituted a gratuity as opposed to a bribe. However, this is an argument to be presented to the jury to rebut the government's assertion of a quid pro quo; it does not go to the sufficiency of the pleadings.

Specifically, the Superseding Indictment alleges that Ernst received payments of more than $2,700,000 made directly to him, SI ¶¶ 86, 90–91, 98 [#272]; and that Heinel received payments of $20,000 per month made directly to her through a sham consultancy agreement, id. ¶ 60. Accordingly, without deciding whether payments made into accounts owned by the universities may constitute bribe payments to Defendants, the court concludes that the Superseding Indictment has sufficiently alleged the factual basis for the bribery allegations.

V.    CONCLUSION

Defendants' Motions to Join in their Co-Defendants' Arguments [#337], [#338], [#343], [#465] are granted but, for the foregoing reasons, Defendants' Motions to Dismiss the Superseding Indictment [#331], [#333] are DENIED.

The original Indictment [#1] is dismissed as moot as to these Defendants in light of the government's decision to obtain the Superseding Indictment [#272] instead of opposing Defendants' previously filed Motions to Dismiss [#262], [#264], [#267].

The parties shall confer and report to the court within two weeks whether: (1) there is any reason not to apply Defendants' motions, the parties' briefings, and this decision to the Second Superseding Indictment [#505]; and (2) there is any reason not to dismiss the Superseding Indictment [#272] as moot in light of the Second Superseding Indictment [#505].

IT IS SO ORDERED.

Date: November 23, 2020                                    /s/ Indira Talwani
                                                          United States District Judge

43