UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>Gordon Ernst,<br><br>Defendant. | Case No. 1:19-cr-10081-IT |

**DEFENDANT GORDON ERNST'S**
<u>**SENTENCING MEMORANDUM**</u>

*Let us see how high we can fly before the sun melts the wax in our wings"*

*E.O. Wilson*

Like Icarus, Gordon Ernst flew too close to the sun and forgot that his wings were made of wax. From very humble beginnings, through a series of coaching jobs where he was constantly struggling financially, he ended up at Georgetown University as the head coach of both the men's and women's tennis teams. It was apparent from the outset that Georgetown cared little about its tennis programs– it did not have separate coaches for the men's and women's teams as most other universities did, it spent little resources on the program (Mr. Ernst's starting salary was $55,000) and a few years after he started there, it tore up the tennis courts to make room for more resources for its renowned basketball team leaving the tennis teams to find court time at local high schools. Nonetheless, Gordon Ernst set out to make the teams as successful as possible, and in many ways, he succeeded. As letter after letter from former players and other coaches attest, Gordon Ernst was a great coach who truly cared about his players and who pushed them to be the best that they could be personally, professionally and athletically.

At Georgetown, Gordon Ernst found himself surrounded by people of wealth and privilege. Many of his players came from very wealthy families, some of whom would host Ernst and the tennis teams at their massive homes. Georgetown was always interested in the donor possibilities of applicants and their families, and the wealth of its students was quite apparent. Gordon Ernst even went to the White House to coach the Obama family. Quite heady for a kid from Cranston, Rhode Island whose family at times depended on public assistance.

In an atmosphere where Georgetown didn't seem to care about its tennis program and the parents didn't seem to care about the money they spent on their children, it was easy for Gordie to accept Rick Singer's offer of money in return for his use of admission slots for the tennis teams. Rationalizing to himself that it wouldn't hurt anyone or the teams, which continued to improve under his leadership, he accepted bribes from wealthy families who wanted to maximize their children's chances of admission to Georgetown. This allowed him to give his family many of the privileges that otherwise would have been out of his financial reach. He got carried away, got in deeper every year and, like Icarus, was destined to come crashing down.

And crash he did. Gordie lost his ability to do the thing he most loved – coach young students – and has become a pariah in the university community in which he used to thrive. He has brought disgrace on himself, which has rubbed off to his family. He has let down and caused harm to those he most cares about – his daughters and his former players.

Having been brought back down to earth, Gordon Ernst did not wallow in self-pity or let his life end. Rather, he accepted responsibility for his crimes, took low paying jobs to help contribute to his family financially, worked for charities to help others less fortunate and has committed to do everything he can to make amends to his family, his friends and his community. As he tells the Court in a letter attached as Exhibit A, he deeply regrets the choices that brought

him here and takes sole responsibility for his actions. He understands that a prison sentence is necessary given the gravity of his offenses but asks the Court to sentence him to a year and a day, which is no greater than necessary to effectuate the purposes of 18 U.S.C. §3553.

## ARGUMENT

The Sentencing Guidelines are advisory and are but one factor for this Court's consideration in imposing a sentence. *United States v. Booker*, 543 U.S. 220 (2005). The Supreme Court held in *Gall* that a district court should begin all sentencing proceedings by calculating the guideline range; and, after arguments by the parties, the "district judge should then consider all of the § 3553(a) factors to determine whether they support a sentence requested by a party" and in so doing, the district judge "may not presume that the Guidelines range is reasonable." *United States v. Gall*, 552 U.S. 38, 49-50 (2007). Instead, the Court must craft a sentence that is sufficient but no greater than necessary to achieve the goals of sentencing. 18 U.S.C. § 3553(a). Moreover, sentencing must be individualized and must comport with the principle that "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011). A sentence of one year and a day is appropriate under the circumstances of this case.

**I.    History and Characteristics of Gordie Ernst**

    **A.    Gordie's early years**

Gordie grew up in Rhode Island with his parents and two brothers. PSR ¶¶ 183-84. He has always been close to his mother, and has been consistently there for her to assist in whatever she needs. PSR ¶ 184. He was raised in the church and remains a devout Catholic to this day. Ex. B at 1, 54. His family struggled financially and at times had to rely on public assistance. PSR ¶ 186.

Gordie's relationship with his father, however, was difficult at best. His father was considered a local legend in Rhode Island sports. Ex. B at 10. He was a teacher and a coach with high expectations. PSR ¶ 187. Richard Ernst expected his sons to live up to his legacy. Gordie has described his father as demanding, strict, and intense. PSR ¶ 184. He beat Gordie with his hands and belts when his son did not live up to Richard's high academic and athletic standards. PSR ¶ 184. Gordie recalls "almost always being braced on the car rides home from a game or at night in bed when he would come into my bedroom wielding a belt or worse." Ex. A. His drive deprived Gordie of an ordinary upbringing; Gordie describes his childhood as "99% driven by sports." PSR ¶ 185.

Gordie lived up to the family legacy. He was a sports star in his youth in both hockey and tennis. He played semi-professional in both sports. PSR ¶ 185. Gordie was so successful at athletics that he described sports as his "identity," a notion he often struggled with. PSR ¶ 185. Even while he was praised for his own athletic prowess, Gordie "was and remains a humble man." Ex. B at 26. He also showed early promise as a coach and teacher to other athletes. Gordie's cousin describes watching the older kids playing tennis and hockey. Ex. B at 11. While they played, Gordie would always tell her "what was going on, always teaching, always involved and giving his knowledge to others." Ex. B at 11.

Although outwardly happy, internally Gordie struggled with his father's expectations, turning to his brother Andy for support and unconditional love. Andy, however, had his own demons. Andy began using drugs as a teenager. PSR ¶ 186. Their parents did not notice because Andy was still able to perform athletically. PSR ¶ 186. Gordie tried to help his brother both financially and emotionally but "felt powerless to lift him up from the dangerous path he was on." Ex. A. Andy died of an overdose of cocaine and methamphetamine on Thanksgiving

in 2014, at the age of 45, an event that was devastating to Gordie.  PSR ¶ 190.  While mourning his brother, Gordie also struggled with the knowledge that he too "was going down a slippery slope of accepting unlawful payments and abusing my position at Georgetown." Ex. A.  Gordie settled his debts, paid for his funeral and was steadfastly by his mother's side.

### B. Gordie's coaching career

Gordie's athletic prowess led him to coaching.  He coached at the University of Pennsylvania, the University or Rhode Island as well as at Georgetown.  Gordie is beloved by the athletes he coached and their families.  Many of them continue to support him even after learning of his actions that led to this conviction, as demonstrated by their letters included in Exhibit A.  He has been compared to a "second father" to his athletes.  Ex. B at 1.  He "focused on developing young men and women who would better the world they lived in, before making them a better tennis player." Ex. B at 25.  They describe him as "one of the few people who has truly helped change the course of my life," "humble, caring and honorable," "kind, caring, and deeply loyal to his players and family," a "mentor and a friend," an "unwavering mentor and friend," and "my forever family." Ex. B at 5, 19-20, 42.  He made an indelible impression on his students' futures.  Two from the Class of 2010 tell the Court, "[W]e lean more in our adult lives on the lessons we learned while playing tennis under Gordie than on any instruction we could have received in the classroom during our time at Georgetown." Ex. B at 32.  Another says, "I know I would not be where I am professionally without Gordie." Ex. B at 19.  He went above and beyond for his team.  He visited when they recovered from surgery.  Ex. B at 1.  He gave them second chances even when they made mistakes.  Ex. B at 40.  And he was a confidant off the tennis courts, with students going to him for advice on their personal problems, academic issues, and for help finding employment during college and after graduation.  Ex. B at 1, 40, 44, 54.  He has even officiated players' weddings.  Ex. B at 52, 54.

One example illustrates the impact Gordie has had on his student's lives. Yannik Mahlangu and his father Richman Mahlangu tell the Court that Gordie was instrumental in Yannik's success today. Richman escaped the Apartheid regime in South Africa by earning a tennis scholarship to attend the University of Nevada, Las Vegas. Ex. B at 35. He encouraged his sons to make their way in the world the same way, by working hard at school and on the tennis court. Ex. B at 35. When Yannik was applying to colleges his grades slipped and he was dropped from the recruiting lists at Brown and Cornell. Ex. B at 35. Richman called a number of coaches to find a place for his son. Ex. B at 35. It was Gordie who called him back and gave Yannik a chance. Ex. B at 35. Even then, when Gordie had to cut Yannik from the team after he tested positive for marijuana, Gordie stood by his side. Ex. B at 37. Yannik says Gordie "supported me, stayed in my corner, and was a big influence on me getting my act together after what was a big mistake." Ex. B at 37. Today Yannik credits Gordie with "set[ting] me up for incredible opportunities in life." Ex. B at 37. Without a scholarship "going to a school like Georgetown would have been out of the question financially." Ex. B at 37. Yannik is now a successful graduate with a career in wealth management. Ex. B at 37.

Gordie has the "magic" gift of bringing out the best in his athletes. Ex. B at 1. And those athletes took his lessons to heart both on and off the court. One tells the story of a tough match when Gordie told him, "If you hold back anything now, you'll never know how good you really are and you'll lose anyway. Worse yet, you'll never know how close you were to winning." Ex. B at 5. That student won that match and he still thinks about that lesson "nearly daily." Ex. B at 5. That same student tells the Court that Gordie taught him to "hold myself to a higher standard" and gave him "the most important lesson on integrity I've ever received." Ex. B at 5.

Gordie also made a favorable impression on his colleagues. His Assistant Coach during his first year at Georgetown, Professor Marc Howard, describes how Gordie worked "tirelessly" to coach his teams despite "extremely limited university resources." Ex. B at 27. Fellow Coach David Geatz, who recruited Gordie when he was seventeen, observed that he "helped bring out the best in myself and his players, whether it is tennis, life, or work." Ex. B at 23. Coach Chuck Kriese, who also tried recruit him as an athlete, has been impressed with Gordie as a coach. Coach Kriese tells the Court that, "[Gordie's] example of hard work and dedication to the coaching profession have been outstanding." Ex. B at 31. Brian Boland, the former men's tennis coach at the University of Virginia, describes Gordie as "professional, objective, complimentary, trustworthy, straight-forward and humorous." Ex. B at 8. Coach Boland was impressed that Gordie's athletes "competed with class" and "were respectful and showed gratitude" during competitions. Ex. B at 8. Another colleague at the University of Pennsylvania says it was "very difficult" for the university to fill Gordie's shoes when he left. Ex. B at 15.

C.   **Gordie's relationship with his wife and children**

Gordie's family life has centered on tennis even as an adult. Gordie met his wife of nearly 30 years at a tournament at her father's tennis club. PSR ¶ 191. They have two teenage daughters who both took up the family sports, hockey and tennis. PSR ¶¶ 193-94. Gordie has been described as "devoted to his wife and two daughters." Ex. B at 1. It pains him to know he has caused them needless pain. In addition to providing "indispensable support to his mother," Goride is a "highly engaged parent to his daughters." Ex. B at 13.

Gordie has also served as a father figure to others. Caren Corso, a longtime friend, tells the Court that Gordie is the godfather to her eldest daughter. Ex. B at 14. When Ms. Corso went through a divorce, Gordie "stepped up to his role as Godfather, providing my daughter with a

much-needed father figure during that painful period and has remained present in her life from there on in." Ex. B at 14.

What is more, Gordie is a compassionate friend, reaching out to others facing their own problems even when he was facing one of the darkest periods in his life. Ex. B at 39, 50. To give one example, Vincenza Senatore Pratt says that Gordie reached out to give a job and a room to her daughter during a particularly challenging summer, when Ms. Pratt's husband left her unexpectedly and she was in the process of donating bone marrow for her ill brother. Ex. B at 43. Gordie's assistance "made a world of different to us." Ex. B at 43.

### D. The consequences of Gordie's offense

Gordie's actions have marked the end of his beloved university tennis coaching career, due not only to the nature of his offenses but the substantial media attention they have garnered. Gordie has been identified in major publications as one of the leading defendants in this case. Reporters camped out in his yard. One father of one of Gordie's athletes describes him as "ostracized and humiliated." Ex. B at 3. Gordie has subsequently managed to cobble together part-time work as a tennis instructor, a hockey referee, and a car cleaner/deliverer, but his university coaching days are over. PSR ¶¶ 212, 214-15, Ex. B at 16. A family friend who has known Gordie for over 40 years reports that he has "suffered great humiliation and remorse." Ex. B at 10. He has lost his "reputation, good name and career." Ex. B at 18.

Gordie has made a point of giving back to the community since his arrest in an attempt to repay the community. Having little to no financial resources, he instead has given of his time. At the beginning of the pandemic when masks were in short supply, he made masks with his mother and delivered them to first responders. He has volunteered for a vaccination clinic in Barnstable County. PSR ¶ 213, Ex. B at 6. He has worked for Catholic Charities in Washington,

DC handing out food to those in need. PSR ¶ 213, Ex. B at 33, 48. He has also volunteered to teach tennis to underprivileged kids in his native Rhode Island. PSR ¶ 213, Ex. B at 7.

Gordie's family has suffered intensely as a result of his actions. As his mother-in-law describes it, the "'sentence' for the family began when Gordie was indicted in March of 2019." Ex. B at 46, PSR ¶ 191. The family moved out of their home to avoid reporters camped outside. Ex. B at 46. He lived apart from his family for some time because of the trauma he caused his daughters but has since been reunited with them. PSR ¶ 191. Gordie's arrest has been particularly difficult for his daughters, whose lives have changed emotionally and financially. PSR ¶ 195. They have "been ostracized by former neighbors, have become extremely introverted, and have difficulty adjusting to the new situation." Ex. B at 47. His oldest daughter was very angry and barely spoke to him for some time, although their relationship has improved. PSR ¶ 195. As a friend reports, Gordie has "worked really hard the last few years to be a better person and to feel deserving of [his family's] love." Ex. B at 22. Gordie deeply regrets the impact of his actions on his wife and children. PSR ¶ 195.

Gordie's other family members have also been deeply affected by his actions. Gordie's relationship with his older brother Robert has always been competitive. PSR ¶ 186. Since his arrest that relationship has been even more distant. PSR ¶ 189.

Gordie's mental health has also suffered as a result of his arrest. He had suffered from periodic depression in the past, especially when his brother died. PSR ¶ 204. He also had suicidal thoughts when he was forced to leave a high school he loved to attend one where his father coached. PSR ¶ 204. Depression reared its head again after his arrest, with Gordie suffering from depression, anxiety, self-loathing, a racing heart, and sleep disturbances for

months.  PSR ¶ 205.  He was in therapy for a period after his arrest and also relied on the support of his priest.  PSR ¶ 205.

## II.     Nature of the Offense

Gordie has pled guilty to conspiracy to commit federal programs bribery, federal programs bribery, and filing a false tax return.  He acknowledges that he received money in exchange for giving admissions spots allotted to the Georgetown tennis team to students who were not otherwise qualified for those slots.  He did so both for clients of Rick Singer and for others who did not work with Mr. Singer.  Gordie also admits that he failed to report the money he received from non-Singer affiliated families as income on his tax returns.[1]

When Gordie was offered money in exchange for admissions slots, he did not think it would hurt anyone for him to accept.  He was surrounded by wealthy parents who were willing to pay for his assistance.  As a fellow coach tells the Court, parents do sometimes offer money to secure a spot on an admissions list and those offers are tempting.  Ex. B at 15.  As Gordie instituted a policy of requiring everyone to try out for the tennis teams, including recruited athletes, he insured that the quality of his teams would remain intact.

Gordie deeply regrets his actions and knows that they were wrong.  He offers no excuses, only sincere apologies.  As his longtime friend Maureen Gately tells the Court, "the experience of the last few years has crushed [Gordie's] soul."  Ex. B at 21.  Another friend has observed that Gordie is "contrite, remorseful, and has suffered greatly with mental and family anguish."  Ex. B at 32.  Coach Boland says he has spoken to Gordie since the indictment and it is "clear" that Gordie "takes full responsibility for his decisions and he intend to use his remaining time on this earth using his experience as an opportunity to serve others."  Ex. B at 9.  Coach Boland goes on

---

[1] Unlike other coaches and administrators in this case, Gordon Ernst did report and pay taxes on the money he received from Rick Singer.

to tell that Court, "If anyone can do this in the most impactful way I would put Gordie at the top of the list." Ex. B at 9. Another longtime friend says, "Gordie has openly acknowledged and taken responsibility for his egregious errors in judgment and misdeeds with friends, colleagues, students, media and the court." Ex. B at 18.

### III.     Sentencing Guidelines

Mr. Ernst agrees with Probation's calculation of a total offense level of 29 based on the offenses with which he was charged. With a criminal history category of I, that offense level yields a recommended guidelines sentencing range of 87 to 108 months. PSR ¶¶ 178, 232. As this Court is well aware, the same conduct could be charged in different ways and the charging decisions generally drive the guidelines. Although the Court must calculate the guidelines range according to the offenses charged, the guidelines in this case greatly overstate the appropriate sentence here. Indeed, this Court has consistently given others in this case, both coaches and parents alike, below guideline sentences.

Mr. Ernst recognizes that he received more in bribes than his fellow coach co-defendants and that his sentence will be higher. However, the amount of the bribes does not warrant a substantially higher sentence than others received as the "loss" is but one factor. Here, the substantial increase in Mr. Ernst's guidelines range over similarly situated co-defendants overstates Mr. Ernst's relative culpability.

The amount of loss has been increasingly criticized as a one-dimensional measure of a defendant's culpability. *See* U.S.S.G. § 2B1.1 background ("loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline"). "[T]he data suggest that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases." *See United*

*States v. Musgrave*, 647 F. App'x 529, 538-39 (6th Cir. 2016) (quoting Mark H. Allenbaugh, "Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data, 26 Fed. Sent'g Rep. 19, 19 (2013)).  "The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense."  *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006).  By focusing on a single factor in most financial crimes, "the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, and, by contrast, effectively guaranteed that many such sentences would be irrational on their face."  *Gupta*, 904 F. Supp. 2d at 351 (internal citation omitted).

The guidelines here greatly overstate Mr. Ernst's relative culpability in comparison to other coaches who have pled guilty.  The nature of Mr. Ernst's conduct is similar in kind to the conduct of other coaching defendants in this case, although he admittedly made more money on the scheme.  The amount of bribes has not been a significant factor in the Court's sentencing decisions in this case to date.  As this Court observed at Mr. Salcedo's sentencing in addressing whether the government's charging decisions should impact the sentences imposed, "[W]hen you are talking about the crimes committed by the coaches, they all engaged in . . . the same offense, essentially, whether there was a little bit more money or a little bit less money, more people, fewer people, et cetera.  It was basically the same crime."  Docket No. 686, 3/19/21 Tr. at 22.

**IV.    Need for the Sentence Imposed**

A sentence of more than one year and a day would be greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a).  That sentence represents a significant period of incarceration that reflects the seriousness of Gordie's offense.  Any sentence of incarceration, as

this Court recognized in sentencing Felicity Huffman to a fourteen day sentence, is a serious punishment.  As Judge Stearns has previously observed, "it is very difficult . . . to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime.  I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when call to account."  *See United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012).

In addition to a prison sentence, Gordie will suffer crippling financial penalties.  He has agreed with the government that $3,435,053.78 is subject to forfeiture.  Gordie also agreed as part of his plea agreement to file corrected tax returns and to otherwise cooperate with the IRS to identify and pay any income tax he owes, including any penalties or interest that apply.

Gordie's court sentence is in addition to the significant punishment Gordie has already received, both personally and professionally.  Personally, this case has had a significant impact on Gordie's family.  His marriage has suffered, and his children have been embarrassed by their father's conduct and angry learning their father is not the person they saw him as.  Gordie is deeply ashamed that he has put his family through this ordeal.

Gordie's reputation has been forever tarnished.  All of the college admissions defendants have been subjected to news coverage to some degree, but the media has been especially interested in Gordie's case.  Reporters camped out at his home.  When defendants appeared at the courthouse to be arraigned, it was Gordie's photograph that appeared in the New York Times.  *See* "12 People, Including 6 Coaches, Plead Not Guilty in College Admissions Scandal," N.Y. Times, Mar. 25, 2019, available at https://tinyurl.com/2jwkd96a (last visited Jun. 22, 2022).  Gordie has fallen from the White House to the tabloids – a fall from grace far longer than the Court sees in a typical case.

In terms of specific deterrence, Gordie has learned his lesson.  He has taken responsibility for his actions and has worked to turn his life around.  Since his arrest, Gordie has focused on repairing his relationships with his family and volunteering in his community.  He will never make the mistake of putting money above his integrity again.

A sentence of a year and a day is likewise sufficient for general deterrence in this case. "There is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514 (collecting studies).[2]  The government has made its point with these cases.  There is no one involved in university athletics or admissions who has any doubt that accepting bribes for admissions slots is a serious crime and will be prosecuted.

## V.     Need to Avoid Unwarranted Sentencing Disparities

Gordie recognizes that it is appropriate that he receive a higher sentence than other coaches who have pleaded guilty because he took a greater amount in bribes, and from a number of parents.  Even so, a sentence of more than one year and a day would impose an unwarranted sentencing disparity.  The nature of Gordie's conduct is the same as the other coaches who accepted bribes in exchange for admissions slots.  And unlike others, including Martin Fox, Gordie had no involvement in the college testing scheme.

A one year and a day period of incarceration is greater than any sentence imposed on the college admissions defendants who have pleaded guilty.  Of the coaches who have been sentenced to date, Jorge Salcedo conduct is the most comparable to Gordie's offense.  Mr.

---

[2] Studies have consistently shown that in white collar cases the certainty of punishment has a greater deterrent effect than the length of sentences.  *See* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 447-49 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity. . . . [T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); *see also* Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects.").

Salcedo accepted bribes to facilitate multiple students' admission to UCLA. *See* Docket No. 662 at 1-3. He also engaged in a scheme unrelated to Rick Singer to secure student admissions to USC. *See id.* at 3-4. And, like Mr. Ernst, Mr. Salcedo filed a false tax return. *See id.* at 4. The Court sentenced Mr. Salcedo to eight months' incarceration.

The other coaches who have been sentenced have all received substantially lower sentences. Martin Fox, who was also involved in the college testing scheme, was sentenced to three months' imprisonment. Michael Center received a sentence of six months. John Vandemoer was sentenced to time served. And the charges against William Ferguson will be dismissed if he complies with the terms of a deferred prosecution agreement. In addition to agreeing to designate recruits for the Wake Forest women's volleyball team that he coached in exchange for donations, Mr. Ferguson also worked to recruit multiple coaches at other schools to participate in the donation scheme. *See* Docket No. 808 at Ex. 1.

The conduct of the coaches and the parents in these cases are not necessarily the same. But it is worth noting that many of the parents who bribed Gordie have not been charged in this case and will not be punished. PSR ¶¶ 54, 59, 68, 72, 82, 95, 104, 125. All other parents who pleaded guilty in this case have received sentences of less than a year in prison.

The only defendants who have been sentenced to the same or more time than Mr. Ernst proposes are the two parents who were convicted at trial. Gamal Abdelaziz was sentenced to serve a year and a day and John Wilson received a fifteen months sentence. Neither took responsibility for their actions, unlike Mr. Ernst.

**VI.   Restitution**

The parties agree that the Court should not order restitution in this case. As an initial matter, the only pecuniary loss in this case was caused by Gordie's failure to report some of his income on his 2017 tax return in violation of 26 U.S.C. § 7206(1). The Court may order

restitution for a Title 26 offense as a condition of supervised release under 18 U.S.C. § 3583(d) and 18 U.S.C. § 3563(b)(2).[3]  *See* PSR ¶ 248, *United States v. Batson*, 608 F.3d 630, 636 (9th Cir. 2010).  The Court should exercise its discretion to decline to award restitution here.  The government is requesting only a special condition of supervised release requiring Gordie to amend his tax returns and to make a good faith effort to pay any taxes owed, as set forth in paragraph 4 of his plea agreement.  The proposed special condition is sufficient in lieu of an order of restitution for a sum certain.

Even if the MVRA applied, the Court should nevertheless decline to order restitution.  Under that statute restitution is not required in property cases where the Court finds that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3)(B).  The only actual loss caused by Mr. Ernst's offense is taxes he failed to pay to the government as a result of underreporting his income.  In lieu of restitution, the plea agreement requires Mr. Ernst to amend his tax returns and to cooperate with the IRS to make a good faith effort to pay those taxes, plus any applicable interests and penalties.

The actual tax loss calculation in this case is complex.  To obtain an accurate assessment the Court would have to consider the impact of amending his tax returns going back a number of years.  Here that exercise is more complicated than in a typical tax case because Mr. Ernst did report the bulk of his illegitimate income.  Any income that was a proceed of Mr. Ernst's offense vested in the government at the time of the offense.  *See United States v. Catala*, 870 F.3d 6, 10

---

[3] Neither the Victim and Witness Protection Act nor the Mandatory Victims Restitution Act applies to convictions under Title 26.  *See* 18 U.S.C. § 3663(a)(1) (applying to certain offenses under Titles 18, 21, and 49); 18 U.S.C. § 3663A(c)(1) (applying to "an offense against property under" Title 18); *see also Batson*, 608 F.3d at 633.

(1st Cir. 2017); 21 U.S.C. § 853(c); 18 U.S.C. § 982(b)(1). Those amounts were not Mr. Ernst's property in the first place and thus should not be taxable to him. That is to say, Mr. Ernst has already paid some taxes he did not owe. Even if the Court were to calculate the taxes owed on Mr. Ernst's illegitimate income, that sum would not be equal to the amount of restitution loss. But the Court need not address these issues and may instead defer to the IRS to determine the amount of taxes Mr. Ernst owes.

Finally, even if the Court were to order restitution, it should not award the $145,067 recommended by Probation. That amount represents the intended tax loss (prior to forfeiture) associated with the income he did not report in 2016, 2017, and 2018. However, the offense of conviction relates only to the $110,000 Mr. Ernst failed to report in the 2017 tax year. *See* Docket No. 505, Second Superseding Indictment at ¶ 161 (Count Twenty-One). Restitution is limited to the offense of conviction where the offense does not involve an element of a scheme, conspiracy, or pattern of criminal activity. That is true whether the Court analyzes restitution under the VWPA, the MVRA, or under 18 U.S.C. § 3583(d). *See Hughey v. United States*, 411, 413 (1990) (VWPA); *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002) (MVRA); *Batson*, 608 F.3d at 636-37 (condition of supervised release). The government estimates the tax loss on that income was $30,800 (that is, 28% of the unreported income in 2017). Accordingly, if the Court were to award restitution, the amount should be – at most – $30,800.

## CONCLUSION

For the foregoing reasons, Gordon Ernst respectfully submits that a sentence of one year and a day is sufficient but no greater than necessary to effectuate the purposes of 18 U.S.C. § 3553(a).

        Gordon Ernst,
        By his attorneys,

        /s/ Tracy A. Miner
        Tracy A. Miner, BBO No. 547137
        Megan A. Siddall, BBO No. 568979
        Miner Siddall LLP
        101 Federal Street, Suite 650
        Boston, MA 02110
        Telephone: (617) 202-5890
        Fax:  (617) 202-5893
        Email: tminer@msdefenders.com
        Email: msiddall@msdefenders.com

Dated:  June 24, 2022

- 19 -

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served by ECF on counsel for all parties on June 24, 2022.

/s/ Megan A. Siddall
Megan A. Siddall